FILED

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS 2: 20

STATE OF LOUISIANA

CASE NO. 19 - 4752   DIVISION ___   NUMBER ___

DENISE BADGEROW

SECTION 13

v.

GREG WALTERS, THOMAS MEYER, AND RAY TROSCLAIR

## ACTION TO VACATE ARBITRATION AWARD

NOW INTO COURT, through undersigned counsel, comes plaintiff, Denise Badgerow, who petitions this court to vacate a final Financial Industries Regulation Authority (FINRA) arbitration award issued on December 28, 2018 dismissing claims of Plaintiff with prejudice against Defendants, on the grounds that such award was procured by means of fraud and undue means, a fact discovered by Plaintiff on April 8, 2019, all as more fully explained in the attached Memorandum in Support. Plaintiff does not seek to vacate the Award to the extent such FINRA Award dismisses Ameriprise Financial Services, Inc. and Ameriprise is not made a party hereto.

## PARTIES

1.       Plaintiff, **DENISE BADGEROW** is an individual domiciled in the Parish of Lafourche, Louisiana.

2.       Defendant **THOMAS MEYER** is domiciled in the Parish of Lafourche, Louisiana.

3.       Defendant **RAY TROSCLAIR** is domiciled in the Parish of Ascension, Louisiana.

4.       Defendant **GREG WALTERS** is domiciled in the Parish of Lafourche, Louisiana.

## JURISDICTION AND VENUE

Jurisdiction and venue proper are in this Court pursuant to La. Civ. Proc. Code Art. 2 and La. R.S. § 9:4210 because the FINRA arbitration occurred in Orleans Parish and the FINRA Award was made in Orleans Parish.

**WHEREFORE**, plaintiff, Denise Badgerow, moves this court for an order vacating the FINRA arbitration award, and for any and all other just and equitable relief that this Court deems appropriate, all as more fully briefed in the Plaintiff's attached Memorandum of Law in Support of her Action to Vacate.

ENTERED RULE DOCKET/COMPUTER _____

SERVICE COPIES TO SHERIFF _____

CARD WITH RULE DATE MAILED _____

COPY OF DOCUMENT MAILED _____

RULE DATE RECEIVED _____

Respectfully Submitted:

BUSINESS LAW GROUP, LLC

By: _____

EXHIBIT
A

Amanda J. Butler (T.A.)
LSBA # 31644
abutler@lawgroup.biz

Stephanie Dovalina
LSBA No. 31137
sdovalina@lawgroup.biz

700 Camp St., Ste. 405
New Orleans, LA 70130
Telephone: (504) 528-9500
Facsimile: (504) 754-7776

Service shall be effectuated through private process service in accordance with the Motion filed:

**Gregory Walters**
132 Rue Colette
Thibodaux, LA 70301

**Thomas Meyer**
132 Rue Colette
Thibodaux, LA 70301

**Ray Trosclair**
37283 Swamp Rd, Ste 1202
Prairieville, LA 70769

FILED

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA** MAY -6 PM 2:21

CASE NO. _____        DIVISION _____ CIVIL NUMBER___

DENISE BADGEROW, DISTRICT COURT

v.

**GREG WALTERS, THOMAS MEYER, RAY TROSCLAIR,**

**MEMORANDUM OF LAW**

Petitioner Denise Badgerow hereby moves this Court to vacate an arbitration award on the basis of fraud. *See* LA Rev Stat § 9:4210. Badgerow was employed as an Associate Financial Advisor by a franchise of Ameriprise Financial Services ("Ameriprise"). Badgerow was fired after she disclosed to her employer and then to her compliance officer that the franchise had been violating securities laws. In the arbitration of Petitioner's Whistleblower and related claims, the individual defendants argued repeatedly that Petitioner had not disclosed a violation of law but had merely disclosed something that was a failure by defendants to meet optional "best practices" in the securities industry or, at most, a failure to comply with Ameriprise "policy." Defendants claimed that they were completely ignorant of what he referred to as "best practices" until after an Ameriprise Compliance Officer informed him of Petitioner's disclosure on July 26, 2016.[1]  It is indisputable that Defendants fired Badgerow the day after the Compliance Officer informed them of her disclosure to the Compliance Officer.

While arguing their successful motion to dismiss the arbitration, defendants and their counsel asserted over a dozen that the conduct at issue did not constitute a violation of law. In response to a subpoena issued in Petitioner's current federal employment discrimination lawsuit, a third party recently produced copies of two proposals that were sent to the franchise in 2014 and 2015. The proposals clearly state that SEC regulations *prohibit* the conduct at issue. See **Exhibit I** and **Exhibit J** ("*Ameriprise policies, in addition to FINRA/SEC regulations, prohibit the payment of securities based compensation to selling employees or AFAs via a non-registered legal entity.*").  Thus, contrary to witness and defense counsel statements, these documents conclusively prove not only that the conduct at issue was a violation of law, and that the individual defendants were aware that the conduct was a violation of law at least a year before Badgerow was terminated.

---
[1] See **Exhibit A**, August 28, 2018 FINRA Transcript at pg 19-23.

3

Defendants successfully concealed their knowledge that their conduct violated the pertinent regulations, and they engaged in a persistent pattern of litigation fraud that undermined the validity of the arbitration. Even though Petitioner's motion to vacate has been served on defendants' counsel more than three months after the arbitration award was issued, the production of documents beyond the three-month time period that reveal the fraudulent concealment fully justifies Petitioner's current motion. Petitioner asks this Court to find that the three-month time period under LA Rev Stat § 9:4213 was equitably tolled due to defendants' persistent fraudulent representations during the arbitration.

## II. FACTUAL BACKGROUND

### A. The Franchise Violated Two Key Legal Restrictions in their Employment of Badgerow as an Assistant Financial Advisor

Badgerow was hired in 2014 as an Associate Financial Advisor ("AFA") by Walters, Meyer, Trosclair & Associates ("WMT"), a franchise of Ameriprise, comprised of three Financial Advisors – Walters, Meyer, and Trosclair. The three financial advisors received Gross Dealer Concession ("GDC") from Ameriprise, and then paid their AFAs a percentage of their GDC, Badgerow is a licensed AFA and she was compensated, in part, through payment of a portion of GDC, which is the revenue a brokerage firm earns when its registered representatives sell securities and other investment products. In addition, although there was an oral agreement regarding what Badgerow would be paid for her brokerage transactions, the franchise never provided Badgerow with a written compensation agreement.

When the three franchise members were paid GDC from Ameriprise, they then paid Badgerow her securities-based compensation by depositing money into the account of an affiliated corporation called REJ Properties, Inc. ("REJ"). REJ would then issue Badgerow her paychecks. REJ is not an entity that is licensed with the SEC.

The securities industry is heavily regulated and the regulations that govern the conduct of licensed members serve to protect investing consumers. The two regulations at issue in Petitioner's Whistleblower claim are specifically designed to protect customers from the manipulation of commissions and to avoid conflicts of interest in the sale of securities.

### 1. The SEC Requires that AFAs Work Pursuant to a Written Compensation Schedule or Agreement.

4

The first regulation at issue in Badgerow's Whistleblower claim is an SEC "Books and Records" requirement that provides that broker-dealers

shall make and keep current the following books and records relating to its business . . .

***

(19) A record

***

>    (ii) Of all agreements pertaining to the relationship between each associated person and the member, broker or dealer including a summary of each associated person's compensation arrangement or plan with the member, broker or dealer, including commission and concession schedules and, to the extent that compensation is based on factors other than remuneration per trade, the method by which the compensation is determined.

17 CFR § 240.17a-3.  Thus, AFAs can only be employed pursuant to a written compensation agreement that provides how the AFA is to be paid any commissions on sales.  Under the Books and Records regulations, the required documents are kept by brokers and are to be made available for inspection by representatives of the SEC.  *See* § 17(a) of the 1934 Act, and Rules 17a-3(a), 17 C.F.R. §§ 240.17a-3(a).  A failure to maintain the required books and records can result in SEC sanctions, such as disbarment and fines.  *See, e.g.*, *Geman v. SEC*, 334 F.2d 1183 (10th Cir. 2003) (upholding SEC sanctions for conduct, including aiding and abetting the violations of SEC recordkeeping regulation; sanctions including disbarment for three years and $200,000 fine); *Sinclair v. SEC*, 444 F.2d 399 (2d Cir. 1971) (affirming SEC's permanent disbarment for willfully violating and aiding and abetting violations of the anti-fraud provisions of § 17(a) of the Securities Act of 1933, including duty to maintain records of actual executing brokers pursuant to Rule 17a-3(a) (6)).

Although the franchise maintained written compensation agreements for other AFAs, it failed to maintain any written commission schedule or written compensation agreement for Badgerow.  *See* **Exhibit B**, CIR at pg. 2 (one franchise member apparently disagreed with the amount of the commission percentage that Walters wanted to pay Badgerow, and as a consequence, the franchise failed to document how Badgerow would be paid her commissions).

>    **2.  The SEC Requires that GDC Compensation Only Be Paid to Registered Entities, Unless there is a Recognized Exception to the Rule.**

The SEC mandates that broker-dealers supervise the securities activity of their personnel, and payment of securities-based compensation through an unregistered entity undermines that requirement.  The SEC prohibits routing commissions through an unregistered entity such as REJ

and NASD (predecessor to FINRA[2]), specifically adopted a rule that encompasses that prohibition. "Both the Securities and Exchange Commission ("SEC") and the Financial Industry Regulation Authority ("FINRA") have asserted that it is unlawful for registered representatives (like Plaintiff Schatski) to share securities-related commission with non-registered companies..." *Schatzki v. Weiser Capital Management, LLC*, No. 10 Civ. 4685 (S.D.N.Y. November 9, 2016).

FINRA Rule 2040 provides: "No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to . . . any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act." FINRA Rule 2040.

The prohibition encompassed by Rule 2040 is enforced by the SEC, and the SEC has always interpreted it as a prohibition against the payment of securities-based compensation through the use of an unregistered entity such as REJ. "*We note that the Division has previously declined to grant no-action relief to the practice of routing commissions or other transaction-related compensation from a broker-dealer directly or indirectly to an unregistered entity for the benefit of the broker-dealer's registered representatives.*" See Exhibit C, Wolf Juall Investments SEC No Action Letter dated May 17, 2005. The SEC described the purpose of prohibiting licensed individuals from routing commission payments through affiliated, unlicensed entities:

> This [prohibition] is because the ability to control the compensation of registered representatives is a key mechanism by which registered broker-dealers exercise supervisory control over sales practices. Compensation schedules can create significant incentives that could undermine a firm's supervisory systems and thus investor protection. Therefore, in order to maintain adequate supervision by registered broker-dealers, registered broker-dealers, not unregistered entities, should determine compensation to natural persons associated with a registered broker-dealer. Accordingly, while there is an exemption from registration for natural persons associated with a registered broker-dealer, that exemption is not available to Wolf Juall Investments. The Division has also previously indicated that the receipt of transaction-related compensation is a key factor in determining whether a person or entity is acting as a broker-dealer, and that absent an exemption, an entity that receives commission or other transaction-related compensation in connection with securities-based activities that fall within the definition of "broker" or "dealer" contained in Sections 3(a)(4) and 3(a)(5), respectively, of the Exchange Act generally is required to register as broker-dealer under Section 15 of the Exchange Act.

---

[2] "FINRA" stands for the Financial Industry Regulatory Authority.

*Id.* (footnotes omitted).[3] Thus, the only way in which payments to Badgerow through REJ would be legal would be if REJ were registered as a broker-dealer. Any registered person who routes such commissions through unlicensed entities could face an enforcement action by the SEC.

The one potentially applicable exception to the prohibition against the types of payments to AFAs at issue here is where registered broker-dealers utilize a third-party payroll processing company to pay commissions to registered persons. *See* **Exhibit D**, ADP TotalSource, Inc. No-Action Letter dated December 4, 2007; *See also, e.g.,* Century Business No Action letter at pg.1 (describing exception where "the broker-dealer employer hires and supervises all aspects of the employees' work and *merely utilizes a payroll and benefits administrator as a means to centralize personnel services*") (emphasis added)[4]. REJ is not an independent payroll agency. One such independent payroll vendor is EmployShare, which was approved for use by Ameriprise and which Walters, Meyer, and Trosclair used to pay most of their AFAs during the period Badgerow was working for the franchise. Apparently, the only reason that the franchise failed to pay Badgerow her GDC-based compensation through EmployShare was because the franchise did not want to pay the additional cost of placing Badgerow on the franchise's EmployShare payroll package.

### B. Badgerow was Terminated the Day After Defendants Learned that Badgerow had Reported the Violations to Ameriprise's Compliance Officer.

On July 13, 2016, Badgerow had her Annual Compliance Interview with Ameriprise's Compliance Officer, Marc Cohen, via telephone. In her annual compliance interview, Badgerow informed Cohen that payments to her through an unregistered entity (i.e., REJ) were out of compliance and that she similarly had no written compensation agreement. Badgerow's disclosure of her compliance concerns in her Annual Compliance Interview were documented in a Compliance Inspection Review ("CIR") report.[5] Cohen asked Badgerow to send him a copy of her

---

[3] In another no action letter, the SEC further explained the prohibition against payments of commissions through unregistered entities: "*Persons who receive transaction-based compensation generally have to register as broker-dealers under the Exchange Act because, among other reasons, registration helps to ensure that persons with a "salesman's stake" in a securities transaction operate in a manner consistent with customer protection standards governing broker-dealers and their associated persons.*"
1st Global No Action letter.
[4] *See* https://www.sec.gov/divisions/marketreg/mr-noaction/cbiz030102.htm
[5] In the CIR (attached as **Exhibit B**), Mr. Cohen described what Ms. Badgerow said as follows: "*I told her the only things I handle are compliance issues. She talked about that she gets a salary plus commissions and said it works like a draw. I told her I will see about her being on a 3rd party vendor. She said she has been paid like this since Oct 2014. She is a W2 employee and has been a W2 all the time. She was lined up to be on Paychex, since it is the rule. She said Greg's partner refused to sign it right before she left. She said her attestation is wrong on how she is paid and wants to get the compensation done properly done since she learned that it must go through Paychex. I told her I would look into the concerns that she was being paid GDC and not through one of the approved vendors.*" CIR at 2-3

7

paystub to verify that she was, in fact, being paid by an unregistered entity. Badgerow then sent Cohen her paystub.

On July 26, 2016, Cohen telephoned Greg Walters and Tommy Meyer separately, and explained the two compliance issues that had been raised by Badgerow. Regarding the failure to have a written compensation agreement, Cohen stated in his CIR: "*I asked Greg Walter if he had a contract for Denise and he answered no*." **Exhibit B**, CIR at 2. Cohen similarly discussed the lack of a written compensation agreement with Meyer, a fact that Meyer confirmed: "*When I spoke with Tommy [Meyer] he told me he would not sign the new [Badgerow compensation] agreement because he did not agree with the payout raise that Greg was recommending for Denise.*" *Id.* at 2.

Cohen also recounted his July 26, 2016 discussion with Walters regarding the franchise's payment of AFA compensation through REJ, an unregistered entity:

> When I spoke with Greg on 7.26.16 he thought the issues Denise had were just related to Tommy, but I shared with him some concerns about him and how she has been paid in the past 9 months and not through employee share [sic]. She said that there were several advisors not being paid properly. I shared this with Greg. I told him that they needed to fix the compensation arrangement and run it through employee share [sic] for all advisors being paid GDC.

*Id.* Cohen noted that in his phone conference with Meyer, "*Tommy also said he would fix the payroll issue immediately if any AFA's were not going through the approved system.*"

Cohen informed Walters in his July 26, 2016 conversation that, although there were other employment-related issues that Badgerow had described, "*the only thing I get involved with is compliance related matters which was the GDC payout.*" *Id.* Cohen noted: "*I did not mention to either of them consequence at this time. I was planning on doing it at the end of the week.*" *Id.*

The day after his telephone conference with Cohen, Walters asked to meet with Badgerow. Badgerow testified to the meeting at the arbitration: "*Greg asked me . . . if I had spoken with Marc Cohen and why would I tell him anything that would ding his perfect compliance record.*" See **Exhibit E**, August 27 Transcript at 142.  Walters then immediately fired Badgerow.

On August 3, 2016, one week after Badgerow was fired, Cohen sent a Letter of Deficiency to Walters.

> You are being issued this Letter of Deficiency for failure to follow Ameriprise Financial Services, Inc. company policy. Please be aware that any further violations

may result in more serious consequences per the Consequence Management process.

Ameriprise Financial expects all people in our organization to adhere to the policies and procedures instituted to protect the company, our clients and our registered representatives.

Specifically, you failed to compensate your AFA using one of the Ameriprise Financial approved vendors.

Please reference the current **Compliance Manual section 4.4 Hiring and Maintenance AFAs** which states:

> "If you pay the AFA a percentage of total GDC, the compensation will be paid to you first by Ameriprise and then be paid by you to the AFA through an Ameriprise Financial approved vendor."

Please read the entire section **4.4 in the Compliance Manual.**[6]

### C. <u>Throughout the Arbitration, Defendants Denied the Existence of the Rules and Denied Any Knowledge of the Rules.</u>

As mentioned previously, the very existence of "law" and defendants' knowledge of applicable "law" became the central focus of the arbitration. This was not a mere disagreement between the parties regarding how to interpret the evidence. The arbitration included respondents' systematic portrayal of "law" as fiction and their knowledge of any problems with the conduct at issue as non-existent. Defendants' story was as follows: They knew nothing about the conduct until the day before they fired Badgerow and, once the Ameriprise Compliance Officer informed them that Badgerow had complained about the conduct, they swiftly corrected the conduct. They portrayed the conduct at issue in Plaintiff's Whistleblower Claim as merely a violation of Ameriprise's policies or a failure to meet "best practices."

### 1. <u>Testimony of Witnesses</u>

During the arbitration, Meyer testified that he was unaware that AFAs are required (by law) to have written compensation agreements.

> Q. Did you know that all associate financial advisors are required to have a written Compensation Agreement?
> A. No.
>
> Q. Did Ameriprise require employees to be put on Paychex or EmployShare?
> A. Associate financial advisors that generated commissions, I have since found out that we are required -- not necessarily required, but urged to have a third-party administrator.

---

[6] See **Exhibit F**, August 3, 2016 Letter of Deficiency, Marc Cohen to Gregory Walters (emphasis in original).

See **Exhibit A**, August 28, 2018 FINRA Transcript at 19. Meyer likewise testified that he did not believe there was any actual requirement to use a third-party administrator to pay AFAs instead of using the non-registered entity REJ to make payments.

> Q. I'm just trying to get to what you are really saying here. You are saying you have since decided to pay in this manner, but prior to this, your understanding is that the way you were paying AFAs was appropriate?
>
> A. I would say that based on the conversations that were had, that it was best practice to pay them through a third-party administrator.

**Id.** Meyer then testified that, even after his conversation with Ameriprise's Compliance Officer, his understanding that payments to AFAs through REJ was merely a breach of "best practices."

> Q. In your conversation with Marc Cohen, what specifically did he tell you about how you had to pay AFAs?
>
> A. Specifically, it would be hard for me to specifically say, but in summarization, Marc made me aware that it was best practice to use a third-party administrator to pay GDC.

*Id.* at 23-24 (emphasis added).

## 2. **Statements of Defense Counsel.**

In briefing and oral argument on their motion to dismiss, defense counsel reiterated the testimony of their witnesses and extrapolated from that testimony to argue repeatedly that there was no violation of law, Defendants were completely unaware of any violation of law, and Badgerow's Whistleblower claim should be dismissed because the conduct at issue only contravened "best practices" and "there was nothing wrong with it." The following statements are examples of such statements from Defendants' Supplemental Motion to Dismiss, attached as **Exhibit G**:

- "As long as she [Badgerow] is licensed REJ could pay her GDC; there is no legal issue."
- "the bottom line is that the use of a third party vendor was an Ameriprise policy and not the law."
- "Badgerow's counsel confuses the prohibition against comingling of funds with clients with the fungible nature of payments by Walters, Meyer and Trosclair, individually, into REJ to pay expenses of operation of their Ameriprise franchise. It is just cash at that point. There is no prohibition on that comingling of funds." *Id.*
- "REJ does not need to be licensed, but can serve as an entity to which licensed franchise advisors can deposit money in order to pay the expenses of their

practice, which can include legally paying licensed AFAs. That is what happened here, and there is nothing wrong with it." *Id.*

- "Ameriprise, in order to show compliance with the books and records requirements of Rule 17a has elected to use third party vendors, EmployShare and Paychex, which is perfectly appropriate, but not required by the law." *Id.*
- "Importantly, both legally and factually, Badgerow's presumed "smoking gun" revelation to Cohen is not smoking in the least. *It certainly does not rise to the level of a violation of law,* state or federal, subject to triggering the Louisiana whistleblower statute." *Id.* (footnote omitted; emphasis added)
- "[N]one of these purported violations contravene state or federal law." *Id.*

In a hearing on Defendants' motion to dismiss, defense counsel made similar arguments and even expressed outrage that Badgerow would assert that the conduct violated securities laws:

- "In essence, the Claimant is alleging that REJ Properties[,] because they paid Ms. Badgerow some commission-based compensation[,] would have to be a broker dealer. That is perhaps the biggest stretch of the Exchange Act that I've ever heard in my years of practice." See **Exhibit H**, Transcript from Hearing on Motion to Dismiss at pg. 7
- "[REJ is] neither a broker or a dealer, so they need not be registered for anything. Because there is no violation of 17(A), no violation of 15(A), there can be no whistleblower claim. You have to have the underlying violation before you can have a whistleblower claim." *Id.* at pg. 8
- "Badgerow was always registered when she was paid a commission-based transaction. There is no question about it. There is no contrary evidence. She admitted herself she was registered at the time that these things happened. So, again, I think that this notion that there is [sic] some securities law violations, particularly with respect to the Exchange Act, is just total and sheer fabrication for purposes of trying to bootstrap some whistleblower claim that doesn't exist." *Id.* at pg. 11.
- "I mean, this record is so devoid of any evidence of a violation that candidly I'm kind of surprised we are hearing this. This is -- I know it's an important issue. I'm not trying to minimize why we are here. . . . REJ was never a broker dealer, we concede. 15(A), do they need to be a broker dealer? No. No. They never effected a single securities transaction, never held themselves out to do any of that. So for those reasons you can't have a corresponding whistleblower violation because there is no underlying violation of any law. *Id.* at pg. 12.
- "I look at the whistleblower claim like peeling back an onion. . . . At the core of it is the fact that there is no violation of any law, federal or state. Mr. Thomas Roberts has articulated that. Whether it's REJ paying Ms. Badgerow directly and violating, allegedly, 17(A) or that REJ should be registered as a broker dealer, those are no violations of law. So at its very core, the onion goes away. It was rotten." *Id.* at pg. 14.

### D. **Emplo<ins></ins>yShare's Production of Two Documents Containing Proposals to the Franchise.**

In response to a subpoena directed to EmployShare in Plaintiff's federal employment discrimination case, in which Plaintiff sought insurance and other information, EmployShare produced two proposals that it sent to the franchise. Plaintiff had never seen the documents before they were produced.

The two proposals were an effort by EmployShare to expand the services that they were then providing to the franchise, and EmployShare detailed the benefits of using EmployShare to

11

handle payroll for all employees, including registered AFAs.  In an October 6, 2014 document entitled "Proposal Details Document," EmployShare informed the franchise, explicitly, that the use of EmployShare to pay AFAs would ensure that the franchise was in compliance with "SEC regulations" and "federal and state law." *See* **Exhibit I.**

EmployShare explicitly informed the franchise that written "Employee Compensation Schedules for all licensed employees" would "comply with your broker dealer's book and records, in addition to federal and state regulations." **Exhibit I** at 4.  In an identical proposal from EmployShare dated June 3, 2015, EmployShare repeated that written employee compensation schedules would comport with the franchise's legal obligations: "These schedules comply with your broker dealer's book and records, in addition to federal and state regulations." **Exhibit J** at 4.[7]

The EmployShare proposals also clearly state that the payment of AFAs through unlicensed entities, such as REJ, is illegal. Under the heading "Purpose," EmployShare's Proposals clearly alert the franchise to the illegality of using REJ to pay Badgerow:

> Ameriprise policies, in addition to FINRA/SEC regulations, prohibit the payment of securities based compensation to selling employees or AFAs via a non-registered legal entity.

**Exhibit I** at 1.  EmployShare described to the franchise how it could help the franchise act in compliance with the law:

> GDC Based Compensation: In accordance with FINRA/SEC rules and Ameriprise policies, we will administer a separate payroll identity (GDC payroll) for paying GDC-based compensation to selling representatives (AFAs). This identity must be the same identity that is 'associated' with your broker dealer.

*Id.* EmployShare repeated these statements in the proposal dated June 3, 2015.

Plaintiff received the documents from EmployShare more than three months after the arbitration award was issued.  Plaintiff was unaware that documents existed outlining the same violations of law at issue in her Whistleblower action prior to receiving them from EmployShare on April 8, 2019.  These EmployShare proposals completely undermine the testimony and arguments defendants made during the arbitration proceeding.

---

[7] The second proposal from Employshare, dated June 3, 2015, was addressed to Denise Badgerow at Walters, Meyer, Trosclair & Associates.  Badgerow never received the proposal or the accompanying letter, and assumes that it as mailed to Defendants' offices after Badgerow was tasked with contacting EmployShare to learn the cost of having her added to Defendants' payroll plan.

## III. LEGAL ARGUMENT

**A.** Petitioner is Entitled to an Evidentiary Hearing on Her Motion to Vacate.

The specific grounds for setting aside an arbitration award are set forth in La. R.S. 9:4210.

Where, as here, a party alleges fraud as a basis for vacating an arbitration award, the court must

conduct a full review of the evidence that allegedly constitutes fraud.

> In cases where the claimant contends that an arbitration award was procured by
> fraud, including perjury, courts must necessarily review enough of the evidence
> submitted to the arbitrators to determine whether clear and convincing evidence
> exists that perjury was committed with respect to a material issue of consequence
> in the proceedings and that substantial rights of a party have been prejudiced
> thereby.

*Seattle Packaging Corp. v. Barnard*, 972 P.2d 577, 581 (Wash. App. 1999). *See also Low v.*

*Minichino*, 126 Hawai`i 99, 267 P.3d 683, 686 (App. 2011) (finding that the trial court erred when

it failed to hold evidentiary hearing on the issue of fraud as the basis to vacate arbitration award).

*Cf Nathan v. Carter*, 372 So.2d 560 (La.1979) (overturning and remanding trial court's summary

rejection of the doctrine of *contra non valentem* so that trial court can review the merits of

plaintiff's fraud allegations).

**B.    The Arbitration Award was Procured by Fraud**

1.    There is a Three-Prong Test for Determining Fraud Sufficient to Vacate an
      Arbitration Award.

The Eleventh Circuit summarized a widely-used test for vacating an arbitration award on

the basis of fraud.

> In reviewing cases under § 10(a) [of the FAA], courts have relied upon a three part
> test to determine whether an arbitration award should be vacated for fraud. First,
> the movant must establish the fraud by clear and convincing evidence. Second, the
> fraud must not have been discoverable upon the exercise of due diligence prior to
> or during the arbitration. Third, the person seeking to vacate the award must
> demonstrate that the fraud materially related to an issue in the arbitration. This last
> element does not require the movant to establish that the result of the proceedings
> would have been different had the fraud not occurred.

*Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (citations and footnote

omitted).

In *Bonar*, the plaintiff's expert witness had lied about his credentials, including faking

multiple degrees and prior employment positions. *Id.* at 1384. The Eleventh Circuit found that the

perjury was material to the arbitration award because the only issue before the arbitrators was

whether to award damages, and the only evidence before the panel on the issue of punitive damages

was the testimony offered by the expert witness. *Id.* at 1384-85. The Eleventh Circuit concluded

that if the expert "had not committed perjury by falsifying his credentials, it is extremely doubtful

that he would have been permitted to testify as an expert, and the arbitrators would have heard none of the . . . testimony" regarding punitive damages. *Id.* at 1385. Without the expert's testimony, then, there would have been no evidence to support an award of punitive damages. "Thus, by establishing the foundation that allowed the panel to hear influential expert testimony on the central issue of negligent supervision, the fraud materially related to an issue in the arbitration." *Id.*

                a.   There is Clear and Convincing Evidence that Defendants Committed Fraud.

       "Obtaining an award by perjured testimony constitutes fraud." *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1297 (9th Cir.1982) (citation omitted). Not only did the witnesses here perjure themselves, but defense counsel relentlessly (and falsely) asserted that Plaintiff had failed to prove her Whistleblower claims based on that same testimony.

       During the arbitration hearing, defense witnesses asserted that any concerns raised about the conduct at the center of Plaintiff's whistleblower claims were merely because of Ameriprise's "best practices" and not because of any legal requirements. The following is Meyer's testimony concerning Defendants' decision to pay AFAs through third-party administrators instead of paying AFAs through their unregistered entity, REJ:

> Q. . . . You are saying you have since decided to pay in this manner, but prior to this, your understanding is that the way you were paying AFAs was appropriate?
> A.     I would say that based on the conversations that were had, that it was best practice to pay them through a third-party administrator.

*See* **Exhibit A** at 22-23 *See, e.g., Id.* at 24 ("Marc made me aware that it was best practice to use a third-party administrator to pay GDC"); *Id.* at 24 (testimony of Meyers, denying that he knew that all associate financial advisors are required to have a written Compensation Agreement). *But see* **Exhibit I** and **Exhibit J** at 1 (EmployShare proposal to Defendants dated October 2014 and June 3, 2015, informing Defendants that "*Ameriprise policies, in addition to FINRA/SEC regulations, prohibit the payment of securities based compensation to selling employees or AFAs via non-registered legal entity*"). In their arguments to the arbitration panel, defense counsel reiterated and extrapolated from this false testimony on more than a dozen occasions. *See, e.g.,* **Exhibit G and Exhibit H** ("the bottom line is that the use of a third-party vendor was an Ameriprise policy and not the law"); *See* **Exhibit G** at 20 ("none of these purported violations contravene state or federal law"); *See* **Exhibit H** at 14 ("At the core of [the Whistleblower claim] is the fact that there is no violation of any law, federal or state"). Defendants' entire theme was

repeatedly to deny both the illegality of the conduct and any knowledge of the illegality of the conduct.

An arbitration award that failed to take into account the fact that defendants knew that the conduct violated the law, as evidenced by their receipt of the two EmployShare proposals that clearly stated that the conduct violated the law, amounted to a fundamentally unfair arbitration for Plaintiff.

The perjury at issue here is similar to the perjury at issue in *Low v. Minichino*, 267 P.3d 683 (2011). In *Low v. Minichino,* the plaintiff (Low) filed an arbitration claim against the defendant (Minichino) for breach of a real property purchase agreement, asserting that the defendant had failed to cancel the agreement in advance of the closing and that the defendant was liable for breach of contract. Minichino testified during the arbitration that she had in fact timely notified Low both orally and via email that she was cancelling the contract. Low testified that he never received notice of the cancellation. The arbitrator sided with Low and issued an award in favor of Low.

Following the arbitration, Minichino was able to find copies of the emails, proving that she had provided early cancellation notice to Low. Low moved for confirmation of the award and Minichino then moved to vacate the arbitration award on the basis of fraud, citing Low's perjury.

> Minichino presented uncontroverted evidence that, if taken as true, establishes that Low committed fraud by presenting perjured testimony to the arbitrator. Minichino's declaration states, inter alia: "I testified that I gave both oral and written notice to the Seller prior to June 25, 2002, but the Arbitrator accepted the contrary testimony of the seller" and "[k]nowing that his testimony at the arbitration hearing was false, [Low] lied before the Arbitrator[.]" Minichino also submitted copies of dated emails that appear to evidence or at least raise a strong inference of Low's alleged perjury regarding Minichino's notification to Low that she could not obtain the financing necessary to close the transaction.

*Id.* at 693.

The court in *Low v. Minichino* reversed the trial court's denial of the motion to vacate and remanded for an evidentiary hearing on the issues of fraud in the arbitration. The court noted that "[t]he e-mails submitted by Minichino would directly contradict any testimony by Low denying his receipt of notice of termination." *Id.* Similarly, the EmployShare proposals submitted by Badgerow here directly contradict testimony by Defendants that the conduct at issue was merely "best practices" and not violations of law. The basis for vacating here is even stronger than the basis in *Low v. Minichino* because the proposals proving that Defendants were lying are documents that Badgerow had never seen and that were never in Badgerow's possession, but only in the

possession of EmployShare and Defendants.  The testimony and misrepresentations to the arbitration panel constitute fraud which deprived Plaintiff of a fair arbitration.

      b.  <u>The Fraud was not Discoverable Prior to or During the Arbitration</u>.

As indicated previously, Badgerow had never seen the proposals that were produced by EmployShare until more than three months after the arbitration award was delivered.  Thus, the fraud was not discoverable until after the time period for filing a motion to vacate had elapsed. While there was a cover letter attached to one of the proposals which was addressed to Denise Badgerow, Denise Badgerow never received a copy of the Proposal.

      c.  <u>The Fraud Materially Related to a Key Issue in the Arbitration</u>.

The arbitration award does not contain the arbitration panel's rationale for dismissing Badgerow's claim.  Nevertheless, the focus of defendants' successful motion to dismiss was an attempt to show that the termination of Badgerow could not have been retaliation for her notification of violations of law *because there was no legal violation and defendants were unaware of any legal violation*.  The question of whether Defendants knew their conduct was illegal was not a collateral issue. When defendants furnished perjured testimony to the arbitration panel, their efforts were directed to a fundamental issue in the arbitration. The materiality of the issue is evident from the number of times defense counsel used the testimony as a basis for arguing that the arbitration should be dismissed, which is precisely what the arbitration panel did.

  **C.**  <u>The Arbitration Award was Procured by Undue Means</u>.

Even if, assuming *arguendo*, the conduct at issue here does not rise to the level of fraud, this Court should vacate the arbitration award because it was procured by "undue means." LA Rev Stat § 9:4210.A.  According to the Louisiana Supreme Court, "undue means" denotes "the use of misconduct or other gross deviation from normal arbitration to procure an award." *Firmin v. Garber*, 353 So.2d 975, 977 (La. 1977). *See also Nat'l Cas. Co. v. First State Ins. Grp.*, 430 F.3d 492, 499 (1st Cir. 2005) ("[t]he best reading of the term `undue means' ... is that it describes underhanded or conniving ways of procuring an award that are similar to corruption or fraud, but do not precisely constitute either"); *Spiska Engineering, Inc. v. SPM Thermo-Shield, Inc.*, 678 N.W.2d 804, 809 (S.D. 2004) (concluding that "undue means" is "bad faith behavior equivalent to fraud or corruption on the part of the winning party"); *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir.1992) (undue means "connotes behavior that is immoral if not illegal"), *cert. denied*, 506 U.S. 1050, 113 S.Ct. 970, 122 L.Ed.2d 126 (1993). Unlike proof of

fraud, a party seeking to vacate an arbitration for "undue means" need only prove the conduct by a preponderance of the evidence. *See Spiska Engineering, Inc. v. SPM Thermo-Shield, Inc.*, 678 N.W.2d at 807.

The *Spiska Engineering, Inc.* case is instructive. At issue in the arbitration in *Spiska Engineering, Inc.* was Thermo-Shield's cancellation of a contract with Spiska based on Spiska's alleged material breach of the agreement. During the arbitration, Spiska tried to prove that Thermo-Shield had used a pretextual basis for cancelling the parties' contract so that Thermo-Shield could obtain a more favorable contract price from one of Spiska's competitors. *Id.* at --. "Spiska presented various documents during arbitration which indirectly and circumstantially indicated Thermo-Shield's favorable dealings with Spiska's competitors. There was no proof, however, that the dealings materialized into actual agreements; nor was there evidence of the time frame any dealings occurred." *Id.* at 808. The arbitrator issued an award in favor of Thermo-Shield.

When Spiska moved to vacate the arbitration award, it presented newly-discovered documents that Spiska obtained in other litigation, showing that Thermo-Shield had, in fact, entered into a more lucrative agreement with one of Spiska's competitors. The basis for Spiska's motion to vacate was "undue means," identical to the language permitting vacation of an arbitration award under LA Rev Stat § 9:4210.A. The South Dakota Supreme Court reversed the trial court's decision to confirm the arbitration award and remanded: "The trial court should determine in light of the new documents whether Thermo-Shield acted in bad faith in withholding the evidence; and if so, whether there is a nexus between the bad faith behavior and the procurement of the arbitration award." *Id.*[8]

**D.** The Time Period for Serving a Motion to Vacate was Equitably Tolled by Defendants' Misconduct.

Louisiana's Arbitration Law contains a three-month period for serving motions to vacate.

Notice of a motion to vacate, modify, or correct an award shall be served upon the adverse party or his attorney within three months after the award is filed or delivered, as prescribed by law for service of a motion in an action. For the purposes of the motion any judge, who might issue an order to stay the proceedings in an action brought in the same court may issue an order, to be served with the notice of motion, staying the proceedings of the adverse party to enforce the award.

LA Rev Stat § 9:4213. The arbitration award was delivered on December 27, 2018.

---

[8] The evidence the trial court was directed to consider on remand included documents Spiska obtained while its appeal was pending, including a memorandum of understanding between Thermo-Shield and a competitor of Spiska, executed prior to Thermo-Shield's cancellation of its contract with Spiska.

17

Even though Petitioner's motion to vacate is being served more than three months after the delivery of the arbitration award, this Court should grant Petitioner's motion.  Petitioner was unaware of the proposals contradicting witness testimony until after the three-month period had expired.  The documents are conclusive evidence that: 1) defendants knew that the conduct at issue in the Whistleblower Act claim violated "FINRA/SEC regulations" and; 2) defendants knew the conduct was illegal at least one year *before* the Ameriprise Compliance Officer contacted them about Badgerow's complaint.  The EmployShare proposals indicate that defendants engaged in a pattern of misrepresentation throughout the arbitration hearing and the motion to dismiss proceedings, during which they repeatedly discounted the import of the conduct at issue in the claim and disclaimed any knowledge of the illegality of the conduct.   The proposals directly contravene false testimony: 1) that the conduct at the center of Badgerow's Whistleblower action was only a violation of "best practices;" and 2) that Defendants first learned of the so-called "best practices" from Ameriprise's Compliance Officer.  Defendants were notified on at least two occasions prior to Plaintiff's notification to the Ameriprise Compliance Officer that it was illegal to pay an AFA using an unregistered entity and that SEC laws required them to have a written compensation agreement with Badgerow.  *See* Exs. 1, 2.

At least one Louisiana court has applied notions of equity and fairness in holding that the three-month prescription applicable to motions to vacate can be tolled.  *See Cole v. Hiller*, 715 So. 2d 451 (La. App. 2d Cir. 1998).  In *Cole v. Hiller*, the arbitrator issued an award, and the parties jointly requested that the arbitrator amend the award based on a mathematical error. The arbitrator denied the parties' request for modification.  Plaintiff filed his motion to modify or correct the award within three months after the arbitrator denied the joint request for modification but more than three months after the award was "filed or delivered."  The Second Circuit described the trial court's decision to permit modification of the arbitration award, even though the motion to modify had been filed late:

> Noting the strong public policy favoring arbitration as an alternative to litigation of disputes, and the general rule that prescriptive statutes are to be strictly construed against prescription, the trial court concluded that the three-month period for seeking judicial modification of the October 31, 1996 award did not commence until January 24, 1997, when the arbitrator denied the joint request to amend the award for mathematical reasons. Considering that the Hillers "acted in concert with Cole to seek clarification and correction of [the award] ... in their favor," *the court found it would be "patently unfair to now prevent Cole from seeking judicial relief."*

*Id.* at 454 (emphasis added).

The Second Circuit affirmed the trial court's decision to allow the modification of the arbitration award even though the motion had been served more than three months after the award was issued. Although the court in *Cole v. Hiller* did not identify the doctrine under which it granted relief, it was clearly applying equitable principles.

> The arbitrator's award as initially made contained what appeared to both parties to be an "evident material miscalculation of figures," one of the grounds for judicial modification of the award under § 4211. *The Hillers, who would have benefitted from the apparent error, joined with Cole in requesting correction of the error by the arbitrator. Had that request been granted, Cole's motion for judicial modification of the award to correct the apparent mathematical error would have been unnecessary.* Cole filed his motion within three months after the joint request was denied. Under the circumstances of this record, we cannot say the trial court erred in finding Cole's motion timely under § 4213.

*Id.* at 455 (emphasis added).

In a 2016 case concerning the FAA's identical three-month limitation period, the Ninth Circuit allowed a party to proceed with a motion to vacate four years after the arbitration award was issued. *See Move, Inc. v. Citigroup Global Markets, Inc.*, 840 F.3d 1152 (9th Cir. 2016). In *Move, Inc. v. Citigroup Global Markets, Inc.*, the losing party learned from a magazine article that the chairman of the FINRA arbitration panel had lied about being a licensed attorney. Even though the FAA requires that notice of a motion to vacate an arbitration award be served within three months after the award is delivered, Move argued the deadline should be equitably tolled because of the arbitrator's fraud.

The Ninth Circuit held that Move, Inc's motion to vacate "was not untimely because the FAA is subject to equitable tolling." *Id.* at 1154. In affirming the vacation of the award, the court reviewed the history of the FAA and whether anything in the statute prevented the application of equitable tolling.

> It is hornbook law that limitations periods are customarily subject to equitable tolling ... unless tolling would be inconsistent with the text of the relevant statute." *Young v. United States*, 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) (internal citations and quotation marks omitted). Accordingly, "Congress must be presumed to draft limitations periods in light of this background principle," *id.* at 49-50, 122 S.Ct. 1036, and the rebuttable presumption that limitations periods are subject to equitable tolling must be overcome by the text or purpose of a statute, *see, e.g., Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990); *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 138, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008). We agree with the district court and conclude that neither the text, nor the structure, nor the purpose of the FAA is inconsistent with equitable tolling.

*Id.* at 1156-57.[9]

---

[9] The text of LA Rev Stat § 9:4213 is identical to the FAA, the structure is similar to the FAA, and the purpose of Louisiana's Arbitration Act is nearly identical to the federal statute. See (case re arbitration finality). Thus there is

The Ninth Circuit weighed the policy favoring arbitration against the whether a specific

arbitration is fundamentally fair, in the same way that the court evaluated the issues in the *Cole*

*v. Hiller* case.

> While the FAA reflects the "national policy favoring arbitration with just the limited review" necessary to maintain finality in arbitral proceedings, *Hall Street*, 552 U.S. at 581, 128 S.Ct. 1396, "[t]he general pro-arbitration policy relies on the assumption that the forum is fair, and therefore cannot justify special deference to arbitration out-comes in the face of a colorable claim that the forum was unfair in a particular case." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Berry*, 92 Fed.Appx. 243, 246 (6th Cir. 2004) (unpublished). Thus, although Citigroup argues that equitable tolling would undermine the FAA's goal of finality, § 10's limited grounds for review were still "designed to preserve due processEx," *Kyocera Corp. v. Prudential-Bache Trade Servs.*, Inc., 341 F.3d 987, 998 (9th Cir. 2003). Balancing the needs for both finality and due process, the arbitral process will not be disrupted if parties are permitted to satisfy the high bar of equitable tolling in limited circumstances. More importantly, permitting equitable tolling will enhance both the accuracy and fairness of arbitral outcomes.

*Id.* at 1157-58. *See also Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155,

1158 (10th Cir. 2007) (noting that "equitable tolling suspends the running of a statute, and it should

be applied unless Congress provides to the contrary," but holding that equitable tolling was

inapplicable because the movant had learned of the basis for moving to vacate within three months

of the issuance of the arbitration award). The court in *Move, Inc. v. Citigroup Global Markets,*

*Inc.* concluded that the plaintiff should not be held to the three-month limit "because [the

arbitrator's] fraudulent conduct was revealed only after the arbitration panel issued its award in

favor of Citigroup, [and] the parties received a hearing chaired by an imposter." *Move, Inc. v.*

*Citigroup Global Markets, Inc.*, 840 F.3d at 1159.

In Louisiana, the doctrine of *contra non valentem* is the means by which prescription may

be suspended and it is the equivalent of equitable tolling. "The principles of equity and justice

which form the mainstay of the doctrine [of *contra non valentem*] . . . demand that under certain

circumstances, prescription be suspended because plaintiff was effectually prevented from

enforcing his rights for reasons external to his own will." *Wimberly v. Gatch*, 635 So.2d 206, 211

(La. 1994) (citations omitted). The *contra non valentem* doctrine is "an application of the long-

established principle of law that one should not be able to take advantage of one's own wrongful

act." *Id.* at 212 (citation omitted). There are four categories of *contra non valentem*, including the

third category "where the debtor himself has done some act effectually to prevent the creditor from

---

nothing in Louisiana's act that is inconsistent with the application of equitable tolling or the application of
Louisiana's comparable doctrine, *contra non valentem.*

availing himself of his cause of action." *Id.*[10] The third category encompasses fraud: "This equitable doctrine has been applied to cases wherein defendant has concealed the fact of the offense or has committed acts (including concealment, fraud, misrepresentation, or other 'ill practices') which tend to hinder, impede, or prevent the plaintiff from asserting his cause of action, as long as plaintiff's delay in bringing suit is not willful or the result of his own negligence." *Nathan v. Carter*, 372 So.2d 560, 562 (La.1979) (citations omitted). *See also Johnson Controls, Inc. v. Lynch*, 633 So. 2d 212, 216 (La. App. 1st Cir. 1993) ("The use of *contra non valentem*, based on the factual situation envisioned by the third category, requires a finding of fraudulent or intentional concealment or misrepresentation.").

A court must evaluate the equitable nature of the circumstances in each individual case to determine the applicability of the doctrine. Here, fraud permeated Defendants' testimony and presentation to the arbitration panel, and Defendants should not benefit from their fraud and misrepresentations. "'No law was ever enacted which contemplated the defeat of its purpose by fraud, and no court was ever organized which would knowingly permit a litigant to profit by his own wrong.'" *Plaquemines Parish Com'n Council v. Delta Development Co., Inc.*, 502 So.2d 1034, 1060 (La.1987) (quoting *Hyman v. Hibernia Bank & Trust Co.*, 139 La. 411, 71 So. 598, 606 (La.1916)) (concurring opinion of Chief Justice Monroe).

## CONCLUSION

Plaintiff requests that this Honorable Court issue an order vacating the arbitration award since such award was procured through fraud or undue means.

A TRUE COPY

*[signature]*

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

---

[10] The court in *Wimberly v. Gatch*, 635 So.2d 206, 211 (La. 1994) identified the four circumstances where *contra non valentem* applies to toll a prescriptive period:

  1. Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
  2. Where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
  3. Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
  4. Where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

CASE NO. _____   DIVISION _____ NUMBER___

**DENISE BADGEROW**

v.

**GREG WALTERS, THOMAS MEYER, AND RAY TROSCLAIR,**

**RULE TO SHOW CAUSE**


IT IS ORDERED BY THE COURT, that the Defendants, Greg Walters, Thomas Meyer, Ray Trosclair show cause on the 13th day of June, 2019, at 9:00 o'clock A.m. why the Plaintiff's Action should not be maintained.


New Orleans, Louisiana, this 6th day of _____, 2019.

_Paulette Irons_

Sgd, Paulette R. Irons
Judge, Division M, Section 13


4852-2203-4068, v. 1

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

FILED

EXHIBIT
A

2019 MAY -6  PM 2: 22

CIVIL
DISTRICT COURT

# Transcript of the Testimony of
# **Proceedings of Financial Industry**
# **Regulatory Authority (FINRA)**

## **Date taken: August 28, 2018**

## **Denise A. Badgerow v. Ameriprise Financial Services, Inc., et al**

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# **Professional Shorthand Reporters, Inc.**
**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**


VERIFIED

Proceedings of Financial Industry Regulatory Authority (FINRA)
Denise A. Badgerow v. Ameriprise Financial Services, Inc., et al

Page 17

1        And ours ends at 139.
2    MS. BUTLER:
3        We will try to get it on the
4    screen.
5    CHAIRMAN WARREN:
6        Does the witness have the whole
7    document?
8    MS. BUTLER:
9        Tommy, what is the last number --
10   PANEL MEMBER MR. ARTEAGA:
11       148.
12   MS. BUTLER:
13       So the witness has a complete copy.
14   CHAIRMAN WARREN:
15       Counsel, I don't think we need to
16   hang up on this very long.  Let's let counsel
17   look at the complete copy before the witness
18   is questioned and then we can move forward.
19   If there is something in particular we need
20   to focus on, we can do that then.
21   PANEL MEMBER MR. ARTEAGA:
22       This is only 140 through 148.
23   CHAIRMAN WARREN:
24       Here is the rest here.
25   EXAMINATION BY MS. BUTLER:

Page 18

1        Q.  Tommy, as the managing partner for WMT,
2    you signed written Compensation Agreements with
3    four other financial advisors, Evan Weibel,
4    Andrew Walters, David Ponson and Lloyd Kern; is
5    that correct?
6        A.  No, ma'am.  I think I signed three of
7    them.
8        Q.  Who signed the fourth?
9        A.  It appears to be Mr. Walters' signature.
10       Q.  On which page?  Oh, his signature is
11   missing.  Are you looking at TM0000139?
12       A.  No, ma'am.  00142.
13       Q.  So this is also for Andrew Walters.  So
14   Greg Walters signed Andrew Walters, and you signed
15   David Ponson, Lloyd Kern and Evan Weibel?
16       A.  Yes, ma'am.  That's appears to be
17   correct.
18       Q.  As the managing partner, were you tasked
19   with drafting written Compensation Agreements?
20       A.  Not necessarily.
21       Q.  Whose job was it?
22       A.  So each associate financial advisor had
23   a franchise advisor by route, and what it appears
24   to be in these documents, I signed Compensation
25   Agreements with associated financial advisors on

Page 19

1    my route.
2        Q.  So your testimony is that Greg Walters
3    would have been -- would Greg Walters have been
4    responsible for drafting the Employment Agreement
5    for Denise Badgerow?
6        A.  I would say that I don't think that was
7    a requirement, so I don't want to answer yes to
8    that.
9        Q.  Did you know that all associate
10   financial advisors are required to have a written
11   Compensation Agreement?
12       A.  No.
13       Q.  Did Ameriprise require employees to be
14   put on Paychex or EmployShare?
15       A.  Associate financial advisors that
16   generated commissions, I have since found out that
17   we are required -- not necessarily required, but
18   urged to have a third-party administrator.
19       Q.  So it is not required under --
20       A.  Yeah, I would have to really look
21   closely at it because I am not sure that defines
22   the whole scope of the arrangement.
23       Q.  And what do you mean by that?
24       A.  I'm sorry?
25       Q.  What does that mean?

Page 20

1        A.  I think in some instances, you don't
2    need a third-party administrator.  Again, I am
3    speaking ignorantly on that fact, but if I read
4    the document, I could go more clear.
5        Q.  What document?
6        A.  The document that you said spells out
7    that Ameriprise requires this.
8        Q.  The Compliance Manual?
9        A.  Yes, ma'am.
10       Q.  The Compliance Manual requires that you
11   have to use an approved third-party,
12   Ameriprise-approved vendor to pay GDC commissions
13   to AFAs, correct?
14   MR. REYNAUD:
15       Counsel is not asking him to assume
16   that, she is making a statement as to what it
17   says.  If she wants the witness to assume
18   that, that is fine, but that would be an
19   assumption and a hypothet.
20   CHAIRMAN WARREN:
21       Overruled.  She has him on cross
22   here, and he can state his understanding or
23   disagree, whatever he wants to do.
24   THE WITNESS:
25       Can I have the opportunity to read

Pages 17 to 20

Proceedings of Financial Industry Regulatory Authority (FINRA)
Denise A. Badgerow v. Ameriprise Financial Services, Inc., et al

Page 21

1    it?
2    EXAMINATION BY MS. BUTLER:
3        Q.   The Compliance Manual?
4        A.   The section in the Compliance Manual
5    that refers to this.
6        Q.   Sure, if you look under Tab 5 in your
7    spiral-bound book.
8        CHAIRMAN WARREN:
9            So we have Tab 5, Claimant's 5, in
10   front of you.  What is the question?
11   EXAMINATION BY MS. BUTLER:
12       Q.   The question is, if you review the
13   Compliance Manual, page 66, it describes how you
14   are allowed to pay AFA compensation, correct?
15       A.   You mind if I read it just for
16   clarification?
17       Q.   Please.
18       A.   And your question?
19       Q.   The question is, does this section
20   address how you pay?  Section 4.4, does it address
21   how you have to pay AFAs?
22       A.   Yes, ma'am.
23       Q.   Does it require you to use an approved
24   third-party vendor?
25       A.   It has four bullet points, and one of

Page 22

1    the bullet points does read that that would be the
2    case.  And then others read that that is not
3    necessarily the case.
4        Q.   Are you saying now that there is some
5    other way you were allowed to pay — there is some
6    other way that you are allowed to pay AFAs?
7        A.   I would say that when informed of best
8    practices, we chose to put everybody on third
9    party.
10       Q.   But prior to best practices, you are
11   telling me you were compliant with the law in some
12   other way?
13       MR. ROBERTS:
14           Object to the form of the question.
15   She is referring to an Ameriprise Compliance
16   Manual now saying he was not complying
17   with the law.
18       MS. BUTLER:
19           I'm trying to — I'm sorry.
20       CHAIRMAN WARREN:
21           Overruled.
22   EXAMINATION BY MS. BUTLER:
23       Q.   I'm just trying to get to what you are
24   really saying here.  You are saying you have since
25   decided to pay in this manner, but prior to this,

Page 23

1    your understanding is that the way you were paying
2    AFAs was appropriate?
3        A.   I would say that based on the
4    conversations that were had, that it was best
5    practice to pay them through a third-party
6    administrator.
7        Q.   But not required by law?
8        MR. REYNAUD:
9            That calls for a legal conclusion
10   outside the scope of what he is reading.
11       CHAIRMAN WARREN:
12           Overruled.  He can state his
13   understanding.
14       THE WITNESS:
15           Am I allowed to read this?
16   EXAMINATION BY MS. BUTLER:
17       Q.   (Nods head affirmatively.)
18       A.   "Non-advisory compensation must be paid
19   to the AFAs through an employee contractor
20   advisor's bank account."
21       Q.   We will come back to this.  We can talk
22   with Marc Cohen about it.
23           In your conversation with Marc Cohen,
24   what specifically did he tell you about how you
25   had to pay AFAs?

Page 24

1        A.   Specifically, it would be hard for me to
2    specifically say, but in summarization, Marc made
3    me aware that it was best practice to use a
4    third-party administrator to pay GDC.
5        Q.   Why did Denise Badgerow not have a
6    written Compensation Agreement?
7        A.   I don't know.
8        Q.   If Denise Badgerow was on EmployShare,
9    would she have had a written Compensation
10   Agreement?
11       A.   I don't know.
12       Q.   Did you provide these written
13   Compensation Agreements to EmployShare for
14   Evan Weibel, Andrew Walters, David Ponson and
15   Lloyd Kern?
16       A.   I apologize, but I am not sure if I did
17   or didn't.
18       Q.   Who would have been responsible for
19   that?
20       A.   Ultimately, I think I would have been,
21   but these are dated many years back.
22       Q.   Did all of the financial advisors that
23   had written Compensation Agreements also receive a
24   base salary?
25       A.   In what time period?

Pages  21  to  24

FILED

2019 MAY -6 P**CIR** 22

CIVIL
DISTRICT COURT



| Advisor: | Denise Badgerow |
|----------|-----------------|
| RP: | Marc Cohen |
| Date: | 5-10-16 Denise was out of town, conducted by phone on 07.13.16 |
| | |

☒ Scorecard                        ☒ Managed Accounts Report

☒ Google, LinkedIn Search          ☐ Consequence Management

☒ A.S.S. Report                    0 No Trade – 21-23 Months

☐ Online Files                     0 No Trade – 24-26 Months

☒ OBA Report                       0 No Trade – 27 Months

☒ Practice Perform. Stmt.          ☒ 2015 CIR Pulled


**Based on the type of business this advisor conducts, my review focused on:**
**The overall structure of the practice consist of the following:**

Financial plans 36, SPS 19, AP 29, and Dual Relationships 17

Product mix: SPS Advisor 41%, SPS 18%, AP 16%, Financial Planning 14%

Advise Services fees: $600-1200; average $800

*********************************************************************************

Tell me about your practice. Changes expect over the next year? Adding AFAs?
Moving? How are you marketing your practice?


I had spoken with Donna Sutton RRS regarding Denise's concerns in her annual CIR.
It was recommended to just document it in the CIR as I am doing and it was
determined that I should handle the compliance piece as always and not get
involved with the non-compliance related concerns. I discussed with Donna;
Denise's concerns that Denise raised in the compliance meeting regarding some
employment issues and her concern that she was not being treated fairly. Donna
and I determined that a LOD would be given to the advisor on the AFA

*Printed: 9/5/2017 10:49:00* AM
Confidential
AFSI/Badgerow 0113



Exhibit 2

# CIR

compensation piece if it turned out to be correct where she was not on the home office approved payroll and getting paid GDC. Donna recommended I see if they have a contract with Denise? How they are paying her and also if they had any questions on employment issues to contact their employment attorney if they had one. I called Greg and then Tommy on 07.26.16 and called Greg first. I followed the discussion from Donna and I which we have done on occasion. I asked Greg if he had a contract for Denise and he answered no. I told him she raised some concerns in her compliance meeting regarding he and another partner that she did not name. Greg and Tommy had both made me aware of some issues between Denise and the office on my visit to their office last time, but we did not get into much detail. It sounded like there were issues with Denise not getting along with other people in the office and Greg was considering getting a separate office for her. When I spoke with Greg on 7.26.16 he thought the issues Denise had were just related to Tommy, but I shared with him she mentioned some concerns about him and how she has been paid in the past 9 months and not through employee share. She said that there were several advisors not being paid properly. I shared this with Greg. I told him that they needed to fix the compensation arrangement and run it through employee share for all advisors being paid GDC. I let him know that Denise told me that she was not being treated fairly, but I told him that I let her know that was between her and the people that she works for and AMP does not get involved in employment issues between an advisor and their staff or AFA's. I let Greg know her concerns were not just about Tommy but him also. I told him he could do whatever he wanted, but per my conversation with Donna; we recommended for any legal issues he consult an attorney. As always I recommended that if the advisor has an attorney, they should consult an attorney regarding any employee / employer issues that they may have and that the only thing I get involved with is compliance related matters which was the GDC payout. I did mention to Greg that Denise said she was not sure if she was not treated fairly because she was not family or because she is a woman. I told Greg that those sounded like legal issues that she is raising and not Compliance other than the GDC issue. When I spoke with Tommy he told me he would not sign the new agreement because he did not agree with the payout raise that Greg was recommending for Denise. Tommy also said he would fix the payroll issue immediately if any AFA's were not going through the approved system. I did not mention to either of them consequence at this time. I was planning on doing it at the end of the week

Denise was out of town when we were in Thibodaux. We did a phone interview. During her interview, she said she has her own practice and she has her own clients. Greg signed the lease at the new place for Denise. She is seeing her clients. Denise started the meeting off with some concerns about how things were handled with Greg and the "other partner," she never mentioned any names. She felt like some things were not fair on how things were done and I told her that is not my role as a Compliance person to go through those things and Ameriprise does not get involved with those types of employee issues. I told her that she works for the practice and that's who she should speak with if she has concerns about how things are done. I told her I would check to see if there is anything that we do in a case like this, but I

Exhibit 2

## CIR

am fairly confident that it is between her and the advisors she works for. I told her if you don't hear from me then assume it is not my role. I told her that the only things I handle are compliance issues. She talked about that she gets a salary plus commissions and said it works like a draw. I told her I will see about her being on a 3rd party vendor. She said she has been paid like this since Oct 2014. She is a W2 employee and has been a W2 all the time. She was lined up to be on Paychex, since it is the rule. She said Greg's partner refused to sign it right before she left. She said her attestation is wrong on how she is paid and wants to get the compensation properly done since she learned that it must go through Paychex. I told her I would look into the concerns that she was being paid GDC and not through one of the approved vendors. She mentioned she did not do any marketing since she is on her own with her own practice I told her I would check on the compensation and how it is paid.

This is the last we discussed her concerns about the practice and her treatment and we went into the annual compliance interview.

Unfortunately, a lot of clients have been laid off and there have been rollovers due to all the Oil layoffs. No over time for employees in LA, budget cutbacks.

Her best friend's mom had property sold and it was a large cash out and she got 3 of them as clients.

Your largest product area(s) is/are SPS Advisor. Tell me about why you recommend this product so often. How do you present it to the client? What factors do you take into consideration when recommending this product?

When she looks at SPS advisor is when clients don't want to be involved in investment selection and she explains SPS advisor and she goes over the relationship with Greg and her partnership and that Greg is their SPS advisor.

What is your client base profile, do you have many senior clients? She does not think she has any clients in their 70's or 80's.

Are you aware of the vulnerable clients group?

I talked to her about the Vulnerable Client Group and the process. I also talked about POA's and making sure they have an AMP on file if needed and making sure the POA is acting in the best interest of the client. I discussed making sure they ask the POA the purpose of any money that has been requested. She has one client where the POA does the decision making. He was one of the 3 clients who sold property. One of the brothers has some mental issues and so they set up a trustee. They were concerned about him meeting a female to avoid taking advantage of him. His siblings are the trustee. ▮▮▮ is the family name. His is ▮▮▮▮. She meets with him on occasion. He drives and has a job. The money is in a cash reserve certificate.

Exhibit 2

# CIR

Are 401k/403b/IRA rollovers a part of your practice? Are you familiar with the "Leave It or Roll It" brochure? FINRA is taking a special interest in rollovers, as well as other "wealth events" i.e. inheritance, this year.

I went over rollovers and discussed the importance of going over the pros and cons of leaving the money in the company retirement plan or rolling the money over to an IRA. I recommended the advisor go over the "Leave it or Roll it Brochure" and document that conversation.

She is using it extensively. Even if they do not roll over money she goes over it with them on her computer and uploads it. She does not print it out; she pulls it up on her computer to show it to them. She documents it in her plan.

Tell me about your SPS Advisor strategy. What is your model? Do you use block trades? Yes they do block trades. She feels it is going smooth so far, but was an issue for making sure they were aligned with the office.

Do you use complex products such as alternative mutual funds, alternative closed end funds, etc.? Tell me where you find the *Complexity Levels for Liquid Offerings* spreadsheets.

I covered the complexity Levels sheet with the advisor and making sure to discuss the products complexity with clients and document. She said she is avoiding mutual funds like the plague.

She uses the IRG models.

Tell me about your process for updating client suitability and risk tolerance:

Most of her clients do planning and she updates profiles and suitability then.

All of the client profiles on advisor compass that we reviewed were current.

She feels that she stays on top of this.

Do you have any SPS, ADP/SMA accounts? Are you using the Manage Accounts Review template? Are you uploading the documentation to OFM?

Documentation everything is being loaded to OFM and she does not have any paper files.

Tell me about the steps you take to protect client data:

Don't send any sensitive info by email.

We discussed the importance of keeping client data protected. We discussed not replying to any email information requests unless it is sent secure or password protected.

How do you and your staff stay current on Compliance requirements?

Exhibit 2

# CIR

She always attends the webinars that AMP puts on, she likes being in the know. She says clients ask her certain questions. She said she goes to all the meetings held in Baton Rouge.

Where does your practice stand on uploading historic client files to OFM?

We discussed that all new business must be on OFM or Contact Manager –no attachments - to be compliant. "BOX" is not a compliant file.

If applicable, have you reviewed your remote supervision plan? Have you fulfilled your obligations for the plan?  N/A

If applicable, how is your AFA compensation handled?  The AFA is paid GDC.  I will look into this issue.

**Scorecard and Other Issues Identified to Review with the Advisors:**

**Surveillance Report Flags:** ☒ No  ☐ Yes - Comment:

**Red Flags on Scorecard:** ☐ No  ☒ Yes - Comment:

High GDC:  L▮▮▮▮▮ L▮▮▮▮▮-October of 2014 did annuity sale.
She said it was her only annuity done.  She said people around there don't like annuities.

L▮▮is retired Chemical Engineer and a referral to Greg that Greg gave her and he had huge balances in ▮▮▮▮.  Qualified and non-qualified.  His wife is several years younger than him.  She talked about LTC, He is approximately mid 50's and she is 43.

About ▮▮▮▮▮▮ with AMP.  Assets held away ▮▮▮▮ at bank account and he lives of this and he has about ▮▮▮ in a ▮▮▮.  She has not worked at all.  Live on a farm.

**Advice Review Gaps:** ☒ No  ☐ Yes - Comment:

**Managed Accounts Actions at a Glance:** ☒ No  ☐ Yes - Comment:

**ADV Brochure – able to find and print:** ☐ No  ☒ Yes - Comment:

Exhibit 2

# CIR

The advisor was aware of how to print her brochure and I went over when to give it to a client as well as the Privacy Notice.

**Other topics:**

Seminars: ☒ No ☐ Yes - Are you familiar with the documentation requirements? Compliance Manual 14.1.9.   She is not doing anything until she knows what her compensation will be.

Gifts & Entertainment Policy: ☐ No ☒ Yes – Are you familiar with the policy that even small lunches (over $25) have to be reported and of 30 day reporting requirement.   Compliance Manual 5.1.   She said she just found out of this policy. She said she just learned about it.  She said Amy handles this in the office.

Trading policy ☐ No ☒ Yes - Are you familiar with trading policy.  Soliciting only approved securities; no mismarking tickets; no batching calls then placing trades, speak to the client and place the trades then go to the next client; the proper use of time and price discretion?  Compliance Manual 9.2.1.

Complex Products ☐ No ☒ Yes - - Do you sell Annuities, Non-Traded REITs, Structured Products, etc.  How do you disclose specific product risks? What are those risks?  Said she rarely does complex products.

## 2015 CIR results/Issues:

| What violations, gaps or issues were discovered? | Follow-up action needed |
|---|---|
| | Confirm that you have completed the SPS advisor required training. |
| | Recommend you copy and paste annuity net notes into contact manager. |
| | Continue to update client profiles as part |

Confidential
AFSI/Badgerow 0118

Exhibit 2

## CIR

| | of your service process. |
|---|---|
| | |

**Observations I made from client files, sales or plans I reviewed based on the type of business the advisor conducts:**
*List the client name of each file reviewed along with observations.*

1. D█████ C███████ █████ purchase.  Financial Plan. –This was a 1035 exchange.  She said she had only done one annuity until I asked about this and then she said she remember doing one.  He is her best friend's uncle.  He still works as a boat captain and the wife does not work.  He has his father lives with him too.  They have been moving money to Denise over time.  He is trying to stop working.  He is ██ & she is ██.  His income is about ███k, she looked it up and it is ███k.  Assets with AMP is ██k

File Review: 6/9/16 meeting notes.  1/7/16 VUL illustrations.  1/7/16 insurance application.  12/21/15 financial plan.  10/27/15 brokerage application and BD change form.

Suitability Updated: 12/26/15

Prohibited content: ☒ No ☐ Yes - describe:

2. H█████ C██████.  Large client.  ████████████████████
H██████ and V████.  He works for an offshore company and the wife was a pharmacist and is now working part time.  He had a previous marriage and they have █████ and been working on ████████████.  He is ██ and wants to stop working asap.  Household income he makes about ███k and she makes about ████kworking part time. Assets with AMP is about $█████████ and assets held away, he has ██k in his ████.

File Review: 5/31/16 █████████change form.  5/14/16 Morningstar research on ████.  2/1/16 information disclosure form █████.  11/11/15 █████████ 4/23/15 █████████ account annual review.  6/4/15 █████████ application. 6/4/15 █████████ application.

Suitability Updated: 10/27/14

Prohibited content: ☒ No ☐ Yes - describe:

Exhibit 2

# CIR

3. W█████Z████. Large client. ██████████████ B██ got an early retirement package for ███. She does not work. Ages are ██ & she is ██. Neither of them are working right now. ███k with AMP. Assets held away are in their bank account of about ██k.

File Review: 2/10/16 ████form.  1/4/16 ████████ application.  1/13/16 ████████
██████supporting documentation.  12/14/15 meeting notes.  11/13/15 ████████
change form.  10/8/15 ██████████████████████████.

Suitability Updated: 4/5/16

Prohibited content:  ☒ No  ☐ Yes - describe:

☒ VA in the last 6 months: ☐ No  ☒ Yes - Comment: 1/19/16 D██ C███████

☒ REITs in the last 6 months: ☒ No  ☐ Yes - Comment:

☒ BDCs in the last 6 months: ☒ No  ☐ Yes - Comment:

**Observations made through my supervisory activities:**

Consequence Management

☒ No

☐ Yes - type

    ☐ ECN

    ☐ Letter of Deficiency

    ☐ Letter of Caution

    ☐ Letter of Reprimand

**OBA and Compliance Tracker:**

Confidential
AFSI/Badgerow 0120

Exhibit 2

# CIR

> Nothing Listed.
>
> Are there any other activities? None.
> Remember, need prior approval.

## Social Media:

> Google review issues:   ☒ No  ☐ Yes - Comment:
>
> LinkedIn review issues:   ☒ No  ☐ Yes - Comment:
>
> Does advisor maintain any web sites, blogs or listings not previously reported?
>
> ☒ No  ☐ Yes - Comment: No facebook.

## Additional Items Reviewed or Comments:

> - I covered disclose and document, make sure investments are suitable, watch investments that are illiquid, leave more cash than necessary.  Don't let guard down.
> - Make sure they do not take short cuts to make clients lives easier, treat all clients the same.
> - VUL reprojections
> - Revisit negative features of REITS, Annuities, in your service meetings with clients.
> - Be sure to terminate staff immediately when someone leaves.
> - Understand product features and annuity riders prior to selling.

| What violations, gaps or issues were discovered? | Follow-up action needed: |
| --- | --- |
|  | Recommend you copy and paste annuity net notes into contact manager. |
|  | Use information disclosure form (402203) when disclosing or sharing client information with a 3rd party.  i.e. |

Wolff Juall Investments, LLC: No-Action Letter dated May 17, 200~~  FILED~~

**EXHIBIT**

C

Page 1 of 2

2019 MAY -6 PM 2: 24

CIVIL
DISTRICT COURT



U.S. Securities and Exchange Commission

May 17, 2005

Mr. Christopher J. Juall
Mr. Marc S. Wolff
Moors & Cabot, Inc.
1800 Second Street
Suite 892
Sarasota, FL 34236

Re: Denial of No-Action Request of Wolff Juall Investments, LLC

Dear Mr. Juall and Mr. Wolff:

In your letter dated March 23, 2005, on behalf of Wolff Juall Investments, LLC ("Wolf Juall Investments"), and indirectly on behalf of Moors & Cabot, Inc., a registered broker-dealer ("Moors & Cabot"), you requested assurances that the Division of Market Regulation ("Division") would not recommend enforcement to the Commission under Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") if Wolff Juall Investments, along with Moors & Cabot and Moors & Cabot's registered representatives in its Sarasota and Englewood offices engage in the activities described in your letter without Wolff Juall Investments registering as a broker-dealer[1] in accordance with Section 15(b) of the Exchange Act.

Based on your letter, I understand the facts to be as follows:

Moors & Cabot paid commissions to Marc Wolff, representing the aggregate commissions for the registered representatives employed by Moors & Cabot in its Sarasota and Englewood offices. Mr. Wolff transferred such payments to Wolff Juall Investments, which in turn paid the registered representatives, Mr. Wolff, Mr. Juall, and the offices' support staff. Wolff Juall Investments also paid for office expenses. On review, NASD examiners found these activities to be in violation of NASD Rule 2420.

As you know, NASD Rule 2420 generally prohibits the payment of commissions and fees to entities that operate (or, based on proposed activities, would operate) as unregistered broker-dealers. Section 3(a)(4)(A) of the Exchange Act defines a "broker" as a person "engaged in the business of effecting transactions in securities for the account of others." Section 15(a) of the Exchange Act generally requires brokers-dealers to register with the Commission.

You propose to address the alleged violation of NASD Rule 2420 by Moors & Cabot by having Moors & Cabot pay commissions individually to each of its registered representatives in its Sarasota and Englewood offices. The registered representatives then would transfer such payments to Wolff Juall Investments. Wolff Juall Investments would then make payments to the registered representatives, Mr. Wolff, Mr. Juall, and the offices' support staff, and pay for office expenses. In your view, however, this plan would be inefficient.

**RESPONSE:**

Based on the facts and representations set forth in your letter, the Division is unable to assure you that it would not recommend enforcement action to the Commission if Wolff Juall Investments, along with Moors & Cabot and Moors & Cabot's registered representatives in its Sarasota and Englewood offices engage in the activities described in your letter without Wolff Juall Investments registering as a broker-dealer. We note that the Division has previously declined to grant no-action relief to the practice of routing commissions or other transaction-related compensation from a broker-dealer directly or indirectly to an unregistered entity for the benefit of the broker-dealer's registered representatives.[2] This is because the ability to control the compensation of registered representatives is a key mechanism by which registered broker-dealers exercise supervisory control over sales practices. Compensation schedules can create significant incentives that could undermine a firm's supervisory systems and thus investor protection. Therefore, in order to maintain adequate supervision by registered broker-dealers, registered broker-dealers, not unregistered entities, should determine compensation to natural persons associated with a registered



VERIFIED



Wolff Juall Investments, LLC: No-action Letter dated May 17, 2005                    Page 2 of 2

broker-dealer. Accordingly, while there is an exemption from registration for natural persons associated with a registered broker-dealer,[1] that exemption is not available to Wolf Juall Investments. The Division has also previously indicated that the receipt of transaction-related compensation is a key factor in determining whether a person or entity is acting as a broker-dealer, and that absent an exemption, an entity that receives commission or other transaction-related compensation in connection with securities-based activities that fall within the definition of "broker" or "dealer" contained in Sections 3(a)(4) and 3(a)(5), respectively, of the Exchange Act generally is required to register as broker-dealer under Section 15 of the Exchange Act.[4]

We express no view with respect to other questions these activities may raise, including the applicability of any other provision of the federal securities laws, any state law, or any self-regulatory organization rules. Before engaging in the activities described in your letter, you should consult with private counsel familiar with the federal securities laws to obtain legal advice as to how the above issues should be resolved in your particular circumstances. Private counsel would be in a position to advise you on the basis of a more thorough understanding of your proposed activities.

Sincerely,

Brian A. Bussey
Assistant Chief Counsel

**Endnotes**

[1] The Division grants no-action relief only with respect to prospective activities. Current or prior activities are beyond the scope of no-action relief.

[2] See Letter re: Birchtree Financial Services, Inc. (Sept. 22, 1998); Letter re: 1st Global, Inc. (May 7, 2001); Letter re: Herbruck, Alder & Co. (May 3, 2002).

[3] See Section 15(a) of the Securities Exchange Act of 1934.

[4] See Birchtree, 1st Global and Herbruck, supra note 2.

**Incoming Letter:**

The Incoming Letter is in Acrobat format.

http://www.sec.gov/divisions/marketreg/mr-noaction/moors051705.htm

Home  |  Previous Page                    Modified: 05/24/2005



FILED



2010 MAY -6 PM 2: 25

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20548 IVIL

DISTRICT COURT

**DIVISION OF
TRADING AND MARKETS**

December 4, 2007

David S. Huntington, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

Re:   No-Action Request of ADP TotalSource, Inc.

Dear Mr. Huntington:

In your letter dated November 28, 2007, on behalf of ADP TotalSource, Inc. ("TotalSource"), you request assurances that the Division of Trading and Markets ("Division")[1] will not recommend enforcement action to the Commission under Section 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") if TotalSource engages in the proposed activities described in your letter without registering as a broker-dealer in accordance with Section 15(b) of the Exchange Act.

Based on the facts and representations set forth in your letter, and without necessarily concurring in your analysis, the staff of the Division will not recommend enforcement action to the Commission under Section 15(a) of the Exchange Act if TotalSource engages in the activities described above without registering as a broker-dealer under Section 15(b) of the Exchange Act.[2]

---

[1]    As of November 14, 2007, the Division of Market Regulation is known as the Division of Trading and Markets.

[2]    TotalSource's situation differs from the one where a registered representative proposes to establish a corporation or other entity that, among other things, is to receive the representative's commission from the registered broker-dealer. Such an entity would be considered an "Employee Owned Corporation." The staff of the Division has repeatedly declined to give no-action assurances under Section 15(a) in situations involving Employee Owned Corporations. *See, e.g.*, letter from Brian A. Bussey, Assistant Chief Counsel, Division of Market Regulation, to Christopher J. Juall and Marc S. Wolff, Wolff Juall Investments, LLC (May 17, 2005) (declining to grant no-action relief to the practice of routing commissions or other transaction-related compensation from a broker-dealer directly or indirectly to an unregistered entity for the benefit of the broker-dealer's registered representatives); letter from Barbara A. Stettner, Special Counsel, Office of Chief Counsel, Division of Market Regulation, Securities and Exchange Commission, to Matthew D. Wayne, Vanasco, Wayne & Genelly, on behalf of a specialist member firm on the Chicago Stock Exchange (Feb. 17, 1999) (noting that, absent an exemption, an entity that is to receive commissions or other transaction-related compensation in connection with securities-based activities generally must register as a broker-dealer); letter from David Shillman, Special Counsel, Office of Chief Counsel, Division of Market Regulation, Securities and Exchange Commission, to Richard T. Angelillo, First Financial of Citrus County, Inc. (Sept. 22, 1998) (noting that there is no exemption from registration for corporate entities formed by registered representatives of broker-dealers that receive securities commissions); letter from Terry R. Young, Attorney, Office of Chief Counsel, Division of Market Regulation, Securities and Exchange Commission, to Michael E. Dunn, Dunn & Swan, on behalf of Century Investment Group Incorporated (Jan. 29, 1996).



David S. Huntington, Esq.
December 4, 2007
Page 2 of 2

In particular, we note that TotalSource will have no discretion concerning the amount or frequency of the salary, wage, commission or bonus payments to employees of the broker-dealer who have been placed on TotalSource's payroll,[3] and that TotalSource's broker-dealer clients will have sole and exclusive direction and control over the day-to-day professional activities of all of their employees. The response of the Division represents a staff position regarding enforcement action only, and does not purport to express any legal conclusions with respect to the applicability of the statutory or regulatory provisions of the federal securities laws or any self-regulatory organization rules. Moreover, this response is based upon the representations you have made, and any different facts or conditions might require a different response.

Finally, we note that we have expressed our views numerous times on unregistered firms that seek to provide professional employer services to broker-dealers.[4] Having stated our views, we will no longer respond to letters in this area unless they present novel or unusual issues.[5]

Sincerely,

Brian A. Bussey
Assistant Chief Counsel
Office of Chief Counsel

---

[3]     The staff recognizes that TotalSource would require that all compensation be paid in a timely manner as required by law.

[4]     *See* letter from Catherine McGuire, Chief Counsel, Division of Trading and Markets, to Tanya Perez, President, eEmployers Solutions, Inc. (Dec. 3, 2007); letter from Brian A. Bussey, Assistant Chief Counsel, Division of Market Regulation, to Gregory L. Hammond, Vice President and General Counsel, TriNet Group, Inc. (Feb. 17, 2006); letter from Tara C. Prigge, Special Counsel, Division of Market Regulation, to David S. Mitchell, Esq., Cadwalader, Wickersham & Taft (Apr. 25, 2005); letter from Daniel P. Fisher, Special Counsel, Division of Market Regulation, to David S. Mitchell, Esq., Cadwalader, Wickersham & Taft (Aug. 14, 2002); letter from Brice D. Prince, Attorney-Advisor, Division of Market Regulation, to Peter D. Deutsch, Executive Vice President and General Counsel, EPIX Holdings Corporation (Mar. 12, 2001); letter from Barbara A. Stettner, Special Counsel, Division of Market Regulation, to Samuel J. Castree, Jr., Vice President and General Counsel, Staff Management, Inc. (April 27, 2000); letters from David S. Shillman, Special Counsel, Division of Market Regulation, to Michael R. Miller, Esq., Kunkel Miller & Hament (re: T.T.C. Illinois, Inc., EMPOWER, Inc., and Cura Group, Inc.) (Feb. 1, 1999).

[5]     Unlike other unregistered firms that have received similar relief, the staff notes that TotalSource is an associated person of a broker-dealer by virtue of its corporate affiliation with ADP Broker-Dealer, Inc. ("ADP Broker-Dealer"), a registered broker-dealer; however, TotalSource does not provide professional employer services or any other services to ADP Broker-Dealer. In addition, neither ADP Broker-Dealer nor its personnel are involved in the professional employment services offered by TotalSource. Unregistered firms that are associated with a broker-dealer, but that do not satisfy these representations, would present novel or unusual issues. *See, e.g.,* letter from Joshua Kans, Special Counsel, Division of Market Regulation, to Randy K. Nestel, General Counsel, Investacorp Group, Inc. and Investacorp, Inc. (Sept. 26, 2003).

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064

TELEPHONE (212) 373-3000
FACSIMILE (212) 757-3990

LLOYD K. GARRISON  (1946-1991)
RANDOLPH E. PAUL  (1946-1956)
SIMON H. RIFKIND  (1950-1995)
LOUIS S. WEISS  (1927-1950)
JOHN F. WHARTON  (1927-1977)

WRITER'S DIRECT DIAL NUMBER
(212) 373-3124

WRITER'S DIRECT FACSIMILE
(212) 492-0124

WRITER'S DIRECT E-MAIL ADDRESS
dhuntington@paulweiss.com

1615 L STREET, NW
WASHINGTON, DC 20036-5694
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101
FACSIMILE (81-3) 3597-8120

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO. 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300
FACSIMILE (86-10) 6530-9070/9080

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2536-9933
FACSIMILE (852) 2536-9622

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600
FACSIMILE (44 20) 7367 1650

MATTHEW W. ABBOTT
MARK H. ALCOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
RICHARD B. BORISOFF
HENK BRANDS
JOHN F. BREGLIO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
PATRICK S. CAMPBELL*
JEANETTE K. CHAN
YVONNE Y. F. CHAN
DOUGLAS A. CIFU
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
JAMES M. DUBIN
LESLIE GORDON FAGEN
MARC FALCONE
PETER L. FELCHER
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
KENNETH A. GALLO*
MICHAEL S. GERTZMAN
PAUL D. GINSBERG
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
JOYCE S. HUANG
JEH CHARLES JOHNSON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP
*NOT ADMITTED TO NEW YORK BAR

JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
JOHN E. LANGE
DANIEL J. LEFFELL
JEFFREY H. LIEBELL
JULIA TARVER MASON
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
ALEX YOUNG K. OH
JOHN J. O'NEIL
KELLEY D. PARKER
ROBERT P. PARKER
MARC E. PERLMUTTER
MARK F. POMERANTZ
VALERIE E. RADWANER
CAREY R. RAMOS
CARL L. REISNER
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
STEVEN B. ROSENFELD
PETER J. ROTHENBERG
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
JUDITH R. THOYER
DANIEL J. TOAL
MARK A. UNDERBERG
LIZA M. VELAZQUEZ
MARIA T. VULLO
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
JORDAN E. YARETT
KAYE N. YOSHINO
ALFRED D. YOUNGWOOD
TONG YU
T. ROBERT ZOCHOWSKI, JR.

Securities Exchange Act Section 15(a)

November 28, 2007

Catherine McGuire, Esq.
Associate Director and Chief Counsel
Division of Trading and Markets
Securities and Exchange Commission
Station Place
100 F Street, N.E.
Washington, D.C. 20549-8549

Re:     ADP TotalSource, Inc.
        (Provision of Professional Employer Services to Securities Brokers-Dealers)

Dear Ms. McGuire:

On behalf of ADP TotalSource, Inc. ("TotalSource"), the professional employer organization ("PEO") unit of Automatic Data Processing, Inc., we respectfully request that the Division of Market Regulation confirm that it will not recommend to the Securities and Exchange Commission (the "Commission") that the Commission take any enforcement action under Section 15(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), in circumstances where TotalSource offers certain professional employer services as described below to securities broker-dealer firms that are registered with the Commission pursuant to the Exchange Act.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Catherine McGuire, Esq.                                                                          2

       We believe that the Exchange Act and relevant staff no-action letters permit TotalSource to provide professional employer services (also known as "PEO" services or employee leasing services) to brokers-dealers without registering as a broker-dealer under Section 15 of the Exchange Act. Such precedents include TriNet Group, Inc., SEC No-Action Letter, 2006 SEC No-Act. LEXIS 274 (Feb. 17, 2006), R&H Management, L.L.C., SEC No-Action Letter, 2005 SEC No-Act LEXIS 545 (April 25, 2005), Headway Corporate Staff Administration, SEC No-Action Letter, 2002 SEC No-Act. LEXIS 692 (Aug. 30, 2002), EPIX Holdings Corporation, SEC No-Action Letter, 2001 SEC No-Act. LEXIS 466 (April 2, 2001), and Staff Management, Inc., SEC No-Action Letter, 2000 SEC No-Act. LEXIS 608 (April 27, 2000).

       As was the case in the correspondence to your office from counsel for TriNet Group, Inc., R&H Management, L.L.C., Headway Corporate Staff Administration, EPIX Holdings Corporation, and Staff Management, Inc., TotalSource does not furnish temporary staffing services or facilities management. TotalSource also does not have a core of employees that it sends to various companies, as do firms that provide temporary help or contract staffing. We believe that, by virtue of its activities as a provider of PEO services, TotalSource is not a broker-dealer. TotalSource is an associated person of a broker-dealer by virtue of its corporate affiliation with ADP Broker-Dealer, Inc. ("ADP Broker-Dealer"), a registered broker-dealer; however, TotalSource does not provide PEO services or any other services to ADP Broker-Dealer. Furthermore, neither ADP Broker-Dealer nor its personnel are involved in the professional employment services offered by TotalSource. Although TotalSource may offer 401(k) plans as part of its professional employment services, ADP Broker-Dealer does not provide brokerage or other services in respect of any such 401(k) plans.

Factual Background

       TotalSource offers certain administrative employer services to the existing worksite employees of its clients. TotalSource places its clients' employees onto TotalSource's payroll, providing them with TotalSource's benefits and furnishing the clients and the employees with human resource functions. These functions include human resources consulting services pertaining to advice regarding compliance with applicable employment laws, the provision of benefit services (e.g., health, dental, life, and accidental death, and disability insurance policies), the provision of workers' compensation benefits (including risk management services), the provision of unemployment compensation benefits, and the provision of payroll processing services. The insurance products to be provided by TotalSource are traditional insurance products and would not be "securities" as defined under the federal securities laws.

       TotalSource does not manage the business of its clients. The employees placed on TotalSource's payroll are at all times subject to the client's supervision. TotalSource does not control the worksite at which, or from which, a client's employees perform their services. The client retains the right and the obligation to direct its worksite

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Catherine McGuire, Esq.                                                                          3

employees as is necessary for the operation of such client's business, including the discharge of any fiduciary duty or compliance with any applicable registration, licensing, regulatory, or statutory requirements. Accordingly, the client remains subject to oversight and discipline by the Commission, other relevant governmental regulatory authorities and applicable self-regulatory organizations ("SROs") for any inappropriate actions engaged in by the client or the client's employees at its worksite. In sum, while the employees placed on TotalSource's payroll are employees of TotalSource for purposes of applicable employment laws, they are employees of the clients for purposes of the securities laws, rules, and regulations in all respects.

The arrangements between TotalSource and any broker-dealer clients will provide, among other things, the following:

- Broker-dealer clients will be obligated to comply with all applicable federal, state, and local regulations and registration and licensing requirements;

- Broker-dealer clients will have sole and exclusive direction and control over the day-to-day professional activities of all their employees;

- Broker-dealer clients will be responsible for recruitment, proper registration, licensing, training, and supervision of all of their employees with respect to broker-dealer obligations under all applicable securities laws, rules, and regulations;

- Broker-dealer clients will retain the right to discipline and terminate all of their employees;

- All books and records in the possession of TotalSource relating to the services provided to a broker-dealer client will be made available for inspection by the Commission, any SRO, or any other regulatory authority with jurisdiction over the broker-dealer's business and the broker-dealer/client relationship;

- All employees of a broker-dealer client who are, or are required to be, registered or licensed by the Commission, any SRO, or any other regulatory authority with jurisdiction over the broker-dealer's business will be deemed to be employees of the broker-dealer client for such registration, licensing, or regulatory purposes;

- Broker-dealer clients will not assert that the existence of a professional employer services arrangement with TotalSource in any way affects the ability of the Commission, any SRO, or any other relevant regulatory

authority to regulate or discipline any broker-dealer client or employee of such broker-dealer client; and

- TotalSource will not engage in any securities-related activities that would require registration as a broker-dealer, such as brokerage services.

Control of the day-to-day operations and professional activities of the broker-dealer will remain with the broker-dealer. In this regard, the broker-dealer will continue to maintain and handle all books and records that the Commission, any applicable SRO, or any other relevant regulatory authority may require of a broker-dealer, and will continue to make such books and records available for inspection by the Commission, any other relevant regulatory authority, and any SRO of which the broker-dealer is a member.

Similarly, the broker-dealer will continue to maintain and handle all funds and securities of the broker-dealer's customers. TotalSource will receive payment from the broker-dealer for gross payroll, including salaries, wages, and commissions, and then pay broker-dealer personnel. TotalSource will either charge an administrative fee (inclusive of its profit margin) based on gross payroll or impose a flat, pre-determined administrative fee based on the number of employees serviced by TotalSource. TotalSource's administrative fee will not be based upon brokerage commissions earned by either the employees of the broker-dealer or the broker-dealer itself.[1]

TotalSource will have no discretion concerning the amount or frequency of the salary, wage, commission, or bonus payments to employees of the broker-dealer who have been placed on TotalSource's payroll, except that TotalSource shall require that all compensation is paid in a timely manner as required by law. The broker-dealer will be responsible for informing TotalSource of the payments that are to be made to such personnel. Such books and records relating thereto will be deemed property of the broker-dealer and will be available for inspection by the Commission and any SRO of which the broker-dealer is a member.

In addition, the broker-dealer will retain the traditional rights of an employer, including the right to hire, set compensation for, terminate, discipline, and reassign personnel of the broker-dealer who have been placed on TotalSource's payroll.

---

[1]     TotalSource's situation differs from the one where a registered representative proposes to establish a corporation or other entity that, among other things, is to receive the representative's commission from the broker-dealer. Such an entity would be considered an "Employee Owned Corporation." TotalSource notes that gross payroll will include, among other components, commissions earned by registered representatives. TotalSource understands from its discussions with the Staff that this representation does not mean that broker-dealer commissions will not comprise a portion of the gross payroll upon which TotalSource's fee may be calculated.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Catherine McGuire, Esq.                                                                    5

The broker-dealer will retain the responsibility for supervision and control with regard to the employees' performance of their securities duties, and the same individuals will continue in their capacity as registered representatives of the broker-dealer after the contract between TotalSource and the broker-dealer is executed. Similarly, the broker-dealer will be responsible for registration and training of the employees with regard to any regulated function. Each employee of the broker-dealer will continue to be hold out to the public as the broker-dealer's registered representative and agent in effecting securities transactions. The broker-dealer will be liable for the acts or omissions of each employee after the agreement between TotalSource and the broker-dealer is entered into, to the same extent that it had been liable prior to execution of such agreement. In such regard, each employee of the broker-dealer, as well as the broker-dealer, will be subject to the same administrative jurisdiction of the Commission and of other relevant regulatory authorities and SROs both before as well as after entering into such agreement.

In any promotional materials that TotalSource distributes, TotalSource will not in any way distribute promotional advertisements related to brokerage services. In any promotional activities, TotalSource will mention that it offers professional employer services, but will in no way mention that it is engaged in any brokerage services. In addition, TotalSource will not identify or endorse any broker-dealer in its promotional materials.

A PEO such as TotalSource possesses neither the expertise nor the desire to manage its clients' businesses. Thus, TotalSource will not presume to tell a brokerage firm how to transact its business or attempt to exercise any influence or control with respect to the broker-dealer's conduct of its business.

Analysis

Section 3(a)(4) of the Exchange Act defines the term "broker," in relevant part, as "any person engaged in the business of effecting transactions in securities for the account of others." Section 3(a)(5) of the Exchange Act defines the term "dealer," in relevant part, as "any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise."

Based upon the facts set forth above, we are of the view that TotalSource does not become a broker-dealer by entering into a contract with a broker-dealer to provide the professional employer services described herein. As noted above, the staff has adopted this position in a number of prior no-action letters.

Consistent with the foregoing, we respectfully request that the Division of Trading and Markets advise TotalSource that it will not recommend to the Commission that it take any enforcement action under Section 15(a) of the Exchange Act if TotalSource carries out the professional employer services described above without registering with the Commission as a broker-dealer.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Catherine McGuire, Esq.                                                                 6

      If you believe that the staff of the Division cannot issue a letter in accordance with this request based upon the facts specified above, we respectfully request that you contact the undersigned at (212) 373-3124 or, in my absence, Richard S. Borisoff at (212) 373-3153, so that we may discuss your concerns.

      Enclosed please find seven additional copies of this letter for your use. Please stamp one of the enclosed copies of this letter to acknowledge receipt of this submission and return the same in the self-addressed stamped envelope provided for that purpose. Thank you for your consideration of this matter.

      Sincerely,

      David S. Huntington

cc.    Daniel A. Zaccardo, Esq.
      Staff Vice President and General Counsel
      (Employer Service Division)
      Automatic Data Processing, Inc.
    William F. Cueto, Esq.
      Division Counsel and DVP Legal Affairs
      ADP TotalSource, Inc.
    Lisse Kravetz, Esq.
      Assistant Division Counsel
      ADP TotalSource, Inc.
    Brian Bussey, Esq.
      Assistant Chief Counsel
      Division of Trading and Markets
      Securities and Exchange Commission
    Darren Vieira, Esq.
      Attorney-Advisor
      Division of Trading and Markets
      Securities and Exchange Commission

FILED

2019 MAY -6 PM 2: 25

CIVIL
DISTRICT COURT



EXHIBIT

_E_

Transcript of the Testimony of

# Proceedings of Financial Industry Regulatory Authority (FINRA)

## Date taken: August 27, 2018

### Denise A. Badgerow v. Ameriprise Financial Services, Inc., et al

All electronic deposition & exhibit files
are available at  <<<**www.psrdocs.com**>>>.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

COPY

VERIFIED

Proceedings of Financial Industry Regulatory Authority (FINRA)
Denise A. Badgerow v. Ameriprise Financial Services, Inc., et al

Page 142

1    in the lobby and I told Amy I was there to see

2    Greg.  She didn't speak to me.  Amy was the

3    receptionist.  She went and told Greg I was there,

4    and she came back and sat down.

5            Then I went back to Greg's office and

6    Kylie was sitting there, and that's when Greg

7    asked me if I had told -- if I had spoken with

8    Marc Cohen and why would I tell him anything that

9    would ding his perfect compliance record.  He was

10   very upset with me.

11      Q.   What else did he say?

12      A.   He told me that he could no longer

13   protect me from Tommy and that he was going to

14   have to let me go.

15      Q.   What else did he say?

16      A.   He passed me two letters.  One stating

17   that -- one stating that I could quit and the

18   other one stating that I could be fired.  And I

19   could sign whatever one I liked.

20           I remembered from previous conversations

21   with Greg that he told me -- when I threatened to

22   quit a few times based on the office environment,

23   he asked me not to quit because, if I quit, then

24   my book of business would be divided between the

25   three partners.



FILED

2016 NOV -6 PM 2: 26

CIVIL
DISTRICT COURT

# Ameriprise
## Financial

**Marc Cohen**
Financial Advisor
Registered Principal

**Cohen, Mackall & Associates**
A financial advisory practice of
Ameriprise Financial Services, Inc.

3655 Brookside Pkwy Suite 240
Alpharetta, GA 30022-1429
Tel: 470.545.6833
Fax: 470.375.2322
marc.b.cohen@ampf.com

August 3, 2016

Gregory A Walters
Financial Advisor
132 Rue Collette Ste A
Thibodaux, LA 70301-5628

RE: Letter of Deficiency

Dear Greg,

You are being issued this Letter of Deficiency for failure to follow Ameriprise Financial Services, Inc. company policy. Please be aware that any further violations may result in more serious consequences per the Consequence Management process.

Ameriprise Financial expects all people in our organization to adhere to the policies and procedures instituted to protect the company, our clients and our registered representatives.

Specifically, you failed to compensate your AFA using one of the Ameriprise Financial approved vendors.

Please reference the current Compliance Manual section 4.4 Hiring and Maintaining AFAs which states:

> "If you pay the AFA a percentage of total GDC, the compensation will be paid to you first by Ameriprise and then be paid by you to the AFA through an Ameriprise Financial approved vendor."

Please read the entire section 4.4 in the Compliance Manual.

Please confirm, via email, to the OSJ that you have read and understand the above referenced section in the compliance manual and going forward you use an approved Ameriprise Financial vendor to compensate your AFAs. Please have this back to the OSJ not later than 8/15/2016.

Let me know if you have any questions or concerns regarding this matter.

Sincerely,

Marc Cohen
Registered Principal

Cc:   Mike Barker, FFVP
      Donna Sutton, RRS

An Ameriprise Financial franchise.
Products from RiverSource® and Columbia Threadneedle Investments are offered by affiliates of Ameriprise Financial Services, Inc.
Investment advisory products and services are made available through Ameriprise Financial Services, Inc., a registered investment adviser.
Ameriprise Financial Services, Inc. Member FINRA and SIPC.

CONFIDENTIAL                                                    TM 000436

VERIFIED



FINANCIAL INDUSTRY REGULATORY AUTHORITY
(FINRA)

In the Matter of the Arbitration Between

DENISE A. BADGEROW,
        Claimant

                              **FINRA Case No. 16-02759**

AMERIPRISE FINANCIAL SERVICES,
INC., THOMAS MEYER, GREGORY
WALTERS, AND RAY TROSCLAIR
        Respondents

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Respondents, Gregory Walters (**"Walters"**), Thomas Meyer (**"Meyer"**) and Ray Trosclair (**"Trosclair"**) (collectively referred to herein as **"Respondents"** or **"WMT"**), herein respectfully submit this supplemental memorandum in support their respective Motions to Dismiss to be heard at the conclusion of Claimant's, Denise A. Badgerow (**"Badgerow"** or **"Claimant"**), case.

Badgerow's broad and often-nebulous claims have been a moving target in spite of numerous rulings by the Panel, which tried to bring focus and consistency to this proceeding. The latest example is Badgerow's devotion of slightly over a page in her pre-hearing brief to a previously-dismissed defamation claim.[1] Here is an up to date summary of Badgerow's claims:

### A.    Violation of La. R.S. 23:967 - Louisiana Whistleblower Statute:

In her pre-hearing brief, Badgerow conceded that she has no private right of action (standing) to bring a claim under the books and records regulations established in Rule 17a of the 1934 Securities and Exchange Act, 17 C.F.R. § 240, 17a-3(19)(i).  Instead, she claims her

---

[1] Pages 11-19 of that pre-hearing brief address the now-dismissed joint employer allegation against Ameriprise.

1624134.1

reporting of this alleged violation to an Ameriprise compliance person can be the basis of a violation of the state whistleblower statute.

**B.   Violations of La. R.S. 51:1401, *et seq.* - Louisiana Unfair Trade Practices Act ("LUTPA"):**

Badgerow has historically claimed that the mere existence of a non-solicitation clause in her Ameriprise Associate Financial Advisor Agreement (**"AFA Agreement"**)[2] is the basis of her LUTPA claim against WMT.  In her pre-hearing memo, she alleges for the first time that WMT violated LUTPA by allegedly violating the Louisiana whistleblower statute.

**C.   Tortious Interference:**

Badgerow claims WMT interfered with her March 19, 2014 AFA Agreement with Ameriprise (deemed by the Panel to not be an employment agreement), and that Ameriprise (now dismissed) interfered with Badgerow's "at-will" employment relationship with WMT.[3]

Respondents will address Badgerow's claims as they now exist.  None are supported by the evidence in the record, and the motions to dismiss should be granted accordingly.

**I.   THE EVIDENCE IS ALREADY IN FAVOR OF RESPONDENTS**

Respondents begin with Badgerow's testimony, which took up most of the first day of the hearing.  Badgerow admits that she was an "at-will" employee with WMT.  She also admitted she knows what that means, which is "I could be terminated at any time."[4]  The non-solicitation clause appears in the Ameriprise AFA Agreement, Paragraph E, at page 4 of 8.[5]  Badgerow admits that WMT did nothing to enforce it.  Specifically, at pages 179-180 of the hearing transcript, Badgerow testified as follows:

---

[2] Claimant's and Respondents' Exh. 7.
[3] Badgerow, at p. 27 of her pre-hearing brief, concedes that her employment with REJ Properties, LLC d/b/a WMT was "at-will."
[4] Transcript, Day 1, p. 177:4-11.
[5] Claimant's Exh. 7, Bates No. WMTA000371.

1624134.1

Q.     So as we sit here today, no ask, no tell, whatever you want to say, no one enforced that Non-solicitation Agreement; is that correct?

A.     That's correct.[6]

Remarkably, when confronted with that testimony, which he did not hear because he did not attend the first day of the hearing, Charles Theriot, Badgerow's "damage expert", said that his damage model was, therefore, based only on a "social contract," like a speed limit, rather than any act of WMT to enforce the non-solicitation clause.[7]

Badgerow was terminated on July 26, 2016. On July 28, 2016, she had an interview with Capital One. In fact, she received a phone call the very next day from the office manager of Capital One in New Orleans. He said, "I have a lot of money I need someone to manage." She also had an offer from another Ameriprise franchisee in Destrehan, Louisiana, and was recommended to that Ameriprise franchisee by Marc Cohen of Ameriprise, who testified on Day 2 of the hearing. Badgerow elected to go with Capital One.[8] She received an offer from Capital One, dated August 2, 2016.[9] She became licensed on September 19, 2016. Accordingly, she was only unlicensed for approximately seven (7) weeks.[10]

Badgerow also concedes the overall context of the call she had with Marc Cohen on July 13, wherein she purportedly "spilled the beans" on being paid GDC commissions directly by REJ Properties, Inc. ("REJ"), was no more than a normal compliance interview. By way of background, she admits that she had similar visits with Marc Cohen in 2014 and 2015, but did not reveal in either interview the methodology by which she was being paid GDC commissions.

---

[6] Transcript, Day 1, p. 179:25 to p. 180:1-3.
[7] Transcript, Day 2, p. 195:3-18.
[8] See discussion of her subsequent employment, Transcript, Day 1 at pp. 161-163.
[9] WMT Exh. 16.
[10] Transcript, Day 2, pp. 234-235.

3

1624134.1

Because he never asked, she did not tell.[11]   It is Badgerow's recollection that the reason the methodology by which she was being paid came up in 2016 is that she was, at the time of July 13, 2016, operating out of a satellite office in Houma, Louisiana.[12]   Importantly, Badgerow admits that she did not call Cohen; he called her, because this was again a "normal" compliance call.[13]

Beginning at p. 218 of Day 1 of the hearing transcript, Badgerow is asked to review numerous ACATS transfers and, in it, admitted each time that these individuals, who were clients of WMT, were free to transfer to her.   This important conversation occurred after Badgerow admitted that she did not get any cease and desist letters related to any of these clients (or any other clients).

> Q.   You testified earlier that Mr. Walters, on a couple of occasions, actually tried to keep some of these clients.  Maybe not these we just went through, but some other clients.  Anything wrong with that?
>
> A.   It is the client's decision who they want.
>
> Q.   Absolutely.  He can solicit them and you can solicit them.  That is the business, isn't it?
>
> A.   That's correct.[14]

Claimant's Exhibit 24 is a letter from counsel for WMT seeking to enforce the confidentiality agreement that Badgerow had signed with Ameriprise.  Badgerow admitted, as is self-evident, that the letter does not address the non-solicitation clause at all and does not ask Badgerow to stop soliciting clients.  Although not introduced, a letter was discussed that was sent to WMT by Badgerow's counsel informing them on August 17, 2016 that the non-

---

[11] Transcript, Day 1, p. 178:1-25 to p. 179:1-10.
[12] Transcript, Day 1, p. 202:13-25 to p. 203:1-2.
[13] Id.
[14] Transcript, Day 1, p. 224:4-13.

4

solicitation (styled as a non-compete) was unenforceable.[15]  Accordingly, Badgerow knew there was no prohibition to her soliciting anyone.

Marc Cohen is an Ameriprise franchisee in Atlanta.[16]  He also performs a compliance function throughout the Southeast.[17]  WMT is one of the Ameriprise franchisees subject to Cohen's compliance review.  His testimony is perhaps the most relevant to Badgerow's limited claims herein.  Annually, he interviewed every licensed employee of WMT, including Badgerow.[18]  On July 13, 2016, Cohen conducted a "standard" compliance telephone interview of Badgerow.[19]  In that call, Badgerow advised Cohen that she was receiving commissions directly from REJ[20] rather than Paychex or EmployShare, who were third party vendors approved by Ameriprise to handle GDC commissions.[21]  It is Badgerow's alleged revelation to Cohen of the source of payment of her commissions that is the basis for her securities claim and whistleblower claim.  Cohen confirmed that it was his understanding, which is already addressed in cited legal authority, that payment by REJ of GDC to a licensed advisor is not illegal.  When asked by Badgerow's counsel if REJ had to be a registered broker dealer to pay Badgerow commissions, Cohen correctly answered "no."[22]  Counsel then asked why, and he responded as follows:

> It is an Ameriprise policy to go through a third party vendor, not a FINRA policy.  As long as she is licensed to be compensated, there is no issue.  It has to come from the advisor or a legal entity.  That is the requirement.

---

[15] Transcript, Day 2, pp. 242:16-25 to p. 243:1-4.
[16] Transcript, Day 2, p. 90.
[17] *Id.*
[18] *Id.*
[19] *Id.*, line 17.
[20] The defendant in the Eastern District Litigation, but not in the FINRA proceeding.
[21] Transcript, Day 1, p. 92.
[22] Transcript, Day 2, p. 55:2.

5

1624134.1

As long as she (Badgerow) is licensed REJ could pay her GDC; there is no legal issue. Counsel continued to badger Cohen for many pages, but the bottom line is that the use of a third party vendor was an Ameriprise policy and not the law.  He later testified that this Ameriprise policy was developed to comply with the "books and records" requirement of the 1934 Securities and Exchange Act.[23]

Badgerow's counsel confuses the prohibition against comingling of funds with clients with the fungible nature of payments by Walters, Meyer and Trosclair, individually, into REJ to pay expenses of operation of their Ameriprise franchise.  It is just cash at that point. There is no prohibition on that comingling of funds.  Then, more specifically, at page 63, the following exchange occurred:

Q.  My question is if Walters, Meyer, Trosclair & Associates collected GDC commission from Ameriprise and then put … those funds into REJ, Inc.'s accounts … and then takes those funds and makes payments to Denise Badgerow, … would that violate the compensation sharing provision in this section?

A.  No.

Q.  And why is that?

A.  …I think somewhere in that agreement … AFAs have to be paid either directly from the advisor or legal entity.  Because she is licensed, that is where Ameriprise requires it to be through a third-party vendor.  Where the issue in the industry is when there is somebody who is not licensed and somebody is giving them commissions.  That is a major -- but she is licensed as an advisor to receive commissions.

Q.  But REJ Properties, Inc. is not licensed, correct?

A.  They do not need to be.

---

[23] Transcript, Day 2, p. 76:11.

1624134.1

Counsel was further confused when she asked Cohen if he issued a letter of deficiency to REJ. His correct answer was no, he did not. He issued a letter to Walters, who was the licensed individual. The reason the letter was issued to Walters was because "he was the hiring advisor for Denise, and that is standard operating procedure."[24]

Then, on examination by counsel for Meyer, the following exchange occurred:

> Q.  So the GDC that Ms. Badgerow was being paid was appropriate because she was licensed, correct?
>
> A.  When you say the GDC, it was appropriate.
>
> Q.  She was entitled to be compensated with GDC because she was licensed?
>
> A.  Correct.
>
> Q.  Are you aware of any FINRA regulation that requires the use of a TPA to pay GDC to AFAs?
>
> A.  I don't believe there is any FINRA policy requiring that. It is an Ameriprise policy, I believe…
>
> Q.  Are you aware of any SEC rule that would require that?
>
> A.  No.[25]

Counsel for Badgerow also had Cohen read virtually all of his CIR report.[26] At the bottom of the lengthy partial paragraph at the beginning of page 2 of his compliance report, Cohen states:

> Tommy also said he would fix the payroll issue immediately if any AFAs were not going through the approved system. I did not mention to either of them consequence at this time. I was planning on doing it at the end of the week.

---

[24] Transcript, Day 1, p. 65:18-25 to p. 66:1-6.
[25] Transcript, Day 2, p. 98:14-25 to p. 99:1-4.
[26] Compliance interview record is a CIR report, p. 92:16.

7

Then, in his testimony in response to questions from counsel for Walters and Trosclair, Cohen said he followed up with a telephone call to Walters to give him the "consequence", and that consequence resulted in a deficiency letter of August 3, 2016, which Cohen testified is the "lowest level of consequence of management."[27]

In short, Cohen desperately tried to explain to counsel for Badgerow how the system works. Walters is licensed. He has his license placed with Ameriprise as a broker-dealer. Badgerow, an Associate Financial Advisor, has her licensed placed through Walters, also with Ameriprise. REJ does not need to be licensed, but can serve as an entity to which licensed franchise advisors can deposit money in order to pay the expenses of their practice, which can include legally paying licensed AFAs. That is what happened here, and there is nothing wrong with it. Ameriprise, in order to show compliance with the books and records requirements of Rule 17a has elected to use third party vendors, EmployShare and Paychex, which is perfectly appropriate, but not required by the law. Interestingly enough, Cohen testified that EmployShare and Paychex are not licensed either as broker-dealers.[28]

Importantly, both legally and factually, Badgerow's presumed "smoking gun" revelation to Cohen is not smoking in the least. It certainly does not rise to the level of a violation of law,[29] state or federal, subject to triggering the Louisiana whistleblower statute.

## II.   LAW AND ARGUMENT

### A.   Legal Argument:

Respondents have not violated any law or regulation. Respondents admit they have violated an Ameriprise policy by paying GDC through REJ. That has been corrected, and this

---

[27] Transcript, Day 2, p. 93:11.
[28] Transcript, Day 2, p. 93:24-25 to p. 94:1-2.
[29] It is also not a violation of federal law.

8

1624134.1

minor deficiency is long over.  Since it is not a violation of any law, Badgerow's whistleblower claim must fall, because its initial premise is false.[30]  Moreover, to the extent Badgerow recants her withdrawal of her direct claim against WMT, there is no private right of action under Sec. 17 of the 1934 Exchange Act. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 569, 99 S.Ct. 2479, 61 Law. Ed.2d 82 (1979).

    **B.**    <u>No Private Right of Action Exists for Alleged Violations of SEC and FINRA Regulations:</u>

Badgerow makes the frivolous assertion that WMT somehow violated Section 17(a) of the Securities Exchange Act of 1934 (15 U.S.C. §78a et. seq.) (the "34 Act"), SEC and FINRA rules by contributing their cash to REJ Properties ("REJ") in order to pay expenses, including some payroll expenses.  Although Badgerow was paid through REJ, at no time did WMT or REJ pay or share commission-based compensation with an unregistered person.  Indeed, Badgerow concedes this fact.

The Regulation implementing §17(a) states that:

> [E]very broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934... (here Ameriprise) shall make and keep current the following books and records relating to its business: ... A record ... As to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary. In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority.  17 C.F.R. § 240.17a-3(19)(i).

17 C.F.R. § 240.17a-3(19)(i)-(ii) requires broker-dealers to maintain:

> A record... [o]f all agreements pertaining to the relationship between each associated person and the member, broker or dealer including a summary of each associated person's compensation arrangement or plan with the member, broker or

---

[30] As stated *supra*, Badgerow has apparently dropped her claim that she has a direct cause of action under 17a of the 1934 Securities and Exchange Act.

9

dealer, including commission and concession schedules and, to the extent that compensation is based on factors other than remuneration per trade, the method by which the compensation is determined.

Importantly, neither Walters, Meyer nor Trosclair are broker-dealers, rather they are persons associated with a member firm. Accordingly, the notion that they are subject to §17(a) is incorrect. Equally important is the fact that no private right of action exists for violation of §17(a). *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 569 (1979) ("Section 17(a) simply requires **broker-dealers** and others to keep such records and file such reports as the Commission may prescribe. It does not, by its terms, purport to create a private cause of action in favor of anyone.") "There is no basis in the language of §17(a) for inferring that a civil cause of action for damages lay in favor of anyone. *Id.* at 571, *citing Cort* v. *Ash*, 422 U.S. 66, 79. "When Congress wished to provide a private damage remedy, it knew how to do so and did so expressly." *Touche*, 442 U.S. at 572. "The fact that a federal statute has been violated, . . . does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago*, 441 U.S. 677, 688 (1979).

Having failed to state a claim pursuant to §17(a), Badgerow claims that WMT violated FINRA Rule 2040 by distributing her compensation through REJ. Rule 2040 provides:

> No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to: (1) any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act but, by reason of receipt of any such payments and the activities related thereto, is required to be so registered under applicable federal securities laws and SEA rules and regulations; or (2) any appropriately registered associated person unless such payment complies with all applicable federal securities laws, FINRA rules and SEA rules and regulations.

There is no dispute that Badgerow is a "registered associated person," and it is equally undisputed that Badgerow fails to point to a single federal, FINRA or SEA rule that has been

10

violated. Rather, Badgerow takes the contorted view that because WMT failed to adhere to an

Ameriprise policy requiring franchisees to contract with a third-party payroll vendor to distribute

commission related compensation, she has suffered damage. Of course, Badgerow has failed to

prove that she sustained any damage as a result of WMT's practice of paying her through REJ.

Additionally, even if a violation of SEC or FINRA rules occurred – which it did not – FINRA

and the SEC are vested with the exclusive authority to enforce those rules.[31]

At the evidentiary hearing, Michael David Barker, Franchise Field Vice President for

Ameriprise, when questioned by Ms. Butler, testified:

> Q:     The policy with regard to books and records is so that Ameriprise can see
> from start to finish, the flow of GDC commissions, correct?
>
> A:     The policy is in place so that when we pay the GDC, it is done being
> GDC, it is cash at that point.  What they choose to do with it is at their discretion.
> If they want to put it in a joint account and pay their staff, how they choose to pay
> them, they can pay them.  They can pay their rent, they can pay whatever they
> want from those accounts, you know within reason.  It is their money at that point.
> We are no longer connected to those accounts or that money.  **It is no longer
> GDC.**

(Transcript, Day 2, Barker Testimony, p. 130: 21-25; p. 131:1-9).  Additionally, Mr. Barker went

on to explain that not all GDC is commission based:

> Q:     Is all GDC-based compensation, all GDC that goes to the AFA, is that all
> commission-based?
>
> A:     So depending on the definition of the word "commission," no.  There are
> managed account products, which are often referred to as fee-based financial
> planning fees, then there is true, what most people consider broker-dealer
> commissions, such as the sale of a mutual fund product, a REIT or a BDC, things
> that are brokerage-based, there is insurance commission that comes off it.  So it

---

[31] REJ is not subject to the requirements of 17 C.F.R. § 240.17a-1 et. seq. because REJ is not a registered broker-dealer.  Rather, WMT are franchisees of a broker-dealer, Ameriprise, and REJ is an entity established by WMT for the sole purpose of facilitating payment.  Therefore, the purported obligations imposed by Badgerow on WMT and ultimately REJ are misguided and inapplicable.  Similarly, Badgerow's assertion that FINRA 2040 was violated also fails because it is an **Ameriprise policy** that was allegedly violated, not any law or regulation promulgated by federal securities laws, FINRA or the Exchange Act.

1624134.1

just kind of depends on your definition of the word "commission." I don't believe, but I wouldn't consider myself an expert, that regulators consider all of that commission. I do think it is viewed a little bit different based off of fee-based versus broker-dealer commission.

(Transcript, Day 2, Barker Testimony, p. 135:24-25; p. 136:1-16).

Badgerow's reliance on the no-action letters cited in her pre-hearing brief as proof of wrongdoing by WMT is equally misguided. First, no-action letters are informal and have no binding legal authority. *See e.g., https://www.sec.gov/interps.shtml.* No-action letters merely serve as the opinions of the Commission on arguable questions of the law. More importantly, Badgerow relies on letters interpreting NASD Rule 2420, which has been repealed and superseded by FINRA Rule 2040. It is noteworthy that since the rule change took effect in August 2015, the SEC has not issued a single no-action letter opining on Rule 2040. Further, it is clear from a plain reading of FINRA Rule 2040, and the preceding discussion, that the facts present here do not constitute a violation of Rule 2040.

WMT are all registered persons with Ameriprise. REJ has never performed services and functions that would qualify it as an "unregistered broker-dealer." REJ is simply an entity established by agreement among WMT in order to facilitate administration and operation of their business. REJ has never operated, nor would operate as a broker-dealer, never held itself out as a broker-dealer.[32] REJ is essentially serving the same purpose as third-party administrators such as Paychex or EmployShare: to serve a "back office" function as an administrator. Clearly, REJ is not required to register as a broker-dealer.

---

[32] Securities Exchange Act § 3(a)(4)(A) defines "broker" as any person engaged in the business of effecting transactions in securities for the account of others.

12

1624134.1

Badgerow failed to meet her burden at arbitration hearing that she was in any way wronged by the method by which she received compensation. Therefore, Badgerow's claim fails and must be dismissed.

## C.    Badgerow's State "Whistleblower" Retaliation Claim Predictably Fails:

Badgerow urges that she is protected from retaliation pursuant to Louisiana's whistleblower statute La. R.S. 23:967. Once again, Badgerow's assertion fails as a matter of law because Badgerow Does Not Satisfy the Requirements of La. R.S. 23:967.

Louisiana's Whistleblower Statute ("LWS"), La. R.S. 23:967, ". . . targets serious employer conduct that violates the law." *Ricalde v. Evonik Stockhausen, LLC*, 202 So. 3d 548, 552 (La. App. 5 Cir. 9/22/16), *writ denied*, 212 So. 3d 1170 (La. 12/16/16). The statute provides, in pertinent part:

> "A) An employer shall not take reprisal against an employee who in good faith, **and** after advising the employer of the violation of law:
> 1) Discloses or threatens to disclose a workplace act or practice that is in violation of **state law,**
> 2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law,
> 3) Objects to or refuses to participate in an employment act or practice that is in violation of law."

La. R.S. 23:967.

Reporting an alleged violation to an employer is "a condition precedent to protection under the statute." *Fondren v. Greater New Orleans Expressway Comm'n*, 871 So. 2d 688, 691 (La. App. 5th Cir. 4/27/04). "The employee must first advise the employer of the violation of law before the statutory remedies take effect." *Mabry v. Andrus*, 34 So. 3d 1075, 1081 (La. App. 2d Cir. 4/14/10).

13                                          1624134.1

Additionally, there must be a violation of state law, otherwise an employee is not entitled to the law's protection. *See e.g. Smith v. Diamond Offshore Mgmt. Co.*, 2003 U.S. Dist. LEXIS 23345 (E.D. La. Dec. 23, 2003) (holding that where Louisiana law did not mandate payment of overtime wages, the employer's failure to pay those wages did not constitute a violation of state law; therefore, the employer's alleged retaliation against the employee for threatening to report that action did not state a claim). "To state a claim under La. R.S. 23:967, a plaintiff must allege the violation of state law." *Ware v. CLECO Power LLC*, 90 Fed. Appx. 705, 709 (5th Cir. 2004); *see also Noto v. Regions Bank*, 2003 U.S. Dist. LEXIS 10039 (M.D. La. June 10, 2003), *aff'd*, 84 Fed, Appx. 399 (5th Cir. 2003) (holding that an employee who never disclosed or advised the employer of practices in violation of state law had no basis for a retaliation claim). "The Louisiana Supreme Court has endorsed the position uniformly adopted by the Louisiana appellate courts which hold that only state law can support a cause of action under the LWS." *Gaspard v. Bechtel Oil, Gas & Chems. Constr. Servs.*, 2018 U.S. Dist. LEXIS 95470 *13 (W.D. La. June 4, 2018).

Badgerow fails to satisfy the requirement that she report a violation of state law on multiple levels. First, REJ is not a registered broker-dealer, and is not subject to §17(a). Second, Badgerow only alleges a deviation from an Ameriprise policy, not a violation of SEC rules, FINRA rules, the '34 Act or Louisiana state law. The fact that Badgerow may have reported a policy violation to Ameriprise is inconsequential. It is undisputed from hearing testimony that Ameriprise was not her employer, but rather the broker-dealer through which she was registered.

Further, Badgerow's argument that because her employment terminated shortly after she allegedly reported the non-existent violation of SEC and FINRA rules to Ameriprise is proof of retaliation, is equally misplaced. It is settled that "temporal proximity alone is insufficient to

14

prove but for causation." *Strong v. Univ. Health Care Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007). "We affirmatively reject the notion that temporal proximity standing alone can be sufficient proof of but for causation. Such a rule would unnecessarily tie the hands of employers." *Id.*

Clearly, in reviewing every prong of this analysis, Badgerow's claims fail.

### D.   Badgerow Fails to State a Claim Under LUTPA:

The relationships between Badgerow and Walters, and Badgerow, Walters and Ameriprise, are subject to analysis under La. R.S. 51:1406(1), which states that the provisions of LUTPA shall not apply to any licensee of the Office of Financial Institutions. Ameriprise, Walters, Meyer, Trosclair and Badgerow are all licensees. For this reason alone, Badgerow's LUPTA claim should be dismissed.

Setting aside this categorical inapplicability, Badgerow claims for the first time in her pre-hearing brief that WMT violated LUTPA by allegedly terminating her for blowing the whistle on the way WMT paid her. Because the compensation methodology applied to Badgerow is not illegal, let alone immoral or unethical, that methodology cannot be the subject of a LUTPA claim. Violation of Ameriprise policy is simply insufficient to support a LUTPA cause of action.

> In order to prove a violation of LUTPA, a plaintiff must show: "(1) an unfair or deceptive trade practice declared unlawful; (2) that impacts a consumer, business competitor or other person to whom the statute grants a private right of action; (3) which has caused ascertainable loss." Louisiana courts have consistently held that, in establishing a LUTPA claim, a plaintiff must show that "the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious." Consequently, "the range of prohibited practices under LUTPA is extremely narrow," as LUTPA prohibits only fraud, misrepresentation, and similar conduct, and not mere negligence. Furthermore, conduct that offends established public policy and is unethical is not necessarily a violation under LUTPA.

15

*Christopher Costin v. GOTECH, Inc.*, CV 16-873-SDD-RLB, 2018 WL 3451513, at *12 (M.D. La. July 17, 2018) (Internal citations omitted).

Furthermore, "[a] one-year limitations period applies to private actions brought under LUTPA ... Louisiana federal district and state appellate courts have determined that the time for filing a private cause of action under LUTPA is peremptive in nature rather than prescriptive ... [P]eremption means that a claim cannot be suspended or interrupted." *Costin*, at *12. Badgerow's newly cast LUTPA claim is perempted because it was asserted (August 7, 2018) well over one year following her termination (July 26, 2016).

Until her pre-hearing memorandum, the principal argument Badgerow presented under LUTPA centered on the non-solicitation clause contained in Subpart E of the March 19, 2016 Associate Financial Advisor Agreement between Ameriprise and Badgerow. Pretermitting the issue that this was an Ameriprise agreement, not a WMT agreement, Badgerow admits that WMT never did anything to enforce it. To support Badgerow's damage model, her expert had to call this a "social contract" like a speed limit. The "but/for" test fails. The evidence was also replete with clients who elected to transfer their business to Capital One with Badgerow. In fact, she is doing quite well at Capital One by her own admission, as revealed in her tax returns. Badgerow's excuse is that she did not try to solicit anyone. Regardless, on August 17, 2016, her lawyer wrote a letter to counsel for WMT asserting that the non-solicitation agreement was invalid and/or unenforceable. There was no contrary response from WMT or its counsel. Accordingly, at least on August 17, 2016, the date of that letter, and well before September 19, 2016, when Badgerow was again licensed, Badgerow knew that she had no impediment from that non-solicitation clause in her AFA agreement to compete, solicit, or do whatever she could

16

to grow her business.  Badgerow's claims under LUTPA are meritless and, in fact, so meritless as to be incredible.

    **E.**    <u>No Tortious Interference Claim:</u>

    As described *supra*, Ameriprise is alleged to have interfered with WMT's verbal "at-will" agreement with Badgerow.  Ameriprise is dismissed, so that claim is no longer viable.  Conversely, WMT is supposed to have interfered with Badgerow's AFA agreement with Ameriprise, which now the Panel has found is not an employment agreement.  Indeed, it was Walters who could hire and fire Badgerow, not Ameriprise.  In short, there is nothing to be interfered with.

    Louisiana is somewhat of an odd duck in the United States, because it has a very limited cause of action for tortious interference.  *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La 1989).  As discussed in pretrial memoranda, the actual window into tortious interference was *in dicta* in that case.  Since that finding, courts have upheld the restriction on tortious interference claims in varying degrees.  *Magnolia Fin. Group v. Antos*, CV 15-7144, 2016 WL 7407174, at *3 (E.D. La. Dec. 22, 2016) ("Tortious interference with contract was recognized in a limited fashion by the Supreme Court of Louisiana ... and to date the holding has been restricted to the precise cause of action it explicates: that is a situation involving a corporation, an officer of the corporation, and a contract between the corporation and a third party."); *Duplessis v. Warren Petroleum, Inc.*, 672 So.2d 1019, 1025 (La.App. 4 Cir. 3/27/96); *Spears v. American Legion Hospital*, 780 So.2d 493, 498 (La.App. 3 Cir. 1/31/01).  There is no evidence in the record to support a factual situation even remotely close to the *9 to 5 Fashions, Inc. v. Spurney dicta*.

    As described above, Louisiana courts have long held that tortious interference with contract claims do not extend to employment contracts or even contracts that are not

17

employments contracts, such as the Ameriprise AFA agreement. *Favrot v. Favrot*, 68 So. 3d

1099, 1111 (La. App. 4th Cir. 2011), *writ denied*, 62 So. 3d 127 (La. 2011) ("Our law, however,

does not recognize a cause of action for tortious interference with such at-will employment.");

*Hanna v. Shell Expl. and Prod., Inc.*, 234 So. 3d 179, 197 (La. App. 4th Cir. 2017) ("[a]n at-will

employee simply has no 'legally protected interest in his employment necessary for a claim for

tortious interference with a contract.'") This claim, respectfully, should be dismissed easily.

> **F.    Badgerow's Damage Model Expert was Discredited Completely:**

Respondents hesitate to even discuss Charles Theriot's testimony, because it is moot if

Respondents' prevail.  However, Theriot's testimony was so incredible and far from reality that

it is evidence of the overall lack of credibility of Badgerow's case.  Charles Theriot was retained

by Badgerow to render an expert report on her alleged damages in the Eastern District lawsuit

and testify on her behalf at the FINRA hearing.  Remarkably, he did not attend Day 1 of the

hearing and missed five hours of Badgerow's testimony.[33]  He was, therefore, in the dark on

cross-examination as to Badgerow's various admissions.  The most important of these was

Badgerow's admission, on the record, that WMT did nothing to enforce the non-solicitation

agreement.  His attempt to avoid Badgerow's admission is sufficiently probative that it should be

quoted:

> Q.    So if Ms. Badgerow testified in this hearing that no one ever tried
> to enforce that non-compete agreement, would that change your
> opinions with respect to the transfer of business?
>
> A.    No, my understanding of contracts is they are meant to be
> complied with not to be enforced.  So if you have a contract, I
> think that is sort of -- it is like the speed limit is 65 on the
> interstate.  That is meant to be obeyed; enforcement is another

---

[33] Transcript, Day 2, p. 232:23-25 to p. 233:1-7.

matter.  But you are supposed to obey it whether it is enforced or not.

Q.      A speed limit is not a contract, right?

A.      It is, it is.  If you travel at that speed limit or less, you will not get a ticket for speeding.  So it is a contract.  <u>It is a social contract.</u>[34]

(emphasis added)

There we have it -- a social contract.  Theriot's complete and utter failure to support his report did not stop there.  He contends that 94% of Badgerow's business would have moved with her to Capital One but/for the unenforced non-solicitation agreement.[35]  Putting aside that obvious blunder, the non-peer reviewed journals he used to support this premise relate to client retention by a broker who stays put -- not a broker who is moving.[36]  Even one of the reports says that the longer the broker is in business and the longer the relationship with the client, the more likely the client is to stay.

Theriot was further embarrassed when it was pointed out to him that Badgerow's entire term as an AFA was 28 months and 7 days.  He admitted that CPAs in his firm could not take business at that level of experience.[37]  He testified the same is generally true with lawyers, and certainly the same with financial advisors.[38]  Moreover, most of the "book of business" Badgerow claimed was actually direct referrals to her from Greg Walters.  Theriot only took Badgerow's word for the source of business.  He also did not witness the testimony from Walters on Day 1 of the hearing, wherein Walters indicated that he did that so she could make a living wage, because she was not getting business on her own.  He did not look at WMT Exhibits 57

---

[34] Transcript, Day 2, p. 195: 3-18.  He also was not aware that Ms. Butler wrote a letter to WMT on August 17, 2016, telling WMT to not enforce the non-solicitation clause in the Ameriprise AFA Agreement.  Transcript, Day 2, p. 242:15-25 to p. 243:1-4.
[35] Transcript, Day 2, p. 205:15-25 to p. 209:1-14.
[36] Id.
[37] Transcript, Day 2, p. 228:7-25 to p. 232:1-22.
[38] Id.

19

and 59, which distinguish Badgerow's natural market from what Walters gave to her.[39]  That important distinction made no difference to Theriot in his report.  His disregard of the evidence is stunning.

## III.   CONCLUSION

Badgerow's limited claims in this proceeding are without merit under prevailing jurisprudence and statutory law. Badgerow has no standing (which she conceded) to pursue the alleged SEC and FINRA violations relating to her verbal contract of employment, WMT not using an approved third-party vendor for commission payments, and REJ's payments to her. Moreover, none of these purported violations contravene state or federal law or caused Badgerow any damage. Her invented tortious interference claim is not recognized under Louisiana law. Neither are her whistleblower reprisal and LUTPA claims.  Finally, the testimony of Badgerow's "damage expert" established that Theriot, his report, and, for that matter, Badgerow's entire case lacks any indicia of credibility. WMT respectfully request the Panel grant the motions to dismiss, dismissing Badgerow's case in its entirety.

---

[39] Transcript, Day 2, p. 183:8-11.

1624134.1

RESPECTFULLY SUBMITTED
By Attorneys:

**BREAZEALE, SACHSE & WILSON, L.L.P.**
301 Main Street, Suite 2300
Baton Rouge, Louisiana  70801
Telephone:  (225) 387-4000
Facsimile:  (225) 381-8029

*s/ Claude F. Reynaud, Jr.*
Claude F. Reynaud, Jr. (#11197)
Sunny Mayhall West (#33968)

and

Eve B. Masinter (#1218)
E. Frederick Preis, Jr. (#10704)
**BREAZEALE, SACHSE & WILSON, L.L.P.**
909 Poydras Street, Suite 1500
New Orleans, Louisiana  70115
Telephone:  (504) 584-5454
Facsimile:  (504) 584-5452

*Counsel for Respondents, Gregory Alan Walters, Ray Anthony Trosclair, and Walters, Meyer, Trosclair & Associates*

and

**BRESSER, AMERY & ROSS, P.C.**
17 State Street, 34th Floor
New York, NY  10004
Telephone: (212) 425-9300
Facsimile: (212) 425-9337

*s/ Thomas A. Roberts*
Thomas A. Roberts
troberts@bressler.com

*Counsel for Respondent, Thomas J. Meyer*

21                                          1624134.1

FILED

2019 MAY -6 PM 2: 27

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**(FINRA)**

CIVIL
DISTRICT COURT

In the Matter of the Arbitration Between

DENISE A. BADGEROW,
            Claimant

**FINRA Case No. 16-02759**

AMERIPRISE FINANCIAL SERVICES,
INC., THOMAS MEYER, GREGORY
WALTERS, AND RAY TROSCLAIR
            Respondents

---

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing *Supplemental Memorandum in Support of Motion to Dismiss*, upon the following *via* email and the FINRA Portal and upon the Panelists *via* the FINRA Portal on this 4th day of **October, 2018**:

    **Amanda J. Butler**
    BUSINESS LAW GROUP
    700 Camp Street
    New Orleans, LA  70130
    abutler@lawgroup.biz

    *Counsel for Denise A. Badgerow*

                                        s/ Claude F. Reynaud, Jr.
                                        Claude F. Reynaud, Jr.

22                                                          1624134.1

FILED

2019 MAY -6  PM 2: 28

Exhibit
H

1

CIVIL
DISTRICT COURT

Transcribed Digital Audio Recordings

Re: Denise A. Badgerow vs. Ameriprise Financial, et al

Arbitration Case No. 16-02759

Transcribed 2/21/19

TRANSCRIBED BY:

LAINEY B. MARGAVIO, CCR

Certified Court Reporter

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com



7

it only applies to registered broker dealers -- and REJ
is not a registered broker dealer -- it has no
application in this case, and in the court.

In response we come to the new assertion that,
oh, well, it's really a violation of 15(A), which
requires registration of a broker dealer.  In essence,
the Claimant is alleging that REJ Properties because
they paid Ms. Badgerow some commission-based
compensation would have to be a broker dealer.  That is
perhaps the biggest stretch of the Exchange Act that
I've ever heard in my years of practice.  A broker
dealer is defined very clearly pursuant to the rules as
to who must register pursuant to the Act.  If you look
at 15(A) and you look at Section 3848, a broker is
defined as a person engaged in the business of effecting
transactions in securities for the accounts of others.
This record is devoid of any evidence that REJ ever did
any such thing.

REJ, for lack of a better term, is kind of a
holding company, or a company -- not even a holding
company.  It was kind of a conduit by which three
individual registered reps put money in; paid their
joint expenses; and in some instances, paid employees.
That is it.  They never held themselves out to be a
broker dealer, nor did they ever once effect a

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

8

transaction in securities.  And there is no evidence to
say that.

So we can go a step further.  So they are not a
broker.  Are they a dealer?  If we look at Section 3858
of the Exchange Act, it's clearly defined what a dealer
is.  Any person engaged in the business of buying and
selling securities for his own account through a broker
or otherwise.  Now, REJ did no such thing, and there is
no evidence to that affect.  None was offered because it
never happened.  They are neither a broker or a dealer,
so they need not be registered for anything.  Because
there is no violation of 17(A), no violation of 15(A),
there can be no whistleblower claim.  You have to have
the underlying violation before you can have a
whistleblower claim.

So it's easy to just read the definition of
what a broker is, but let me tell you what the SEC
fleshes it out to be in their definitions.  A broker
finds investors or customers, makes referrals for other
-- or acts as a securities intermediary.  It finds
investment banking clients for registered broker
dealers.  It finds investors or issuers, entities
issuing securities.  It engages in or finds investors
for venture capital.  It finds buyers and sellers of
businesses.  There is no evidence here, no testimony,

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

nothing that REJ ever engaged in those activities.
Zero.

Similarly, if we look at what a dealer is, a
person who holds himself out as being willing to buy and
sell a particular security on a continuous basis, also
known as a market maker; a person who runs match books
of repurchase agreements or repos; a person who issues
or originates securities that he also buys and sells.
Zero.  There is no evidence in this record, and they
offered no testimony either through fact witnesses or an
expert that REJ is a broker dealer.  Because they are
not, there can be no whistleblower violation.  If they
needed to be or there was some inkling that they are a
broker dealer or needed to be registered as a broker
dealer, one would think that the Claimant would have met
their burden and perhaps put on some evidence in the
form of fact witnesses or expert testimony.  No expert
testimony.  No fact witness.

In fact, the only expert that testified with
respect to 17(A), because that is what the questions
related to, was Mr. Barker from Ameriprise.  And in his
capacity as a supervisor, as a 20 -- a registered 24
supervisor, Series 24 supervisor, there is no
requirement with respect to this TPA.  Is it best
practice to use a TPA?  Undoubtedly.  It gives the

ALLIANCE COURT REPORTERS, LLC
(504)488-5624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

broker dealer the ability to track who commission related compensation is going to. It's an added layer of supervision. It's a best practice. Is it an absolute requirement? No.

In order to bolster this, the Claimant cites to no action letters issued by the SEC saying that this is a prohibited activity. First, no action letters are not binding. They are just the opinion of the Commission that if faced with something, they cannot guarantee that they wouldn't proceed with an enforcement action. That is all they say. They don't tell you not to proceed with the course that you want to. They say if we were faced with this, we cannot guarantee that we would not commence an enforcement action.

Here, FINRA came in and audited these folks -- excuse me, not audited, but FINRA does compliance audits of Walters, Meyer and Trosclair. They never brought any enforcement action. And when Ameriprise found out about it, they said, Yeah, you violated a company policy. They wrote a letter telling them don't do it again and comply with the policy, which they have. There is no underlying violation here. More importantly and remarkably, actually, these no action letters don't apply or weren't determined with respect to the rule that is in effect now and in effect at the time that the

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

transactions took place that the payments were being made.

I mean, right now 2040 is the existing FINRA rule with respect to payment to registered persons, which has always been in effect.  2040 really was amended to deal with the payments to unregistered persons and the guidance with respect to how you can pay commission-based transactions or security-based transactions to unregistered persons.  Okay.  Everything here, the entire record, Badgerow was always registered when she was paid a commission-based transaction.  There is no question about it.  There is no contrary evidence.  She admitted herself she was registered at the time that these things happened.  So, again, I think that this notion that there is some securities law violations, particularly with respect to the Exchange Act, is just total and sheer fabrication for purposes of trying to bootstrap some whistleblower claim that doesn't exist.

Finally, what are our damages here?  Even if it was a violation, it wasn't -- she was paid what she was supposed to be paid.  The violation would have been against the individuals who paid her.  It would have been against Walters, Meyer and Trosclair.  Okay.  They would have had to answer to the SEC or FINRA; but it never happened because there was no violation sufficient

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

-- well, no violation at all because they don't have to be.  And, second, she was -- she was always paid consistent with the way that they told her that she would be paid.  So by virtue of the fact that she was just paid by an entity that Ameriprise didn't approve doesn't mean that she suffered any damage with respect to that payment.  And without damage, you can't have a cause of action.  It's ineligible.  And there is no evidence to the contrary.

I mean, this record is so devoid of any evidence of a violation that candidly I'm kind of surprised we are hearing this.  This is -- I know it's an important issue.  I'm not trying to minimize why we are here.  At the same time, when you look at the law and you look at the well-established -- the statutes, the plain language with respect to both books and records, must be a broker dealer.  REJ was never a broker dealer, we concede.  15(A), do they need to be a broker dealer?  No.  No.  They never effected a single securities transaction, never held themselves out to do any of that.  So for those reasons you can't have a corresponding whistleblower violation because there is no underlying violation of any law.

And unless the Panel has any questions? I'm happy to share whatever other statutory guidance you

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

13

need, but I think this case needs to be dismissed.

THE CHAIRMAN:

Well, as to why it's heard, this Panel ruled that your earlier motion to dismiss be carried over to the case, and there was an opportunity provided for a full hearing, which I think is a very important part of this process.  And then with respect to why we are here today is to make sure that you and your clients, as well as the Claimants, get -- the Claimant gets a full opportunity to be heard because there is more than one way to see a record, and we want to make sure that we hear it from every way before we make a ruling.

MR. ROBERTS:

That is totally fair, and I probably overstepped my advocacy guidelines when I said that.

THE CHAIRMAN:

Well, no harm, no fowl there.  I just want you to understand our thinking.

MR. ROBERTS:

Sure.  I appreciate that.  Thank you.

MR. REYNAUD:

Okay.  I'm Claude Reynaud, again, for

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

14

Respondents Walters and Trosclair. We will have a
little bit of overlap. I look at the whistleblower
claim like peeling back an onion. We will do it in
reverse order. At the core of it is the fact that there
is no violation of any law, federal or state.
Mr. Roberts has articulated that. Whether it's REJ
paying Ms. Badgerow directly and violating, allegedly,
17(A) or that REJ should be registered as a broker
dealer, those are no violations of law. So at its very
core, the onion goes away. It was rotten. That is even
better. But beyond that, the Louisiana whistleblower
statute says that is has to be a violation of state law.
Ms. Badgerow has asserted certain Administrative
Procedures Act provisions, and those are simply not
applicable, nor do they raise a right of action. So
once again that next layer of onion goes away.

          Probably more importantly than anything,
Mr. Walters, Mr. Trosclair and Mr. Meyer did not employ
Ms. Badgerow. REJ did. And REJ is not a party. REJ --
this Panel really doesn't even have jurisdiction over
REJ's license, probably couldn't proceed against REJ
even if Ms. Badgerow tried to do it, unless we
consented. And as you well know, REJ is a defendant in
the litigation, so those claims -- claims, not
necessarily the same claims, can be asserted against REJ

ALLIANCE COURT REPORTERS, LLC
(504)488-6624  alldepo@bellsouth.net
4919 CANAL STREET, SUITE 303, NEW ORLEANS, LA 70119
www.alldepo.com

Exhibit I

**EmployShare**
Employer Risk Management Solutions

FILED
2019 MAY
CIVIL
DISTRICT COURT

Monday, October 6, 2014

Proposal Details Document – Walters, Meyer, Trosclair & Associates

The premise behind your Invisible Fence Blueprint; *The System*
    One of our esteemed Ameriprise resources, Art DeLorenzo, coined this metaphor. His view of our core services platform is that we are like a security system or invisible fence; "Helping you to protect your business by keeping the bad things out and the good things in."

The following information represents a general overview of our proposal details. This information is likely to change based on further discovery and discussions on your needs and objectives.

IDEAS FOR UTILIZING YOUR LEGAL ENTITY
    NOTE: Your organization already utilizes an S-corporation equally owned by Greg and Tommy. The following information is for information purposes only.
- Many clients utilize a legal entity to manage the accounting and expenses of their business.
- It just makes sense to have some added protection and benefits that a legal entity can provide.

PURPOSE
- The purpose of this entity is to run your business affairs.
- The entity will employ your administrative staff and owners and will create another layer of insulation from personal employer liability.
- Your legal entity must be an approved outside business activity (OBA) as required by your broker dealer.
- The legal entity will be responsible for all administrative payrolls and business expenses that you assign to it.
- Ameriprise policies, in addition to FINRA/SEC regulations, prohibit the payment of securities based compensation to selling employees or AFAs via a non-registered legal entity.
    - o  GDC Based Compensation: In accordance with FINRA/SEC rules and Ameriprise policies, we will administer a separate payroll identity (GDC payroll) for paying GDC-based compensation to selling representatives (AFAs). This identity must be the same identity that is 'associated' with your broker dealer.
    - o  Currently your producers or AFAs are being paid as employees outside of your legal entity. These payments will continue to be paid from Tommy's sole proprietor account and not the bank account associated with your legal entity.
- EmployShare is an approved vendor for Ameriprise Financial Services, Inc., specifically for administering the GDC based compensation system.

ACCOUNTING
- Your broker dealer will still pay or distribute all GDC to you directly as a Sole Proprietor and directly to your current sole proprietor deposit account.
- You can then allocate any portion of this revenue to the entity, which then becomes an expense.
- We will consult you and your CPA on accounting and billing procedures that are in compliance with your broker dealer's book and records.

Badgerow 000630





- We will also discuss ACT 34 and ACT 40 GDC separation to make sure that you do not redistribute GDC as reflected in your book and records and your compensation statement.

BENEFITS TO YOU, THE OWNERS
- Your legal entity is an S-Corp. Owners should pay themselves a management salary from the legal entity for the work they do in managing the entity and related employees.
- As a W2 employee of your legal entity, you will have access to the same employee benefits that you make available to your employees.
  - o  Group dental and vision
  - o  Group disability and group life.
  - o  401k Retirement plan, with safe harbor and Roth options.
- We will consult with you and your CPA regarding your adjustable salaries and related compensation and will explain what many others have done with their compensation plans.
- We will also consult on and provide the necessary agreements between you and your entity if you decide to pay yourselves.
- Additional fees may be required through separate engagement, for documents such as a buy-sell agreement.
- Your tax advisor or CPA will give you advice on retaining monies in your legal entity for distribution to members via K1.
- We can also arrange for tax advice from our contracted CPA resources that are expert in the tax world of the independent financial advisor. A separate engagement fee proposal will be presented upon request.

---

*Building Your Invisible Fence*
**'PAPERING UP' YOUR PRACTICE - CORE SERVICES MIGRATION DETAILS**

- Implement EmployShare's industry standard employment paperwork for all W2 employees. EmployShare team members will manage this process with each employee individually and as a group.
- Onsite orientation has been proposed for your transition. An EmployShare team member will conduct group and one-on-one meetings for an entire day, to acquaint your entire team with our new relationship.
- Create your confidential employer database for your online technology portals, both for company use and employee use.
- Obtain Power of Attorney for handling all of your Workers' Compensation policy responsibilities and functions, including premium collection and payment as part of regular payroll. We will also handle the annual audit, which is included in your core service recurring fee.
- Assume administrative responsibility for handling your mandatory disability policy, deductions, and payments, if required in your state.
- Obtain Power of Attorney for handling all of your State Unemployment Account (SUTA) responsibilities including collecting and paying through payroll and assisting with claims.
- Plan for your first payroll reporting date and pay date in sequence with your current payroll schedule, unless you prefer to change this schedule.
- Align all existing payroll deductions so that EmployShare can continue with the deductions, including pre-tax and court ordered deductions, if any.
- Coordinate time keeping systems or improve upon your existing system for time record keeping, whether paper or electronic.

P.O. Box 963  ●  Beaver Falls, PA  15010
p: 866-812-5302  ●  f: 412-291-3085  ●  *www.EmployShare.com*          Badgerow 000631



Employ**Share**
*Employer Risk Management Solutions*

- Review tax reporting changes in your practice. We bundle employee 941 taxes for all clients. This will affect your current 941 reporting requirements. We do not bundle employer taxes as you are the employer.
- Please note: Your current payroll processor will be responsible for their portion of your annual W2 forms. We will provide W2 forms for the work that we process. More details and guidance will follow.
- EmployShare bundles its employee withholding taxes for all clients, which provides some additional benefits for clients. We will need to coordinate communications with your tax processor or accountant to discuss your existing tax processing and appropriate changes.

## GROUP BENEFITS ADMINISTRATION
- Establish employee health insurance records in accordance with HIPAA regulations. We will gather all existing benefit records and applications and correct any deficiencies.
- Set up benefit deductions as pre-tax deductions (when allowable by IRS regulations) and set up employer benefits contributions in accordance with your premium sharing policies.
- Set up employee Cafeteria Plan Benefits Program-Employer Sponsored and/or Voluntary and obtain proposals, if necessary, for group medical comparison.
    o Current licensing in Louisiana for the Caputo Agency is not pending. Consequently we will manage the deductions and payments for your group medical plan while you retain your existing broker of record relationship.
    o The Caputo Agency manages our client's benefit plans and other commercial insurance products.
    o Supplemental cafeteria benefits include dental, vision, short and long term disability and group term life Insurance with life buy up options.
    o Supplemental benefits are available for all W2 employees associated with EmployShare's tax id. Establish and set up Flex Spending Arrangements including dependent care and transportation accounts.
    o NOTE: Owners paying themselves a taxable wage through EmployShare can also elect to use our group DI plan. It is extremely cost effective.
- Retirement Plan:
    o For your current plan, we will collect and remit contributions to your administrator through our payroll system.
        ▪ Should you ever wish to change your retirement plan, EmployShare sponsors a 401(k) plan (MEP) and you are eligible to adopt and design a sub plan of this master plan. The plan includes options for Roth, safe harbor, profit sharing and new comparability testing. The plan may be a more cost effective option for your team. Details will be provided upon request.

## HR POLICIES & EMPLOYMENT DOCUMENTS
- Create your new Employee Handbook legally compliant with Federal and State law- we will incorporate your current policies in your new handbook and make changes as we both see the need. Your new employee handbook can be stored on your secure and confidential online portal. Our employment law firm, Jackson Lewis, periodically reviews EmployShare handbooks.
- Review employee classification of W2 vs. 1099 (if applicable) and Exempt vs. Non-Exempt in accordance with the Fair Labor Standards Act and IRS publication 15a and Circular E.
    o EmployShare has extensive experience in this area and with your help will provide the following critical tasks and supporting documents:



EmployShare
*Employer Risk Management Solutions*

- o   Testing of each employee to establish employee classification of exempt or non-exempt
  - o   Job description
- Timesheets for both exempt and non-exempt employees
- Review of online time reporting options to determine if our systems would enhance your current systems.
- Employment & Compensation Agreements
  - o   The employment agreement is a valuable document for your practice.
    - ▪   EmployShare employment agreements help define the terms of your employment relationship and protect your intellectual property while maintaining the at-will status in most states.
    - ▪   The Employment agreement has options and sections depending on your employment agreement needs.
    - ▪   The main components of the agreement are the employment language body, schedule 1 for the job description, and schedule 2 for the compensation schedule (for licensed employees).
- Arbitration Option: The agreement 'option' includes arbitration terms in compliance with your state guidelines.
- Please note that our employment agreements are reviewed and updated by Jackson Lewis.
- Employee Compensation Schedules for all licensed employees:
  - o   We will provide compensation schedules for your Associate Financial Advisor(s), financial advisors, and any other licensed employees.
  - o   The schedules will outline the compensation structure of the AFA/employee and clarify the terms and conditions of the compensation.
  - o   These agreements are appropriate for online posting to your OFM.
  - o   These schedules comply with your broker dealer's book and records, in addition to federal and state regulations.
  - o   Delivery of these schedules will vary based on complexity and location.
  - o   The compensation schedule is easy to update at any time when employee compensation is revised. There is no need to revise the entire employment agreement.
- Practice Interest Agreements (PIA) for Associated Financial Advisors (AFA):
  - o   Practice Interest Agreements are not included in this proposal. A separate engagement will be provided as you see the need for these valuable documents.
  - o   The Practice Interest Agreement provides for quasi equity in an AFA's book of business, which is 100% owned by the contracting or parent financial advisor. This agreement is similar to a buy-sell, which is specifically designed for two owners and not to be used between an owner and non-owner.
  - o   We will utilize these agreements for each AFA relationship where you have allowed for an interest in your practice based on numerous variables.
  - o   The Practice Interest Agreement is a financial liability to your practice and therefore should be identified in your succession plan or buy-sell agreement.
- Attrition/Non-Competition Agreements for AFAs:
  - o   Attrition/Non-Competition agreements are a stand-alone contract between you and your Associate Financial Advisor. You should consider this agreement when:
    - ▪   You are not using a Practice Interest Agreement.
    - ▪   Your AFA is either an independent contractor or an employee.


Employer Risk Management Solutions

- ▪ Your AFA's book of business is large enough to be awarded a franchise agreement by your broker dealer AND you have assigned YOUR OWN clients to that AFA.
  - ▪ Attrition is a serious risk when an AFA becomes a franchise owner and remains with your broker dealer. Clients can be transferred to the new FA's book of business at no fault of your AFA, now FA.
  - ▪ Your broker dealer is obligated to transfer clients to their preferred servicing advisor.
  - ▪ Attrition/Non-Competition Agreements also include liquidated damages terms.
  - ▪ Attrition/Non-Competition Agreements require a separate engagement and must be drafted by a qualified attorney. We will discuss these matters in more detail as time permits.
- Predictive Indexing (PI) can help you hire better employees:
  - o EmployShare is a licensed administrator for PI, a management tool that measures the work-related behaviors and motivating needs of people in your organization.
  - o It requires a very small amount of their time yet will provide you with an amazing amount of information about your biggest asset, your people. It is also EEOC compliant.
  - o PI will give you and your management team the power and knowledge to better motivate, lead and utilize your people to achieve your company's goals.
  - o Founded in 1955 by Arnold S. Daniels, PI is based on proven behavioral science techniques that pinpoint traits that help you discover what makes people work.
  - o PI does NOT measure:  intelligence, education & training, knowledge, skills, experience, interests, attitudes and values, literacy and language, and physical and health.
  - o New Employees: PI is an option. The fee per PI is $250.00, regardless of whether or not you hire the prospective employee.
  - o Existing employees: The fee is also $250 per PI per employee.
- Skills Testing: grammar, math, cognitive.  The fee is $95 for all 3 tests.
- Orientation via onsite meetings and communications:
  - o Transitioning to our way of business administration is not that complicated but will require our team to have access to your key contacts on a regular basis, for decision making purposes as you are the employer.
  - o We will mutually agree on a timeline for transitioning that gives us both the time we need to make certain that everything is in place and in order.
  - o Expenses for onsite orientation meetings have been included in your one-time migration fee.
  - o We provide a visual chart reminder and will conduct ongoing training as necessary to make sure that your key contacts understand the role they play in helping you protect your business.
  - o We will introduce your employees to our team to make sure they have access to the support they need for things like:
    - ▪ Direct depositing and payroll related information
    - ▪ Online or paper time sheet reporting and guidance
    - ▪ HR questions on your Employee Handbook and PTO tracking and availability.
    - ▪ General questions on policies and procedures related to their employment with your organization.
    - ▪ Benefits and supplemental options.



EmploʸShare
Employer Risk Management Solutions

*Maintaining your Invisible Fence*
**CORE SERVICE RECURRING FEE DETAILS**
**'UNLIMITED ACCESS' TO OUR PROFESSIONAL TEAM FOR A CONTROLLED COST**

Just like any security system, once your invisible fence has been built and is in place, you want to make sure it keeps working for you. We provide unlimited access to our team at a controlled cost. Please read on to see the many amenities we provide in maintaining your invisible fence to ultimately help you protect your business.

HUMAN RESOURCE ADVICE AND COUNSELING
- Day to day access to the EmployShare team for employee related matters.
- Employee policy administration and interpretation, excluding legal counsel where requested.
    o We will only charge you for representation when you agree in advance and when legal representation is provided directly to you by a law firm.
- We do not charge for legal services that we request in order for us to better serve you.
- Miscellaneous incidents, conflict resolution.
- Discipline and termination advice and counseling including document preparation.
- On boarding of new employee - deliver employee applications, complete employee classification, employee agreement, job description, and handbook distribution, benefits walk through, and general orientation.
- Revise and write offer letters relative to each new employee, including AFAs and financial advisors.
- Monitoring of wage and hour compliance including overtime.
- Monitoring of job classification where possible or reported by client.
- Annual employee job performance/ review guidance and paperwork, including review results and related paperwork.
- Employee compensation review and recommendations.
- Ongoing support for employee dispute resolution, including discipline documentation: Access to labor law specialists and attorneys as situations elevate to legal status (additional costs will be quoted separately for legal defense when attorneys are required).
- Ongoing practice and business management reviews and planning.
- Monthly, quarterly, or semi-annual conference call meetings and personal meetings to review issues and changes pertinent to your business, your business entity, your employees, and potential liabilities and planned changes. This schedule can be flexible and is different for every client, based on their needs and speed of change and growth.
- Administration and storage of all employment paperwork, including providing industry standard employment documents.
- Creation, administration, and storage of all time sheets, online or paper, for all employees, to protect the employer in the event of a wage and hour challenge or audit.
- PTO tracking, with PTO availability on each employee's pay stub and portal.
- All check processing and delivery:
    o Direct deposit is included. We do not issue paper checks.
- Online distribution of paystubs.
    o Paystubs and other information are stored in your confidential and secure online employer portal.
- Invoice detail report includes all employee expenses.
- All required payroll tax processing and filing, including annual W2's and payroll summary reports:



EmployShare
Employer Risk Management Solutions

- o EmployShare accepts the role as a fiduciary for the taxes we collect on your behalf. Federal and State taxes are deposited each week and EmployShare is solely responsible for the accuracy and timeliness of payments and filings.
  - o Your payroll tax withholding is processed under our federal identification number.
  - o Collection and payment of disability insurance as mandated by state, if applicable.
- Workplace posters
  - o Federal and State labor law posters are provided and updated as changes in law occur.
  - o Sexual Harassment and Equal Opportunity policies required by law and posted in workplace.
- Collection and payment of premiums for all benefits:
  - o Medical, dental, vision, short and long term disability and group term life insurance premiums.
    - We will bill your employer contributions on each invoice according to your policy for premium contribution for each employee.
  - o HIPAA privacy regulations do not allow us to manage your plan when Caputo Insurance Agency is NOT the broker of record.

COMMERCIAL INSURANCE OPTIONS *
- Review your current GL Policy, Property Coverage and provide you a proposal for a complete business owner's insurance package, if needed.
- Obtain a proposal for Employer Practices Liability Insurance (EPLI)
- Review management liability, fiduciary liability, and employee dishonesty coverage.
- Obtain a proposal for your umbrella or excess policy coverage. Review your building lease to ensure that you carry adequate coverage as specified in the terms of the lease.

*All insurance quotes are provided by our affiliate, Caputo Insurance Agency, Inc.



**General Service Acknowledgment & Disclaimer**

EmployShare (ES) provides human resource management, payroll administration, benefits administration and business consulting and advice as outlined in this proposal and with any other services rendered. ES is not a law firm or CPA firm. We do not provide legal advice, legal opinions, tax advice and accounting or auditing services or opinions nor do we warrant our recommendations. Our recommendations and solutions are based on sound human resource management practices and our experience in these matters. We believe we offer you the best possible recommendations and solutions for your employer compliance and human resource management requirements based on information you provide to us about your business and business needs. We understand and acknowledge that you are the employer of record for your employees and manager of your business. You are responsible for all employment and business decisions made by you or your staff.

You may wish to seek legal advice or opinions from your attorney or an attorney that specializes in specific legal matters and we encourage you to do so. You may want to seek the advice or opinions of your tax advisor, CPA or accountant on related matters and we encourage you to do so. We will make ourselves available to such persons regarding questions concerning our recommendations or solutions to your particular business and business practices. The failure to provide certain pertinent information to us may affect the recommendations offered by ES and may affect the implementation and/or effectiveness of the recommendation.

You are responsible to ultimately decide to accept or decline our recommendations or solutions. If you do not accept our recommendations or solutions, or subsequently fail to follow the recommended action(s), any action(s) you do or do not implement and follow may increase your risk and exposure to adverse legal or regulatory agency actions including but not limited to increased tax liabilities, tax penalties, benefit disqualifications, workers compensation penalties, unemployment compensation penalties and wage and hour penalties.

We, Gregory Walters, Thomas Meyer, and Ray Trosclair, doing business as Walters, Meyer, Trosclair & Associates, certify that EmployShare®, Inc provided a copy of this acknowledgment and disclaimer and that we have reviewed this acknowledgement and disclaimer and have been advised by EmployShare®, Inc. to provide a copy to my/our attorney for review.


_____          _____
Signature: Gregory Walters                Date


_____          _____
Signature: Thomas Meyer                   Date


_____          _____
Signature: Ray Trosclair                  Date


*Employer Risk Management Solutions*

Wednesday, June 03, 2015

Proposal Details Document – Walters, Meyer, Trosclair & Associates

The premise behind your Invisible Fence System Blueprint; *The System*
One of our esteemed Ameriprise resources, Art DeLorenzo, coined this metaphor. His view of our core services platform is that we are like a security system or invisible fence; "Helping you to protect your business by keeping the bad things out and the good things in."

---

The following information represents a general overview of our proposal details. This information is likely to change based on further discovery and discussions on your needs and objectives.

**NOTE:** Gentlemen, your current employer model is that of a LLC, hopefully with a S tax election. You do not have to change this model. The following legal entity info has been left intact for informational purposes only in order that you may see how many of our clients ustilize their entities.

IDEAS FOR UTILIZING YOUR LEGAL ENTITY
- Many clients utilize a legal entity to manage the accounting and expenses of their business.
- It just makes sense to have some added protection and benefits that a legal entity can provide.

PURPOSE
- The purpose of this entity is to run your business affairs.
- The entity will employ your administrative staff and will create another layer of insulation from personal employer liability.
- Your legal entity must be an approved outside business activity (OBA) as required by your broker dealer.
- The legal entity will be responsible for all administrative payrolls and business expenses that you assign to it.
- Ameriprise policies, in addition to FINRA/SEC regulations, prohibit the payment of securities based compensation to selling employees or AFAs via a non-registered legal entity.
    o   GDC Based Compensation: In accordance with FINRA/SEC rules and Ameriprise policies, we will administer a separate payroll identity (GDC payroll) for paying GDC-based compensation to selling representatives (AFAs). This identity must be the same identity that is 'associated' with your broker dealer.
- EmployShare is an approved vendor for Ameriprise Financial Services, Inc., specifically for administering the GDC based compensation system.

ACCOUNTING:
- Your broker dealer will still pay or distribute all GDC to you directly as a Sole Proprietor and directly to your current sole proprietor deposit account.
- You can then allocate any portion of this revenue to the entity, which then becomes an expense.
- We will consult you and your CPA on accounting and billing procedures that are in compliance with your broker dealer's book and records.
- We will also discuss ACT 34 and ACT 40 GDC separation to make sure that you do not redistribute GDC as reflected in your book and records and your compensation statement.



EmployShare
*Employer Risk Management Solutions*

**BENEFITS TO YOU, THE OWNERS:**

- Your legal entity should be an S-corp or LLC-s, the most common entity type used by many franchise owners. Owners can and should pay themselves a management salary from the legal entity for the work they do in managing the entity and related employees.
- As a W2 employee of your legal entity, you will have access to the same employee benefits that you make available to your employees.
  - Group medical
  - Group dental and vision
  - Group disability and group life, guarantee issue upon initial enrollment.
  - 401k Retirement plan, with safe harbor and Roth options.
- We will consult with you and your CPA regarding your adjustable salaries and related compensation and will explain what many others have done with their compensation plans.
- We will also consult on and provide the necessary agreements between you and your entity if you decide to pay yourselves.
- Additional fees may be required through separate engagement, for documents such as a buy-sell agreement.
- Your tax advisor or CPA will give you advice on retaining monies in your legal entity for distribution to members via K1.
- We can also arrange for tax advice from our contracted CPA resources that are expert in the tax world of the independent financial advisor. A separate engagement fee proposal will be presented upon request.

---

*Building Your Invisible Fence System*
**'PAPERING UP' YOUR PRACTICE**
**CORE SYSTEM MIGRATION DETAILS**

The following details correlate to your one-time fees as listed on your Proposal Fees Document. Documents and services not included in your one-time engagement fee are identified via this symbol ☒

- Implement EmployShare's industry standard employment paperwork for all W2 employees.
  - These agreements are between you and your employees, not between your employees and your broker dealer.
  - EmployShare team members will manage this process with each employee individually and as a group. Onsite orientation has been proposed for your transition.
- Create your confidential employer database for your online technology portals, both for company use and employee use.
- Obtain Power of Attorney for handling all of your Workers' Compensation policy responsibilities and functions, including premium collection and payment as part of regular payroll. We will also handle the annual audit, which is included in your core service recurring fee.
- Assume administrative responsibility for handling your mandatory disability policy, deductions, and payments, if required in your state.
- Obtain Power of Attorney for handling all of your State Unemployment Account (SUTA) responsibilities including collecting and paying through payroll and assisting with claims.



- Plan for your first payroll reporting date and pay date in sequence with your current payroll schedule, unless you prefer to change this schedule.
- Align all existing payroll deductions so that EmployShare can continue with the deductions, including pre-tax and court ordered deductions, if any.
- Coordinate time keeping systems or improve upon your existing system for time record keeping, whether paper or electronic.
- Review tax reporting changes in your practice. We bundle employee 941 taxes for all clients. This will affect your current 941 reporting requirements. We do not bundle employer taxes as you are the employer.
- Please note: Your current payroll processor will be responsible for their portion of your annual W2 forms. We will provide W2 forms for the work that we process. More details and guidance will follow.
- EmployShare bundles its employee withholding taxes for all clients, which provides some additional benefits for clients. We will need to coordinate communications with your tax processor or accountant to discuss your existing tax processing and appropriate changes.

GROUP BENEFITS ADMINISTRATION
- Establish employee health insurance records in accordance with HIPAA regulations. We will gather all existing benefit records and applications and correct any deficiencies.
- Set up benefit deductions as pre-tax deductions (when allowable by IRS regulations) and set up employer benefits contributions in accordance with your premium sharing policies.
- Set up employee Cafeteria Plan Voluntary Benefits:
    - Supplemental cafeteria benefits include:
        - Delta dental
        - BCBS vision
        - CIGNA short term disability, long term disability and group term life Insurance with life buy up options, guarantee issue upon initial enrollment.
        - Flexible pre-tax spending accounts for:
            - Medical care expenses
            - Dependent care expenses
            - Transportation and parking qualified expenses
            - Non-employer sponsored premium excluding federal exchange plans
    - Supplemental benefits are available for all W2 employees associated with EmployShare's tax id.
    - **Owners paying themselves a taxable wage** through EmployShare can also elect to use our supplemental benefits including the CIGNA group DI plan. It is extremely cost effective.
- Retirement Plan:
    - For your current plan, we will collect and remit contributions to your administrator through our payroll system.
        - Should you ever wish to change your retirement plan, EmployShare sponsors a 401(k) plan (MEP) and you are eligible to adopt and design a sub plan of this master plan. The plan includes options for Roth, safe harbor, profit sharing and new comparability testing. The plan may be a more cost effective option for your team. Details will be provided upon request.


*Employer Risk Management Solutions*

## HUMAN RESOURCE POLICY & EMPLOYMENT DOCUMENTS

- Create your new Employee Handbook legally compliant with Federal and State law- we will incorporate your current policies in your new handbook and make changes as we both see the need. Your new employee handbook can be stored on your secure and confidential online portal. Our employment law firm, Jackson Lewis, periodically reviews EmploShare handbooks.
- Review employee classification of W2 vs. 1099 (if applicable) and Exempt vs. Non-Exempt in accordance with the Fair Labor Standards Act and IRS publication 15a and Circular E.
  - o EmployShare has extensive experience in this area and with your help will provide the following critical tasks and supporting documents:
  - o Testing of each employee to establish employee classification of exempt or non-exempt
  - o Job description
- Timesheets for both exempt and non-exempt employees
- Review of online time reporting options to determine if our systems would enhance your current systems.
- Employment & Compensation Agreements
  - o The employment agreement is a valuable document for your practice.
    - EmploShare employment agreements help define the terms of your employment relationship and protect your intellectual property while maintaining the at-will status in most states.
    - The Employment agreement has options and sections depending on your employment agreement needs.
    - The main components of the agreement are the employment language body, schedule 1 for the job description, and schedule 2 for the compensation schedule (for licensed employees).
- Arbitration Option: The agreement 'option' includes arbitration terms in compliance with your state guidelines.
- Please note that our employment agreements are reviewed and updated by Jackson Lewis.
- Employee Compensation Schedules for all licensed employees:
  - o We will provide compensation schedules for your Associate Financial Advisor(s), financial advisors, and any other licensed employees.
  - o The schedules will outline the compensation structure of the AFA/employee and clarify the terms and conditions of the compensation.
  - o These agreements are appropriate for online posting to your OFM.
  - o These schedules comply with your broker dealer's book and records, in addition to federal and state regulations.
  - o Delivery of these schedules will vary based on complexity and location.
  - o The compensation schedule is easy to update at any time when employee compensation is revised. There is no need to revise the entire employment agreement.
- ☒ Practice Interest Agreements (PIA) for Associated Financial Advisors (AFA):
- ☒ Attrition/Non-Competition Agreements for AFAs:
- ☒ Predictive Indexing (PI) can help you hire better employees:
- ☒ Skills Testing: grammar, math, cognitive.  The fee is $95 for all 3 tests.
- Orientation via onsite meetings and communications:



o   ☒ Expenses for onsite orientation meetings have not been included in your one-time migration fee. This valuable service is available upon request and for an additional engagement fee.

---

*Maintaining your Invisible Fence*
**CORE SYSTEM RECURRING FEE DETAILS**
**'UNLIMITED ACCESS' TO OUR PROFESSIONAL TEAM FOR A CONTROLLED COST**

Just like any security system, once your invisible fence has been built and is in place, you want to make sure it keeps working for you. We provide unlimited access to our team at a controlled cost. Please read on to see the many amenities we provide in maintaining your invisible fence to ultimately help you protect your business.

HUMAN RESOURCE ADVICE AND COUNSELING
- Day to day access to the EmployShare team for employee related matters.
- Employee policy administration and interpretation, excluding legal counsel where requested.
    - We will only charge you for representation when you agree in advance and when legal representation is provided directly to you by a law firm.
- We do not charge for legal services that we request in order for us to better serve you.
- Miscellaneous incidents, conflict resolution.
- Discipline and termination advice and counseling including document preparation.
- On boarding of new employee - deliver employee applications, complete employee classification, employee agreement, job description, and handbook distribution, benefits walk through, and general orientation.
- Revise and write offer letters relative to each new employee, including AFAs and financial advisors.
- Monitoring of wage and hour compliance including overtime.
- Monitoring of job classification where possible or reported by client.
- Annual employee job performance/ review guidance and paperwork, including review results and related paperwork.
- Employee compensation review and recommendations.
- Ongoing support for employee dispute resolution, including discipline documentation: Access to labor law specialists and attorneys as situations elevate to legal status (additional costs will be quoted separately for legal defense when attorneys are required).
- Ongoing practice and business management reviews and planning.
- Monthly, quarterly, or semi-annual conference call meetings and personal meetings to review issues and changes pertinent to your business, your business entity, your employees, and potential liabilities and planned changes. This schedule can be flexible and is different for every client, based on their needs and speed of change and growth.
- Administration and storage of all employment paperwork, including providing industry standard employment documents.
- Creation, administration, and storage of all time sheets, online or paper, for all employees, to protect the employer in the event of a wage and hour challenge or audit.
- PTO tracking, with PTO availability on each employee's pay stub and portal.
- All check processing and delivery:
    - Direct deposit is included. We do not issue paper checks.
- Online distribution of paystubs.



EmployShare
Employer Risk Management Solutions

- - o  Paystubs and other information are stored in your confidential and secure online employer portal.
- Invoice detail report includes all employee expenses.
- All required payroll tax processing and filing, including annual W2's and payroll summary reports:
  - o  EmployShare accepts the role as a fiduciary for the taxes we collect on your behalf. Federal and State taxes are deposited each week and EmployShare is solely responsible for the accuracy and timeliness of payments and filings.
  - o  Your payroll tax withholding is processed under our federal identification number.
  - o  Collection and payment of disability insurance as mandated by state, if applicable.
- Workplace posters:
  - o  Federal and State labor law posters are provided initially and updated as changes in law occur. Please note that requests for labor law posters for expanding workplace locations will be an additional fee that will be quoted separately.
  - o  Sexual Harassment and Equal Opportunity policies required by law and posted in workplace.
- Collection and payment of premiums for all benefits:
  - o  Medical, dental, vision, short and long term disability and group term life insurance premiums.
    - ▪  We will bill your employer contributions on each invoice according to your policy for premium contribution for each employee.
  - o  HIPAA privacy regulations do not allow us to manage your plan when Caputo Insurance Agency is NOT the broker of record.

COMMERCIAL INSURANCE OPTIONS *
- Review your current GL Policy, Property Coverage and provide you a proposal for a complete business owner's insurance package, if needed.
- Obtain a proposal for Employer Practices Liability Insurance (EPLI)
- Review management liability, fiduciary liability, and employee dishonesty coverage.
- Obtain a proposal for your umbrella or excess policy coverage. Review your building lease to ensure that you carry adequate coverage as specified in the terms of the lease.

*All insurance quotes are provided by our affiliate, Caputo Insurance Agency, Inc.

Badgerow 000628



**General Service Acknowledgment & Disclaimer**

EmployShare (ES) provides human resource management, payroll administration, benefits administration and business consulting and advice as outlined in this proposal and with any other services rendered. ES is not a law firm or CPA firm. We do not provide legal advice, legal opinions, tax advice and accounting or auditing services or opinions nor do we warrant our recommendations. Our recommendations and solutions are based on sound human resource management practices and our experience in these matters. We believe we offer you the best possible recommendations and solutions for your employer compliance and human resource management requirements based on information you provide to us about your business and business needs. We understand and acknowledge that you are the employer of record for your employees and manager of your business. You are responsible for all employment and business decisions made by you or your staff.

You may wish to seek legal advice or opinions from your attorney or an attorney that specializes in specific legal matters and we encourage you to do so. You may want to seek the advice or opinions of your tax advisor, CPA or accountant on related matters and we encourage you to do so. We will make ourselves available to such persons regarding questions concerning our recommendations or solutions to your particular business and business practices. The failure to provide certain pertinent information to us may affect the recommendations offered by ES and may affect the implementation and/or effectiveness of the recommendation.

You are responsible to ultimately decide to accept or decline our recommendations or solutions. If you do not accept our recommendations or solutions, or subsequently fail to follow the recommended action(s), any action(s) you do or do not implement and follow may increase your risk and exposure to adverse legal or regulatory agency actions including but not limited to increased tax liabilities, tax penalties, benefit disqualifications, workers compensation penalties, unemployment compensation penalties and wage and hour penalties.

We, Gregory Walters, Thomas Meyer, and Ray Trosclair, doing business as Walters, Meyer, Trosclair & Associates, certify that EmployShare®, Inc provided a copy of this acknowledgment and disclaimer and that we have reviewed this acknowledgement and disclaimer and have been advised by EmployShare®, Inc. to provide a copy to my/our attorney for review.


Signature: Gregory Walters                     Date


Signature: Thomas Meyer                        Date


Signature: Ray Trosclair                       Date

Badgerow 000629

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

CASE NO. 19-4752    DIVISION M    NUMBER 13

DENISE BADGEROW

v.

GREG WALTERS, THOMAS MEYER, AND RAY TROSCLAIR

**MOTION APPOINTING PRIVATE PERSON TO SERVE PROCESS**

On motion of the plaintiff, Denise Badgerow, through undersigned counsel, in accordance with Article 1293 (B) of the Louisiana Code of Civil Procedure, the plaintiff, Denise Badgerow, desires that John Culver and Vallery D. Thierry IV, each a private person, be appointed to make service of process upon Defendants in LaFourche Parish and Ascension Parish, as set forth below, and that John Culver and Vallery D. Thierry IV are each individuals who are not a party to these proceedings, are over the age of majority, and reside within this state, and is thus are qualified to be appointed by this Honorable Court to serve process. Private service is appropriate based on the summary nature of the proceeding and is necessary due to the need for expedient service of process.

Respectfully Submitted:

BUSINESS LAW GROUP, LLC

By: s/Amanda J. Butler
Amanda J. Butler (T.A.)
LSBA # 31644
abutler@lawgroup.biz
Stephanie Dovalina
LSBA No. 31137
sdovalina@lawgroup.biz

700 Camp St., Ste. 405
New Orleans, LA 70130
Telephone: (504) 528-9500
Facsimile: (504) 754-7776

Private Service will be effected on:

Gregory Walters
132 Rue Colette
Thibodaux, LA 70301

Thomas Meyer
132 Rue Colette
Thibodaux, LA 70301

Ray Trosclair
37283 Swamp Rd, Ste 1202
Prairieville, LA 70769



FILED

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA          2019 MAY -6 PM 3: 22

CASE NO. _____   DIVISION _____   NUMBER___

DISTRICT COURT

DENISE BADGEROW

v.

GREG WALTERS, THOMAS MEYER, AND RAY TROSCLAIR

ORDER APPOINTING PRIVATE PERSON TO SERVE PROCESS

The Court has considered Plaintiff's Motion to Appoint Private Process Servers.  The Court

has decided to grant Plaintiff's motion. ACCORDINGLY, Plaintiff's motion to Appoint Private

Process Servers is GRANTED.

Dated:   This 6th day of May, 2019

JUDGE

Sgd, Paulette R. Irons
Judge, Division M, Section 13

4836-5643-2021, v. 1

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

VERIFIED

VERIFIED
5/7/2019

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DENISE A. BADGEROW,                         *        CIVIL ACTION
on behalf of herself and a class of those   *
similarly situated,                         *        NO. 2:17-cv-09492
                    Plaintiffs,             *
                                            *        SECTION "A"
        v.                                  *
                                            *        JUDGE JAY C. ZAINEY
REJ PROPERTIES, INC. D/B/A                  *
WALTERS MEYER TROSCLAIR &                   *        MAG. DIV. (2)
ASSOCIATES, AND AMERIPRISE                  *
FINANCIAL SERVICES, INC.,                   *        MAG. JUDGE WILKINSON
                                            *
                    Defendants.             *
* * * * * * * * * * * * * * * * * * * * * * * * *

## AMERIPRISE FINANCIAL SERVICES, INC.'S
## MOTION TO CONFIRM ARBITRATION AWARD

NOW INTO COURT, through undersigned counsel, comes Defendant Ameriprise

Financial Services, Inc. ("Ameriprise Financial") to move this Court to confirm an arbitration

award dated December 27, 2018 that was entered against Plaintiff Denise Badgerow and in favor

of Ameriprise Financial and three individual respondents (the "Award").

The time for Plaintiff to move to vacate, modify, or correct the Award expired on March

28, 2018, and there is no basis consistent the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, for

the relief granted by the arbitrators who entered the Award to be set aside or altered.  For these

reasons and those set out in its attached Memorandum in Support, Ameriprise Financial

respectfully submits that the Award should be confirmed.

WHEREFORE, Ameriprise Financial respectfully requests that this Court grant its

Motion, confirm the Award, and enter judgment dismissing with prejudice all claims brought by

Plaintiff against Ameriprise Financial and the individual respondents, along with such other and

further relief the Court deems appropriate.

4838-8672-1425\1



Respectfully submitted,

Date: April 17, 2019

**DORSEY & WHITNEY LLP**

BY:    */s/ John T. Sullivan*
           MELISSA RAPHAN, T.A.
           (admitted *pro hac vice*)
           JOHN T. SULLIVAN
           (admitted *pro hac vice*)
           50 South Sixth Street, Suite 1500
           Minneapolis, MN 55402
           Tel: (612) 343-7907
           Fax: (612) 340-2777
           E-mail: raphan.melissa@dorsey.com
           E-mail: sullivan.jack@dorsey.com

and

**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC**

*/s/ Jennifer McNamara*
NANCY SCOTT DEGAN (La. 01819)
JENNIFER McNAMARA (La. 23946)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
E-mail: ndegan@bakerdonelson.com
E-mail: jmcnamara@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT
AMERIPRISE FINANCIAL SERVICES, INC.**

4838-8672-1425\1

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of April, 2019, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*/s/ John T. Sullivan*
JOHN T. SULLIVAN

4838-8672-1425\1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DENISE A. BADGEROW, | * | CIVIL ACTION |
| on behalf of herself and a class of those | * | |
| similarly situated, | * | NO. 2:17-cv-09492 |
| Plaintiffs, | * | |
| | * | SECTION "A" |
| v. | * | |
| | * | JUDGE JAY C. ZAINEY |
| REJ PROPERTIES, INC. D/B/A | * | |
| WALTERS, MEYER TROSCLAIR & | * | MAG. DIV. (2) |
| ASSOCIATES, AND AMERIPRISE | * | |
| FINANCIAL SERVICES, INC., | * | MAG. JUDGE WILKINSON |
| | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## AMERIPRISE FINANCIAL SERVICES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO CONFIRM ARBITRATION AWARD

On January 10, 2018, this Court stayed all claims brought by Plaintiff Denise A. Badgerow against Ameriprise Financial Services, Inc. ("Ameriprise Financial") pending arbitration before the Financial Industry Regulatory Association ("FINRA"). *See* Order and Reasons, Jan. 10, 2018 (Rec. Doc. 47) ("Order Compelling Arbitration"). A panel of three FINRA arbitrators subsequently heard Plaintiff's claims and, on December 28, 2018, entered an order dismissing with prejudice all claims against Ameriprise Financial and three individual respondents, Gregory Walters, Thomas Meyer, and Roy Trosclair (the "Award"). Award at 5, Dec. 28, 2018 (attached as **Exhibit A** to this Memorandum). Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), Ameriprise Financial now moves the Court to confirm the Award and enter judgment providing the relief awarded by the FINRA arbitrators: The dismissal with prejudice of all claims brought by Plaintiff against Ameriprise Financial and the individual respondents.

In support of its Motion to Confirm, Ameriprise Financial states as follows:

1

## I.    **Factual Background**

As this Court noted in its Order Compelling Arbitration: "It is beyond dispute that Badgerow and Ameriprise have an agreement to arbitrate." (Order Compelling Arbitration, at 5.) In fact, as noted by this Court, the record includes three agreements in which Plaintiff made binding commitments to arbitrate claims that may arise between her and Ameriprise Financial. Plaintiff also expressly and repeatedly agreed that judgment may entered in any court with jurisdiction based on any award rendered against her in an arbitration with Ameriprise Financial.

The applicable agreements are:

1.    The **FINRA Uniform Application for Securities Industry Registration or Transfer** ("Form U4") that Plaintiff signed on January 6, 2014. (Rec. Doc. 27-2; attached as **Exhibit B** to this Memorandum.) Part 15A of the Form U4 provides that Plaintiff agrees to "arbitrate any dispute, claim or controversy that may arise" between her and Ameriprise Financial. The same Part includes Plaintiff's express and binding agreement "that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction."

2.    The **AFG Registered Staff Agreement** ("AFG Agreement") that Plaintiff signed on January 6, 2014. (Rec. Doc. 26-2; attached as **Exhibit C** to this Memorandum.) Part 9A of the AFG Agreement provides that, unless otherwise agreed to in writing by Plaintiff and Ameriprise Financial, Plaintiff agrees to "arbitrate any dispute, claim or controversy" between her and Ameriprise. Part 9.F of the AFG Agreement provides that either party may compel arbitration; Part 9.H states that any award of an arbitration panel will be final and binding, and judgment may be entered in "any court having jurisdiction."

3.    The **Associate Financial Advisor Agreement** ("AFA Agreement") that Plaintiff signed on March 19, 2014. (Rec. Doc. 26-3; attached as **Exhibit D** to this Memorandum.) As with

2

the AFG Agreement, Part 9A of the AFA Agreement provides that, that, unless otherwise agreed to in writing by Plaintiff and Ameriprise Financial, Plaintiff agrees to "arbitrate any dispute, claim or controversy" between her and Ameriprise Financial. As in the AFG Agreement, Part 9.F of the AFA Agreement provides that either party may compel arbitration and Part 9.H states that any award of an arbitration panel will be final and binding, and judgment may be entered in "any court having jurisdiction."

## II.  **Procedural Background**

Plaintiff brought claims in a FINRA arbitration proceeding against Ameriprise Financial and Walters, Meyer, and Trosclair (the "Individual Respondents") on or about October 17, 2016 (Rec. Doc. 27-2) and filed suit against Ameriprise Financial in this Court on September 22, 2017. (Rec. Doc. 1.) Ameriprise Financial brought a Motion to Dismiss and Compel Arbitration on December 28, 2017. (Rec Doc. 27.) In the Order Compelling Arbitration, this Court stayed Plaintiff's claims against Ameriprise Financial and directed that all of her claims against Ameriprise Financial be decided in the FINRA arbitration, consistent with the binding commitments that Plaintiff made in the Form U4, AFG Agreement, and AFA Agreement. (Order Compelling Arbitration, at 6.)

Plaintiff's claims against Ameriprise Financial and the Individual Respondents were heard by a FINRA panel of three arbitrators on August 27 and 28, 2018, in New Orleans, Louisiana. Award at 1, 5. Immediately after Plaintiff presented her case, the panel granted Ameriprise Financial's oral motion to dismiss. Award at 5. After briefing, the panel granted the Individual Respondents' motions to dismiss on December 28, 2018 and delivered on that date a written Award dismissing Plaintiff's claims with prejudice. Award, at 5.

On February 15, 2019, Defendant REJ Properties, Inc. ("REJ"), brought a motion in this Court to confirm the arbitration award. (Rec. Doc. 99). Ameriprise Financial supported the motion. (Rec. Doc. 100). A day after the deadline for opposition briefs had passed, Plaintiff filed a brief in which she asked the Court to deny REJ's motion and "issue a further order vacating the arbitration award . . . or alternatively, remanding the matter back to the FINRA panel for clarification . . . ." (Rec. Doc. 105, at 4.) Plaintiff has never brought a motion to vacate, modify or correct the award, nor has she served Ameriprise Financial nor any other party with notice of a motion to vacate, modify or correct the award.

This Court denied the relief that REJ sought, noting that REJ did not have standing to seek an order confirming the arbitration award. Order and Reasons at 2, Mar. 13, 2019. As to the merits of a future motion to confirm, however, this Court was clear: "**That the arbitration award in favor of Ameriprise will be confirmed and all claims against that defendant dismissed with prejudice is without question.**" *Id.* (emphasis added).

### III.   The FINRA Arbitration Award Should Be Confirmed by the Court

Ameriprise Financial respectfully requests that this Court confirm the Award and enter judgment dismissing all claims against Ameriprise Financial and the Individual Respondents.

#### A.   Standard of Limited Review

The FAA mandates that the Award be confirmed. Where, as here, the parties have agreed that a judgment shall be entered upon the award, then a party to the arbitration may apply to the federal court for the district within which such award was made. 9 U.S.C. § 9. When a party seeks an order confirming an award, the FAA directs that the court "**must grant such an order** unless the award is vacated, modified, or corrected" pursuant to the FAA. 9 U.S.C. § 9 (emphasis added).

4

The FAA provides a narrow set of circumstances in which a court may decline to confirm an award. *Citigroup Global Markets v. Bacon*, 562 F.3d 349, 352 (5th Cir. 2009). The limited reasons include that (1) the award was procured by corruption, fraud or undue means; (2) there was evident partiality or corruption in the arbitrators; (3) the arbitrators committed misconduct or misbehavior in refusing to postpone the hearing, refusing to hear pertinent evidence, or prejudicing the rights of any party; or (4) the arbitrators exceeded their powers or mishandled them to the point that a final and definite award was not made. 9 U.S.C. § 10(a); *Berk-Cohen Associates, LLC v. Orkin Exterminating Co.*, 264 F. Supp. 2d 448, 451 (E.D. La. 2003), *aff'd*, 91 F. App'x. 969 (5th Cir. 2004).

**B.      The Award Should be Confirmed and Judgment Entered Against Plaintiff**

The Award easily clears the threshold set by the FAA for confirmation of an award. Thus, the Award should be confirmed and judgment entered dismissing all claims with prejudice.

**1.      All Procedural Requirements are Met and the Award Should be Confirmed**

Ameriprise has fulfilled all procedural requirements for this motion. The FAA provides that when an order confirming an award is filed, the party moving to confirm the arbitration award must also file the arbitration agreements at issue, the award to be confirmed, and the papers that constitute the application for an order to confirm. 9 U.S.C. § 13. Exhibits A through D to this Motion comprise the arbitration agreements signed by Plaintiff and the Award rendered by the FINRA arbitration panel.

Moreover, the Award complies fully with FINRA rules, which provide that "All awards shall be in writing and signed by a majority of the arbitrators or as required by applicable law. Such awards may be entered as a judgment in any court of competent jurisdiction." FINRA Rule 13904(a). The Award itself documents the claims that were before the panel, the procedural

history of the proceedings, and the decision of the panel to dismiss Plaintiff's claims with prejudice. An order of this Court confirming the award will give full effect to the panel's decision, as the FAA provides that "[t]he judgment so entered shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." 9 U.S.C. § 13(c).

> ### 2.   All Substantive Requirements are Met and the Award Should be Confirmed

There likewise is no substantive basis for the Award not to be confirmed and judgment entered. When a party seeks an order confirming an award, the FAA directs that the court "**must grant such an order** unless the award is vacated, modified, or corrected" pursuant to the FAA. 9 U.S.C. § 9 (emphasis added).

The FAA gives Ameriprise Financial one year to move to confirm the Award, 9 U.S.C. § 9, but set a strict three-month limitation for Plaintiff to move to vacate, modify, or correct an award. 9 U.S.C. § 12. When, as here, a party does not move to vacate an arbitration award within the three-month period set out in section 12 of the FAA, then the FAA "bars him from raising the alleged invalidity of the award as a defense in opposition to a motion brought under section 9 of the [FAA] to confirm the award." *La. Health Serv. Indem. Co. v. Gambro A B*, 756 F. Supp. 2d 760, 765-66 (W.D. La. 2010). *See also Cigna v. Huddleston*, 986 F.2d 1418 (5th Cir. 1993) (refused to consider defenses to an arbitration award because they were raised beyond the three-month period of limitation and so untimely) (cited in *Gambro A B*); *Pfannenstiel v. Merrill Lynch*, 477 F.3d 1155, 1158 (10th Cir.2007) (failure to file within three months waived judicial review) (same); *Hart Surgical, Inc. Ultracision, Inc.*, 244 F.3d 231, 235 (1st Cir. 2001) (holding that by failing to seek vacatur of an award a party "forfeits" its right to challenge the award) (same); *Taylor*

*v. Nelson*, 788 F.2d 220, 225  (4th Cir.1986) (once the three-month period has expired, an attempt to vacate an arbitration award could not be made even in opposition to a later motion to confirm arbitration award) (same); *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 174 (2d Cir.1984) (the FAA precludes "a motion to vacate, modify, or correct an arbitration award after the three month period has run, even when raised as a defense to a motion to confirm") (same).  Thus, any argument for the Award to be vacated or modified that Plaintiff may assert in defense to Ameriprise Financial's motion to confirm is simply too late and must be rejected.

Plaintiff may try to evade the three-month bar by pointing to the offhand requests that she made for an order to vacate the Award when opposing REJ's motion to confirm.  If she does, her attempt must fail because the FAA sets out a required procedure that Plaintiff ignored: "Notice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."  *Id.*  Importantly, this Court's Order denying relief to REJ was filed on March 13, 2019—meaning Plaintiff had more than two full weeks to properly notice and file a motion to vacate, modify, or correct the award before the statutory three-month period for such a motion expired.  Regardless of her opposition to REJ's motion to confirm, Plaintiff's decision to ignore the statutory deadline should not be excused.

Because there is no reason for the Award to be vacated, modified or corrected, Ameriprise Financial respectfully requests that this Court grant its motion, confirm the Award, and enter judgment dismissing with prejudice the claims against Ameriprise Financial.

### IV.  <u>Conclusion</u>

For the reasons set forth above, Ameriprise Financial respectfully requests that this Court:

1.    Lift the stay that the Court ordered on January 10, 2018;

2.    Grant Ameriprise Financial's Motion to Confirm; and

3.     Enter judgment dismissing Ameriprise Financial from this action with prejudice and providing such other and further relief as this Court deems warranted.

Respectfully submitted,

Dated:  April 17, 2019

**DORSEY & WHITNEY LLP**

BY:    */s/ John T. Sullivan*
       MELISSA RAPHAN, T.A.
       (admitted *pro hac vice*)
       JOHN T. SULLIVAN
       (admitted *pro hac vice*)
       50 South Sixth Street, Suite 1500
       Minneapolis, MN 55402
       Telephone: (612) 343-7907
       Facsimile: (612) 340-2777
       E-mail: raphan.melissa@dorsey.com
       E-mail: sullivan.jack@dorsey.com

**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC**

*/s/ Jennifer McNamara*
NANCY SCOTT DEGAN (La. 01819)
JENNIFER McNAMARA (La. 23946)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile: (504) 636-4000
E-mail: ndegan@bakerdonelson.com
E-mail: jmcnamara@bakerdonelson.com

**ATTORNEYS FOR DEFENDANT AMERIPRISE FINANCIAL SERVICES, INC.**

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on this 17th day of April, 2019, a copy of the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

                                    */s/ John T. Sullivan*
                                    JOHN T. SULLIVAN

8

**Award**
**FINRA Office of Dispute Resolution**

In the Matter of the Arbitration Between:

<u>Claimant</u>                                                                <u>Case Number</u>: 16-02759
Denise A Badgerow

     vs.

<u>Respondents</u>                                                          <u>Hearing Site</u>: New Orleans, Louisiana
Ameriprise Financial Services, Inc.
Thomas James Meyer
Ray Anthony Trosclair
Gregory Alan Walters

<u>Counter-Claimants</u>
Thomas James Meyer
Ray Anthony Trosclair
Gregory Alan Walters

     vs.

<u>Counter-Respondent</u>
Denise A. Badgerow

Nature of the Disputes: Associated Person vs. Member and Associated Persons
Associated Persons vs. Associated Person

## REPRESENTATION OF PARTIES

For Claimant/Counter-Respondent Denise A Badgerow ("Claimant"): Amanda J. Butler, Esq., Business Law Group, New Orleans, Louisiana.

For Respondent Ameriprise Financial Services, Inc. ("Ameriprise"): Melissa Raphan, Esq., Dorsey & Whitney LLP, Minneapolis, Minnesota.

For Respondents/Counter-Claimants Ray Anthony Trosclair ("Trosclair") and Gregory Alan Walters ("Walters"): Claude F. Reynaud, Jr., Esq., Breazeale, Sachse & Wilson, L.L.P., Baton Rouge, Louisiana.

For Respondent/Counter-Claimant Thomas James Meyer ("Meyer"): Thomas A. Roberts, Esq., Bressler, Amery & Ross, P.C., New York, New York.

Hereinafter, Trosclair, Walters and Meyer are collectively referred to as the "Individual Respondents."

**EXHIBIT**
**B-1**

FINRA Office of Dispute Resolution
Arbitration No. 16-02759
Award Page 2 of 8

## CASE INFORMATION

Statement of Claim filed on or about: September 18, 2016.
Statement of Answer to the Counterclaim filed by Claimant on or about: January 23, 2017.
Second Amended and Restated Statement of Claim filed on or about: June 22, 2018.
Claimant signed the Submission Agreement: September 14, 2016.

Statement of Answer filed by Ameriprise on or about: December 9, 2016.
Ameriprise signed the Submission Agreement: December 9, 2016.

Statement of Answer and Counterclaim filed by the Individual Respondents on or about: December 8, 2016.
Individual Respondents signed a Submission Agreement: December 8, 2016.

## CASE SUMMARY

Claimant asserted the following causes of action: non-party REJ Properties, Inc. d/b/a Walters, Meyer, Trosclair & Associates' ("Company") unwritten compensation agreement and payment method of commissions violated SEC and FINRA regulations; Claimant was fired in retaliation for reporting the Individual Respondents' conduct to Ameriprise in violation of Louisiana Law; non-party Company tortiously interfered with Claimant's employment agreement; and Claimant's employment agreement's non-compete and non-solicitation provisions are invalid and non-party Company tortiously interfered with Claimant's book of business after wrongful termination in violation of Louisiana's Unfair Trade Practices & Consumer Protection Law ("LUPTA"). In Claimant's Second Amended and Restated Statement of Claim, she added as a cause of action that Ameriprise was a joint employer and is jointly and severally liable for the actions of the Individual Respondents and non-party Company. The causes of action relate to Claimant's allegations that she was involuntarily terminated from her employment with non-party Company, a franchise of Ameriprise.

Unless specifically admitted in their respective Statements of Answer, Ameriprise and the Individual Respondents denied the allegations made in the Statement of Claim. In their Counterclaim, the Individual Respondents asserted the following causes of action: breach of contract and violation of the Louisiana Trade Secrets Act.

Unless specifically admitted in the Statement of Answer to the Counterclaim, Claimant denied the allegations made in the Counterclaim.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested:
1.  Back pay from non-party Company in an amount to be determined based upon prior compensation and commissions, including $75,000.00 for the change in Claimant's pay without a proper record of such compensation arrangement, as required by FINRA and SEC law;
2.  Front pay damages for the period of time Claimant was unemployed together with damages in lieu of Claimant's right of reinstatement of her employment and

FINRA Office of Dispute Resolution
Arbitration No.  16-02759
Award Page 3 of 8

      loss of 401K matching benefits, in an amount to be determined based upon prior
      compensation and commissions and benefits, estimated to be $350,000.00 for a
      period of three (3) years from the date of termination;

3. Treble damages under LUPTA in an amount of $1,125,000.00 for non-party
    Company and Walters tortiously interfering with Claimant's book of business by
    instructing her she could not contact her clients or keep her book of business if
    she was ever terminated by non-party Company even though such non-compete
    and non-solicitation provisions of the employment agreement were invalid under
    Louisiana law;

4. Attorneys' fees and costs relating to sustaining this action, which amounts shall
    be determined at the conclusion, but total $55,000.00 to date; and

5. Any other amounts as may be determined after review of Claimant's
    compensation and benefits, including any amounts for nonpayment of overtime
    wages earned under the Fair Labor Standards Act.

In the Statement of Answer, Ameriprise requested:
1. Claimant's claims be dismissed in their entirety;
2. Costs and attorneys' fees incurred in defending this matter; and
3. All further relief as the Panel deems just and proper.

In the Statement of Answer and Counterclaim, the Individual Respondents requested:
1. Claimant's claims be denied;
2. Individual Respondents' Counterclaim be granted in an amount of damages to be
    proved at the arbitration hearing;
3. Judicial interest from the date of demand;
4. Attorneys' fees pursuant to La. R.S. 51:1409A; and
5. Any additional relief that the Panel may deem just and appropriate.

In the Statement of Answer to the Counterclaim, Claimant requested that costs and
attorneys' fees relating to the Counterclaim be assessed to the Individual Respondents.

In the Second Amended and Restated Statement of Claim, Claimant requested:
1. The same relief requests as 1-5 in the Statement of Claim; and
2. Declaratory judgment that Ameriprise's conduct in this matter created a joint
    employer relationship with non-party Company.

## OTHER ISSUES CONSIDERED AND DECIDED

The Arbitrators acknowledge that they have each read the pleadings and other
materials filed by the parties.

On January 5, 2018, Walters, Trosclair and non-party Company submitted a Motion to
Dismiss. On February 19, Claimant submitted an opposition to the Motion to Dismiss
and a Motion for Monetary Penalties and Sanctions for filing the Motion to Dismiss. On
February 23, Walters and Trosclair submitted a reply in further support of their motion.
On February 26, Walters and Trosclair submitted an opposition to Claimant's Motion for
Monetary Penalties and Sanctions. On March 23, Walters and Trosclair requested that
the Panel cancel the April 2 pre-hearing conference scheduled to hear oral argument on
their Motion to Dismiss and instead decide the motion after Claimant presents her case-

FINRA Office of Dispute Resolution
Arbitration No. 16-02759
<u>Award Page 4 of 8</u>

in-chief during the evidentiary hearing. On March 28, Claimant submitted an objection to Walters and Trosclair's request to cancel the April 2 pre-hearing conference.

On January 31, 2018, Claimant submitted a Motion to Amend the Statement of Claim. On February 9, Walters, Trosclair and non-party Company submitted an opposition to Claimant's motion. On February 12, Ameriprise submitted an opposition to Claimant's motion and a reply to Walters and Trosclair's opposition brief.

On April 2, 2018, the Panel and parties held a pre-hearing conference so the parties could present oral argument on Walters and Trosclair's Motion to Dismiss and Claimant's Motion to Amend the Statement of Claim, among other matters. By Order dated that same day, the Panel, among other matters, deferred oral argument on the Motion to Dismiss until the evidentiary hearing and granted Claimant's Motion to Amend the Statement of Claim to the following extent:

a. Claimant is allowed to amend her claim to add the joint employer claim consistent with the Order of the Federal District Court for the Eastern District of Louisiana; and

b. Any oppositions to the amended claim by the Individual Respondents and Ameriprise should be filed within twenty (20) days of the date of this Order.

In accordance with the Panel's April 2, 2018 Order, on April 13, 2018 Claimant submitted an Amended and Restated Statement of Claim wherein she added as a cause of action that Ameriprise was a joint employer and is jointly and severally liable for the actions of the Individual Respondents and non-party Company and requested declaratory judgment that Ameriprise's conduct in this matter created a joint employer relationship with non-party Company. Claimant also alleged that in 2015 she was subjected to harassment that was so severe by Meyers and his team that she sought medical attention.

On April 20, 2018, Ameriprise submitted an objection to Claimant's Amended and Restated Statement of Claim. Ameriprise objected to Claimant's request for declaratory judgment that Ameriprise's conduct created a joint employer relationship with non-party Company. On April 24, Claimant submitted a response in further support of her Amended and Restated Statement of Claim.

On April 30, 2018, Meyer submitted a request for an order of production to compel Claimant to provide authorizations for the release of her medical records. On May 1, Claimant submitted an objection to Meyer's request. On May 2, Meyer submitted a reply in further support of his request. On May 2, 2018, the Panel granted Meyer's order for production. On May 8, Meyer submitted a request for clarification on the order for production. Claimant did not submit a response. On June 6, the Chairperson and parties held a pre-hearing conference so the parties could present oral argument on Meyer's order for production. By Order dated June 8, 2018, the Panel advised that Claimant reaffirmed her objection to Meyer's order of production and stated that she would withdraw the allegation at issue. Therefore, the Panel ruled that in view of Claimant's willingness to withdraw the allegation, the claim is hereby amended to remove the allegation regarding medical attention.

FINRA Office of Dispute Resolution
Arbitration No.  16-02759
<u>Award Page 5 of 8</u>

On June 22, 2018, Claimant filed a Second Amended and Restated Statement of Claim in accordance with the Panel's June 8, 2018 Order and it became part of the record.

The case proceeded to hearing on August 27 and 28, 2018.  After the close of Claimant's case, Ameriprise and Meyer made oral motions to dismiss, and Walters and Trosclair renewed their motion to dismiss. Claimant opposed all motions. After hearing arguments of counsel, the Panel granted Ameriprise's motion to dismiss on the basis that Claimant failed to prove Ameriprise was a "joint employer." The Individual Respondents' motions to dismiss were deferred pending additional briefing by the parties.

On October 4, 2018, the Individual Respondents submitted a joint supplemental memorandum in support of their respective motions to dismiss. On October 18, Claimant submitted an opposition to the Individual Respondents' motions to dismiss. On November 6, the Individual Respondents submitted a joint reply in further support of their motions to dismiss. On November 16, Claimant filed a sur-reply brief in opposition to the Individual Respondents' motions to dismiss.

On November 20, 2018, the Panel and the Individual Respondents held a recorded in-person conference to hear the parties' oral argument on the Individual Respondents' motions to dismiss. The Individual Respondents argued that Claimant's theories of recovery were legally and/or factually without merit. Claimant opposed the motions to dismiss. After due deliberation, the Panel granted the Individual Respondents' motions to dismiss and found that Claimant did not: 1) establish liability for the Individual Respondents under the Louisiana Whistleblower Act; 2) prove a tortious interference with contract claim against the Individual Respondents; and 3) prove any claim against the Individual Respondents under the Louisiana Unfair Trade Practice Act or establish any other basis for recovery under the Amended and Restated Statement of Claim.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, the testimony and evidence presented at the evidentiary hearing and conference on the Individual Respondents' motions to dismiss, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1.  Claimant's claims are dismissed with prejudice.

2.  The Individual Respondents' Counterclaim is denied in its entirety.

3.  Any and all claims for relief not specifically addressed herein, including attorneys' fees, are denied.

## FEES

Pursuant to the Code of Arbitration Procedure, the following fees are assessed:

FINRA Office of Dispute Resolution
Arbitration No.  16-02759
<u>Award Page 6 of 8</u>

**<u>Filing Fees</u>**
FINRA Office of Dispute Resolution assessed a filing fee* for each claim:

| | |
|---|---|
| Initial Claim Filing Fee | =$ 2,000.00 |
| Counterclaim Filing Fee | =$ 1,575.00 |

*The filing fee is made up of a non-refundable and a refundable portion.*

*FINRA Office of Dispute Resolution preliminarily deferred the initial filing fee. At the conclusion of this matter, the Panel determined to waive the $600.00 non-refundable portion of the filing fee.*

**<u>Member Fees</u>**
Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. Accordingly, as a party, Ameriprise is assessed the following:

| | |
|---|---|
| Member Surcharge | =$ 3,025.00 |
| Member Process Fee | =$ 6,175.00 |

**<u>Postponement Fees</u>**
Postponements granted during these proceedings for which fees were assessed or waived:

| | |
|---|---|
| March 6 – 9, 2018, postponement by Ameriprise | = WAIVED |

**<u>Discovery-Related Motion Fee</u>**
Fees apply for each decision rendered on a discovery-related motion.

| | |
|---|---|
| One (1) decision on a discovery-related motion on the papers with one (1) arbitrator @ $200.00/decision | =$  200.00 |

Meyers submitted one (1) discovery-related motion

| | |
|---|---|
| Total Discovery-Related Motion Fees | =$  200.00 |

The Panel has assessed $200.00 of the discovery-related motion fees jointly and severally to the Individual Respondents.

**<u>Hearing Session Fees and Assessments</u>**
The Panel has assessed hearing session fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| Two (2) pre-hearing sessions with a single arbitrator @ $450.00/session | | | =$  900.00 |
| Pre-hearing conferences: | February 23, 2018 | 1 session | |
| | June 6, 2018 | 1 session | |

FINRA Office of Dispute Resolution
Arbitration No.  16-02759
<u>Award Page 7 of 8</u>

| Four (4) pre-hearing sessions with the Panel @ $1,400.00/session | | | =$ 5,600.00 |
|---|---|---|---|
| Pre-hearing conferences: | March 6, 2017 | 1 session | |
| | April 2, 2018 | 1 session | |
| | August 24, 2018 | 1 session | |
| | November 20, 2018 | 1 session | |

| Five (5) hearing sessions @ $1,400.00/session | | | =$ 7,000.00 |
|---|---|---|---|
| Hearing Dates: | August 27, 2018 | 3 sessions | |
| | August 28, 2018 | 2 sessions | |

| Total Hearing Session Fees | =$13,500.00 |
|---|---|

The Panel has assessed $13,500.00 of the hearing session fees jointly and severally to the Individual Respondents.

All balances are payable to FINRA Office of Dispute Resolution and are due upon receipt.

FINRA Office of Dispute Resolution
Arbitration No. 16-02759
Award Page 8 of 8

## ARBITRATION PANEL

| | | |
|---|---|---|
| James L. Warren, III | - | Public Arbitrator, Presiding Chairperson |
| Mario Alberto Arteaga, Jr. | - | Public Arbitrator |
| Joseph Michael Prisco, Jr. | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

### Concurring Arbitrators' Signatures

_____     12/27/2018
James L. Warren, III                  Signature Date
Public Arbitrator, Presiding Chairperson


_____     _____
Mario Alberto Arteaga, Jr.            Signature Date
Public Arbitrator


_____     _____
Joseph Michael Prisco, Jr.            Signature Date
Non-Public Arbitrator



___December 28, 2018_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No. 18-02759
Award Page 8 of 8

## ARBITRATION PANEL

| | | |
|---|---|---|
| James L. Warren, III | - | Public Arbitrator, Presiding Chairperson |
| Mario Alberto Arteaga, Jr. | - | Public Arbitrator |
| Joseph Michael Prisco, Jr. | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

**Concurring Arbitrators' Signatures**

_____          _____
James L. Warren, III                                          Signature Date
Public Arbitrator, Presiding Chairperson

_____          _____
Mario Alberto Arteaga, Jr.                               12/27/18
Public Arbitrator                                               Signature Date

_____          _____
Joseph Michael Prisco, Jr.                               Signature Date
Non-Public Arbitrator

_____December 28, 2018_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

FINRA Office of Dispute Resolution
Arbitration No. 16-02759
<u>Award Page 8 of 8</u>

## ARBITRATION PANEL

| | | |
|---|---|---|
| James L. Warren, III | - | Public Arbitrator, Presiding Chairperson |
| Mario Alberto Arteaga, Jr. | - | Public Arbitrator |
| Joseph Michael Prisco, Jr. | - | Non-Public Arbitrator |

I, the undersigned Arbitrator, do hereby affirm that I am the individual described herein and who executed this instrument which is my award.

## **Concurring Arbitrators' Signatures**

_____

James L. Warren, III
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____

Mario Alberto Arteaga, Jr.
Public Arbitrator

_____
Signature Date

_____

Joseph Michael Prisco, Jr.
Non-Public Arbitrator

12/27/2018
_____
Signature Date


___December 28, 2018_____
Date of Service (For FINRA Office of Dispute Resolution office use only)

# FORM U4
## UNIFORM APPLICATION FOR SECURITIES INDUSTRY
### REGISTRATION OR TRANSFER

249

Reference #: 71264185161e9de28                    Rev. Form U4 (05/2009)

**Individual Name: BADGEROW, DENISE A (6285199)**

**Firm Name: AMERIPRISE FINANCIAL SERVICES, INC. (6363)**

### 1. GENERAL INFORMATION

| First Name: DENISE | Middle Name: A | Last Name: BADGEROW | Suffix: |
|---|---|---|---|

*Firm* CRD #: 6363

*Firm* Name: AMERIPRISE FINANCIAL SERVICES, INC.

Employment Date (MM/DD/YYYY): 01/06/2014

Firm Billing Code: 76369 *P*

*Individual CRD #:* 6285199

Individual SSN: xxx-xx-xxxx 9455

**Do you have an independent contractor relationship with the above named firm?:**

◉ Yes ○ No

#### Office of Employment Address

| CRD Branch # | NYSE Branch Code # | Firm Billing Code | Address | Private Residence | Type of Office | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| 186449 | | 29506 | 613 CANAL BLVD THIBODAUX , LA 70301 UNITED STATES | N | Located At | 01/06/2014 | |

### 2. FINGERPRINT INFORMATION

Electronic Filing Representation

○ By selecting this option, I represent that I am submitting, have submitted, or promptly will submit to the appropriate *SRO* a fingerprint card as required under applicable *SRO* rules; or Fingerprint card barcode

○ By selecting this option, I represent that I have been employed continuously by the *filing firm* since the last submission of a fingerprint card to CRD and am not required to resubmit a fingerprint card at this time; or,

○ By selecting this option, I represent that I have been employed continuously by the *filing firm* and my fingerprints have been processed by an *SRO* other than FINRA. I am submitting, have submitted, or promptly will submit the processed results for posting to CRD.

Exceptions to the Fingerprint Requirement

○ By selecting one or more of the following two options, I affirm that I am exempt from the federal fingerprint requirement because I/filing firm currently satisfy(ies) the requirements of at least one of the permissive exemptions indicated below pursuant to Rule 17f-2 under the Securities Exchange Act of 1934, including any notice or application requirements specified therein:

☐ Rule 17f-2(a)(1)(i)

☐ Rule 17f-2(a)(1)(iii)

Investment Adviser Representative Only Applicants

EXHIBIT
B-2

○ I affirm that I am applying only as an investment adviser representative and that I am not also applying or have not also applied with this *firm* to become a broker-dealer representative. If this radio button/box is selected, continue below.

   ○ I am applying for registration only in *jurisdictions* that do not have fingerprint card filing requirements, or

   ○ I am applying for registration in *jurisdictions* that have fingerprint card filing requirements and I am submitting, have submitted, or promptly will submit the appropriate fingerprint card directly to the *jurisdictions* for processing pursuant to applicable *jurisdiction* rules.

## 3. REGISTRATIONS WITH UNAFFILIATED FIRMS

Some *jurisdictions* prohibit "dual registration," which occurs when an individual chooses to maintain a concurrent registration as a representative/agent with two or more *firms* (either BD or IA *firms*) that are not affiliated. *Jurisdictions* that prohibit dual registration would not, for example, permit a broker-dealer agent working with brokerage *firm* A to maintain a registration with brokerage *firm* B if *firms* A and B are not owned or controlled by a common parent. Before seeking a dual registration status, you should consult the applicable rules or statutes of the *jurisdictions* with which you seek registration for prohibitions on dual registrations or any liability provisions.

Please indicate whether the individual will maintain a "dual registration" status by answering the questions in this section. (Note: An individual should answer 'yes' only if the individual is currently registered and is seeking registration with a *firm* (either BD or IA) that is not affiliated with the individual's current employing *firm*. If this is an initial application, an individual must answer 'no' to these questions; a "dual registration" may be initiated only after an initial registration has been established).

Answer "yes" or "no" to the following questions:     **Yes  No**

**A.** Will *applicant* maintain registration with a broker-dealer that is not *affiliated* with the *filing firm*? If you answer "yes," list the *firm*(s) in Section 12 (Employment History).   ○   ◉

**B.** Will *applicant* maintain registration with an investment adviser that is not *affiliated* with the *filing firm*? If you answer "yes," list the *firm*(s) in Section 12 (Employment History).   ○   ◉

## 4. SRO REGISTRATIONS

### Check appropriate *SRO* Registration requests.
**Qualifying examinations will be automatically scheduled if needed. If you are only scheduling or re-scheduling an exam, skip this section and complete Section 7 (EXAMINATION REQUESTS).**

| REGISTRATION CATEGORY | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OP - Registered Options Principal (S4) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| IR - Investment Company and Variable Contracts Products Rep. (S6) | ☐ | | ☐ | | | | | | ☐ | | | | | | | | | | |
| GS - Full Registration/General Securities Representative (S7) | ☑ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

L14023PB00914.001

| REGISTRATION CATEGORY | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TR - Securities Trader (S7) | | ☐ | ☐ | | | | | | | ☐ | | | | | | | | | |
| TS - Trading Supervisor (S7) | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| SU - General Securities Sales Supervisor (S9 and S10) | ☐ | | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | |
| BM - Branch Office Manager (S9 and S10) | | ☐ | ☐ | | | | | | | | | | | | ☐ | ☐ | | | |
| SM - Securities Manager (S10) | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| AR - Assistant Representative/Order Processing (S11) | ☐ | | | | | | | | | ☐ | | | | ☐ | | | | ☐ | |
| IE - United Kingdom - Limited General Securities Registered Representative (S17) | ☐ | ☐ | ☐ | | | | | | | ☐ | | | | | | | | ☐ | |
| DR - Direct Participation Program Representative (S22) | ☐ | ☐ | ☐ | | | | | | | ☐ | | | | ☐ | | | | | |
| GP - General Securities Principal (S24) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| IP - Investment Company and Variable Contracts Products Principal (S26) | ☐ | ☐ | ☐ | | | | | | | ☐ | | | | | | | | ☐ | |
| FA - Foreign Associate | ☐ | | | | | | | | | | | | | | | | | | |
| FN - Financial and Operations Principal (S27) | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| FI - Introducing Broker-Dealer/Financial and Operations Principal (S28) | ☐ | ☐ | ☐ | | | | | | | ☐ | | | | ☐ | | | | ☐ | ☐ |

| | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RS - Research Analyst (S86, S87) | ☑ | ☑ | ☑ | | | | | | | | | | | | | | | | |
| RP - Research Principal | ☑ | | | | | | | | | | | | | | | | | | |
| DP - Direct Participation Program Principal (S39) | ☑ | ☑ | ☑ | | | | | | | ☑ | | | | ☑ | | | | | |
| OR - Options Representative (S42) | | | | | | ☑ | ☑ | | | | | | | | | | | ☑ | |

| REGISTRATION CATEGORY | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MR - Municipal Securities Representative (S52) | ☑ | ☑ | ☑ | | | | | | | ☑ | | | | ☑ | | | | | |
| MP - Municipal Securities Principal (S53) | ☑ | ☑ | ☑ | | | | | | | ☑ | | | | ☑ | | | | | |
| CS - Corporate Securities Representative (S62) | ☑ | ☑ | ☑ | | | | | | | ☑ | | | | ☑ | | | | ☑ | |
| RG - Government Securities Representative (S72) | ☑ | | | | | | | | | | | | | | | | | | |
| PG - Government Securities Principal | ☑ | | | | | | | | | | | | | | | | | | |
| SA - Supervisory Analyst (S16) | ☑ | | | | | | | | | | | | | | | | | | |
| PR - Limited Representative - Private Securities Offerings (S82) | ☑ | ☑ | ☑ | | | | | | | | | | | | | | | | |
| CD - Canada-Limited General Securities Registered Representative (S37) | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ | | ☑ | ☑ | | ☑ | ☑ | ☑ | | | | | | |
| CN - Canada-Limited General Securities Registered Representative (S38) | ☑ | ☑ | ☑ | ☑ | ☑ | ☑ | | ☑ | ☑ | | ☑ | ☑ | | | | | | ☑ | |
| ET - Equity Trader (S55) | ☑ | ☑ | ☑ | | | | | | | ☑ | | | | | | | | | |

L14023PB00914.001

| REGISTRATION CATEGORY | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AM – Allied Member | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| AP – Approved Person | | ☐ | ☐ | | | ☐ | ☐ | | | | ☐ | ☐ | | | ☐ | ☐ | | | ☐ |
| LE – Securities Lending Representative | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| LS – Securities Lending Supervisor | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| ME – Member Exchange | | ☐ | ☐ | | | ☐ | ☐ | | | | ☐ | | | | ☐ | ☐ | | | |
| FE – Floor Employee | | ☐ | ☐ | | | | | | | ☐ | ☐ | | | | | | | | |
| OF – Officer | | ☐ | ☐ | | | | | | | | ☐ | | | | | | | | |
| CO – Compliance Official (S14) | | ☐ | ☐ | ☐ | ☐ | | | | | | | | | | | ☐ | ☐ | | |
| CF – Compliance Official Specialist (S14A) | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| PM – Floor Member Conducting Public Business | | ☐ | ☐ | | | | | | | | | | | | | | | | |

| REGISTRATION CATEGORY | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PC – Floor Clerk Conducting Public Business | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| SC – Specialist Clerk (S21) | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| TA – Trading Assistant (S25) | | ☐ | ☐ | | | | | | | | | | | | | | | | |
| FP – Municipal Fund (S51) | ☐ | | | | | | | | | | | | | | | | | | |
| IF – In-Firm Delivery Proctor | ☐ | ☐ | ☐ | | | | | | | | | | | | | | | | |
| MM – Market Maker Authorized Trader-Options (S56) | | | | | | | | | | | ☐ | | | | | | | | |
| FB – Floor Broker (S56) | | | | | | | | | | | ☐ | | | | | | | | |

| REGISTRATION CATEGORY | FINRA | NYSE | NYSE-MKT | BATS-ZX | BATS-YX | BOX | BX | EDGA | EDGX | NSX | ARCA | CBOE | C2 | CHX | PHLX | ISE | GEMINI | NQX | MIAX |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MB - Market Maker acting as Floor Broker | | | | | | | | | | | ☐ | | | | | | | | |
| OT - Authorized Trader (S7) | | | ☐ | | | | | | | | ☐ | | | | | | | | |
| MT - Market Maker Authorized Trader-Equities (S7) | | | | ☐ | ☐ | | | ☐ | ☐ | | ☐ | | | | | | | | |
| IB - Investment Banking Representative (S79) | ☐ | | | | | | | | | | | | | | | | | | |
| OS - Operations Professional (S99) | ☐ | | | | | | | | | | | | | | | | | | |
| AF - Floor Broker - Options (S56) | | | ☐ | | | | | | | | | | | | | | | | |
| AO - Market Maker - Options (S56) | | | ☐ | | | | | | | | | | | | | | | | |
| AC - Floor Clerk - Options | | | ☐ | | | | | | | | | | | | | | | | |
| CT - Proprietary Trader Compliance Officer (S14) | | | | ☐ | ☐ | | | | | | | ☐ | ☐ | ☐ | | | | | |
| PT - Proprietary Trader (S56) | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| TP - Proprietary Trader Principal (S24) | | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Other |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| _____ (Paper Form Only) |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

## 5. JURISDICTION REGISTRATION

**Check appropriate *jurisdiction(s)* for broker-dealer agent (AG) and/or investment adviser representative (RA) registration requests.**

| JURISDICTION | AG | RA | JURISDICTION | AG | RA | JURISDICTION | AG | RA | JURISDICTION | AG | RA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | ☐ | ☐ | Illinois | ☐ | ☐ | Montana | ☐ | ☐ | Puerto Rico | ☐ | ☐ |
| Alaska | ☐ | ☐ | Indiana | ☐ | ☐ | Nebraska | ☐ | ☐ | Rhode Island | ☐ | ☐ |
| Arizona | ☐ | ☐ | Iowa | ☐ | ☐ | Nevada | ☐ | ☐ | South Carolina | ☐ | ☐ |
| Arkansas | ☐ | ☐ | Kansas | ☐ | ☐ | New Hampshire | ☐ | ☐ | South Dakota | ☐ | ☐ |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| California | ☐ | ☐ | Kentucky | ☐ | ☐ | New Jersey | ☐ | ☐ | Tennessee | ☐ ☐ |
| Colorado | ☐ | ☐ | Louisiana | ☑ | ☐ | New Mexico | ☐ | ☐ | Texas | ☐ ☐ |
| Connecticut | ☐ | ☐ | Maine | ☐ | ☐ | New York | ☐ | ☐ | Utah | ☐ ☐ |
| Delaware | ☐ | ☐ | Maryland | ☐ | ☐ | North Carolina | ☐ | ☐ | Vermont | ☐ ☐ |
| District of Columbia | ☐ | ☐ | Massachusetts | ☐ | ☐ | North Dakota | ☐ | ☐ | Virgin Islands | ☐ ☐ |
| Florida | ☐ | ☐ | Michigan | ☐ | ☐ | Ohio | ☐ | ☐ | Virginia | ☐ ☐ |
| Georgia | ☐ | ☐ | Minnesota | ☐ | ☐ | Oklahoma | ☐ | ☐ | Washington | ☐ ☐ |
| Hawaii | ☐ | ☐ | Mississippi | ☐ | ☐ | Oregon | ☐ | ☐ | West Virginia | ☐ ☐ |
| Idaho | ☐ | ☐ | Missouri | ☐ | ☐ | Pennsylvania | ☐ | ☐ | Wisconsin | ☐ ☐ |
| | | | | | | | | | Wyoming | ☐ ☐ |

**AGENT OF THE ISSUER REGISTRATION (AI)** ☐ **Indicate 2 letter *jurisdiction* code(s):**_____

## 6. REGISTRATION REQUESTS WITH AFFILIATED FIRMS

Will *applicant* maintain registration with *firm*(s) under common ownership or control with the *filing firm*? If "yes", fill in the details to indicate a request for registration with additional *firm*(s).

○Yes   ◉No

No Information Filed

## 7. EXAMINATION REQUESTS

**Scheduling or Rescheduling Examinations** Complete this section only if you are scheduling or rescheduling an examination or continuing education session. Do <u>not</u> select the Series 63 (S63) or Series 65 (S65) examinations in this section if you have completed Section 5 (JURISDICTION REGISTRATION) and have selected registration in a *jurisdiction*. If you have completed Section 5 (JURISDICTION REGISTRATION), and requested an AG registration in a *jurisdiction* that requires that you pass the S63 examination, an S63 examination will be automatically scheduled for you upon submission of this Form U4. If you have completed Section 5 (JURISDICTION REGISTRATION), and requested an RA registration in a *jurisdiction* that requires that you pass the S65 examination, an S65 examination will be automatically scheduled for you upon submission of this Form U4.

| | | | | | |
|---|---|---|---|---|---|
| ☐ S3 | ☐ S14 | ☐ S28 | ☐ S42 | ☐ S53 | ☐ S79 |
| ☐ S4 | ☐ S16 | ☐ S30 | ☐ S44 | ☐ S55 | ☐ S82 |
| ☐ S5 | ☐ S17 | ☐ S31 | ☐ S45 | ☐ S56 | ☐ S86 |
| ☐ S6 | ☐ S22 | ☐ S32 | ☐ S46 | ☐ S62 | ☐ S87 |
| ☑ S7 | ☐ S23 | ☐ S33 | ☐ S51 | ☐ S63 | ☐ S99 |
| ☐ S9 | ☐ S24 | ☐ S37 | ☐ S52 | ☐ S65 | ☐ S101 |
| ☐ S10 | ☐ S26 | ☐ S38 | | ☐ S66 | ☐ S106 |
| ☐ S11 | ☐ S27 | ☐ S39 | | ☐ S72 | ☐ S201 |
| | | | | | ☐ S501 |

Other _____   (Paper Form Only)

OPTIONAL: Foreign Exam City _____   Date (MM/DD/YYYY) _____

L14023PB00914.001

If you have taken an exam prior to registering through the CRD system please enter the exam type and date taken.

| Exam type: | Date taken (MM/DD/YYYY): |
| --- | --- |

## 8. PROFESSIONAL DESIGNATIONS

**Select each designation you currently maintain.**

☐ **Certified Financial Planner**

☐ **Chartered Financial Consultant (ChFC)**

☐ **Personal Financial Specialist (PFS)**

☐ **Chartered Financial Analyst (CFA)**

☐ **Chartered Investment Counselor (CIC)**

## 9. IDENTIFYING INFORMATION/NAME CHANGE

| First Name:<br>DENISE | Middle Name:<br>A | Last Name:<br>BADGEROW |
| --- | --- | --- |
| Suffix: | Date of Birth<br>(MM/DD/YYYY)<br>06/22/1979 | |
| State/Province of Birth<br>LOUISIANA | Country of Birth<br>USA | Sex<br>○ Male ◉ Female |
| Height (ft)<br>5 | Height (in)<br>2 | Weight (lbs)<br>105 |
| Hair Color<br>Brown | Eye Color<br>Brown | |

## 10. OTHER NAMES

No Information Filed

## 11. RESIDENTIAL HISTORY

Starting with the current address, give all addresses for the past 5 years. Report changes as they occur.

| From | To | Street | City | State | Country | Postal Code |
| --- | --- | --- | --- | --- | --- | --- |
| 12/2013 | PRESENT | 264 COTTAGE WAY | THIBODAUX | LA | USA | 70301 |
| 02/2010 | 12/2013 | 136 ANSLEY PLACE COURT | HOUMA | LA | USA | 70360 |
| 01/2008 | 02/2010 | 225 GOUAUX AVE | HOUMA | LA | USA | 70364 |

## 12. EMPLOYMENT HISTORY

Provide complete employment history for the past 10 years. Include the *firm*(s) noted in Section 1 (GENERAL INFORMATION) and Section 6 (REGISTRATION REQUESTS WITH AFFILIATED FIRMS). Include all *firm*(s) from Section 3 (REGISTRATION WITH UNAFFILIATED FIRMS). Account for all time including full and part-time employments, self-employment, military service, and homemaking. Also include statuses such as unemployed, full-time education, extended travel, or other similar statuses.
Report changes as they occur.

L14023PB0091.001

| From | To | Name of *Firm* or Company | *Investment-Related* business? | City | State | Country | Position |
|------|-----|---------------------------|-------------------------------|------|-------|---------|----------|
| 02/2013 | 01/2014 | JPMORGAN CHASE BANK | ○Yes ◉No | HOUMA | LA | USA | PERSONAL BANKER |
| 09/2012 | 02/2013 | PA MURRAY GROUP | ○Yes ◉No | HOUMA | LA | USA | EXECUTIVE ASSISTANT |
| 04/2010 | 09/2012 | SELF EMPLOYED | ○Yes ◉No | HOUMA | LA | USA | BOOKKEEPER |
| 05/2008 | 04/2010 | INTERTEK | ○Yes ◉No | SCHRIEVER | LA | USA | HYDROCARBON ALLOCATIONS CLERK |
| 10/2007 | 05/2008 | NICHOLLS STATE UNIVERSITY | ○Yes ◉No | HOUMA | LA | USA | FULL TIME STUDENT |
| 08/2002 | 10/2007 | WOOD GROUP | ○Yes ◉No | HOUMA | LA | USA | ACCOUNTING CLERK |

## 13. OTHER BUSINESS

Are you <u>currently</u> engaged in any other business either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise? (Please exclude non *investment-related* activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.) If YES, please provide the following details: the name of the other business, whether the business is *investment-related*, the address of the other business, the nature of the other business, your position, title, or relationship with the other business, the start date of your relationship, the approximate number of hours/month you devote to the other business, the number of hours you devote to the other business during securities trading hours, and briefly describe your duties relating to the other business.

○Yes ◉No

## 14. DISCLOSURE QUESTIONS

**IF THE ANSWER TO ANY OF THE FOLLOWING QUESTIONS IS 'YES', COMPLETE DETAILS OF ALL EVENTS OR PROCEEDINGS ON APPROPRIATE DRP(S)**

### REFER TO THE EXPLANATION OF TERMS SECTION OF FORM U4 INSTRUCTIONS FOR EXPLANATIONS OF ITALICIZED TERMS.

#### Criminal Disclosure

|  | YES | NO |
|--|-----|-----|
| **14A. (1) Have you ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ◉ |
| (b) been *charged* with any *felony*? | ○ | ◉ |
| **(2) Based upon activities that occurred while you exercised *control* over it, has an organization ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic or foreign court to any *felony*? | ○ | ◉ |
| (b) been *charged* with any *felony*? | ○ | ◉ |
| **14B. (1) Have you ever:** | | |
| (a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign or military court to a *misdemeanor involving:* investments or an *investment-related* business or any fraud, false statements or omissions, wrongful taking of | ○ | ◉ |

property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses?

(b) been *charged* with a *misdemeanor* specified in 14B(1)(a)?    ○  ◉

**(2) Based upon activities that occurred while you exercised *control* over it, has an organization ever:**

(a) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic or foreign court to a *misdemeanor* specified in 14B(1)(a)?    ○  ◉

(b) been *charged* with a *misdemeanor* specified in 14B(1)(a)?    ○  ◉

### Regulatory Action Disclosure

**14C.**  **Has the U.S. Securities and Exchange Commission or the Commodity Futures Trading Commission ever:**    YES NO

(1) *found* you to have made a false statement or omission?    ○  ◉

(2) *found* you to have been *involved* in a violation of its regulations or statutes?    ○  ◉

(3) *found* you to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted?    ○  ◉

(4) entered an *order* against you in connection with *investment-related* activity?    ○  ◉

(5) imposed a civil money penalty on you, or *ordered* you to cease and desist from any activity?    ○  ◉

(6) *found* you to have willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board, or *found* you to have been unable to comply with any provision of such Act, rule or regulation?    ○  ◉

(7) *found* you to have willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board?    ○  ◉

(8) *found* you to have failed reasonably to supervise another person subject to your supervision, with a view to preventing the violation of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board?    ○  ◉

**14D. (1) Has any other Federal regulatory agency or any state regulatory agency or *foreign financial regulatory authority* ever:**

(a) *found* you to have made a false statement or omission or been dishonest, unfair or unethical?    ○  ◉

(b) *found* you to have been *involved* in a violation of *investment-related* regulation(s) or statute(s)?    ○  ◉

(c) *found* you to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked or restricted?    ○  ◉

(d) entered an *order* against you in connection with an *investment-related* activity?    ○  ◉

(e) denied, suspended, or revoked your registration or license or otherwise, by *order*, prevented you from associating with an *investment-related* business or restricted your activities?    ○  ◉

**(2) Have you been subject to any *final order* of a state securities commission (or any agency or officer performing like functions), state authority that supervises or examines banks, savings associations, or credit unions, state insurance commission (or any agency or office performing like functions), an appropriate *federal banking agency*, or the National Credit Union Administration, that:**

|  |  |  |
|---|---|---|
| (a) bars you from association with an entity regulated by such commission, authority, agency, or officer, or from engaging in the business of securities, insurance, banking, savings association activities, or credit union activities; or | ○ | ◉ |
| (b) constitutes a *final order* based on violations of any laws or regulations that prohibit fraudulent, manipulative, or deceptive conduct? | ○ | ◉ |

**14E. Has any *self-regulatory organization* ever:**

|  |  |  |
|---|---|---|
| (1) *found* you to have made a false statement or omission? | ○ | ◉ |
| (2) *found* you to have been *involved* in a violation of its rules (other than a violation designated as a *"minor rule violation"* under a plan approved by the U.S. Securities and Exchange Commission)? | ○ | ◉ |
| (3) *found* you to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked or restricted? | ○ | ◉ |
| (4) disciplined you by expelling or suspending you from membership, barring or suspending your association with its members, or restricting your activities? | ○ | ◉ |
| (5) *found* you to have willfully violated any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board, or *found* you to have been unable to comply with any provision of such Act, rule or regulation? | ○ | ◉ |
| (6) *found* you to have willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? | ○ | ◉ |
| (7) *found* you to have failed reasonably to supervise another person subject to your supervision, with a view to preventing the violation of any provision of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, or any rule or regulation under any of such Acts, or any of the rules of the Municipal Securities Rulemaking Board? | ○ | ◉ |

| **14F.** | **Have you ever had an authorization to act as an attorney, accountant or federal contractor that was revoked or suspended?** | ○ | ◉ |
|---|---|---|---|

| **14G.** | **Have you been notified, in writing, that you are now the subject of any:** | | |
|---|---|---|---|
|  | (1) regulatory complaint or *proceeding* that could result in a "yes" answer to any part of 14C, D or E? *(If yes, complete the Regulatory Action Disclosure Reporting Page.)* | ○ | ◉ |
|  | (2) *investigation* that could result in a "yes" answer to any part of 14A, B, C, D or E? *(If yes, complete the Investigation Disclosure Reporting Page.)* | ○ | ◉ |

**Civil Judicial Disclosure**

**14H. (1) Has any domestic or foreign court ever:**                                                           YES  NO

|  |  |  |
|---|---|---|
| (a) *enjoined* you in connection with any *investment-related* activity? | ○ | ◉ |
| (b) *found* that you were *involved* in a violation of any *investment-related* statute(s) or regulation(s)? | ○ | ◉ |
| (c) dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you by a state or *foreign financial regulatory authority*? | ○ | ◉ |
| **(2) Are you named in any pending *investment-related* civil action that could result in a "yes" answer to any part of 14H(1)?** | ○ | ◉ |

**Customer Complaint/Arbitration/Civil Litigation Disclosure**

**14I. (1) Have you ever been <u>named</u> as a respondent/defendant in an *investment-related*,   YES  NO
consumer-initiated arbitration or civil litigation which alleged that you were
*involved* in one or more *sales practice violations* and which:**

L14023PB00914.001

(a) is still pending, or;

(b) resulted in an arbitration award or civil judgment against you, regardless of amount, or;

(c) was settled, prior to 05/18/2009, for an amount of $10,000 or more, or;

(d) was settled, on or after 05/18/2009, for an amount of $15,000 or more?

**(2) Have you ever been the subject of an *investment-related*, consumer-initiated (written or oral) complaint, which alleged that you were *involved* in one or more *sales practice violations*, and which:**

(a) was settled, prior to 05/18/2009 for an amount of $10,000 or more, or;

(b) was settled, on or after 05/18/2009, for an amount of $15,000 or more?

**(3) Within the past twenty four (24) months, have you been the subject of an *investment-related*, consumer-initiated, written complaint, not otherwise reported under question 14I(2) above, which:**

(a) alleged that you were *involved* in one or more *sales practice violations* and contained a claim for compensatory damages of $5,000 or more (if no damage amount is alleged, the complaint must be reported unless the firm has made a good faith determination that the damages from the alleged conduct would be less than $5,000), or;

(b) alleged that you were *involved* in forgery, theft, misappropriation or conversion of funds or securities?

**Answer questions (4) and (5) below only for arbitration claims or civil litigation filed on or after 05/18/2009.**

**(4) Have you ever been the subject of an *investment-related*, consumer-initiated arbitration claim or civil litigation which alleged that you were *involved* in one or more *sales practice violations*, and which:**

(a) was settled for an amount of $15,000 or more, or;

(b) resulted in an arbitration award or civil judgment against any named respondent (s)/defendant(s), regardless of any amount?

**(5) Within the past twenty four (24) months, have you been the subject of an *investment-related*, consumer-initiated arbitration claim or civil litigation not otherwise reported under questions 14I(4) above, which:**

(a) alleged that you were *involved* in one or more *sales practice violations* and contained a claim for compensatory damages of $5,000 or more (if no damage amount is alleged, the arbitration claim or civil litigation, must be reported unless the firm has made a good faith determination that the damages from the alleged conduct would be less than $5,000), or;

(b) alleged that you were *involved* in forgery, theft, misappropriation or conversion of funds or securities?

## Termination Disclosure

**14J. Have you ever voluntarily *resigned*, been discharged or permitted to *resign* after allegations were made that accused you of:**

(1) violating *investment-related* statutes, regulations, rules, or industry standards of conduct?

(2) fraud or the wrongful taking of property?

(3) failure to supervise in connection with *investment-related* statutes, regulations, rules or industry standards of conduct?

## Financial Disclosure

**14K. Within the past 10 years:**

(1) have you made a compromise with creditors, filed a bankruptcy petition or been the subject of an involuntary bankruptcy petition?

(2) based upon events that occurred while you exercised *control* over it, has an organization made a compromise with creditors, filed a bankruptcy petition or been the subject of an involuntary bankruptcy petition?

L14023PB00914.001

| | | |
|---|---|---|
| (3) based upon events that occurred while you exercised *control* over it, has a broker or dealer been the subject of an involuntary bankruptcy petition, or had a trustee appointed, or had a direct payment procedure initiated under the Securities Investor Protection Act? | ○ | ◉ |
| **14L. Has a bonding company ever denied, paid out on, or revoked a bond for you?** | ○ | ◉ |
| **14M. Do you have any unsatisfied judgments or liens against you?** | ○ | ◉ |

## 15. SIGNATURE SECTION

**Please Read Carefully**

All signatures required on this Form U4 filing must be made in this section.

A "signature" includes a manual signature or an electronically transmitted equivalent. For purposes of an electronic form filing, a signature is effected by typing a name in the designated signature field. By typing a name in this field, the signatory acknowledges and represents that the entry constitutes in every way, use, or aspect, his or her legally binding signature.

15A   INDIVIDUAL/APPLICANT'S ACKNOWLEDGMENT AND CONSENT
This section must be completed on all initial or Temporary Registration form filings.

15B   FIRM/APPROPRIATE SIGNATORY REPRESENTATIONS
This section must be completed on all initial or Temporary Registration form filings.

15C   TEMPORARY REGISTRATION ACKNOWLEDGMENT
This section must be completed on Temporary Registration form filings to be able to receive Temporary Registration.

15D   INDIVIDUAL/APPLICANT'S AMENDMENT ACKNOWLEDGMENT AND CONSENT
This section must be completed on any amendment filing that amends any information in Section 14 (Disclosure Questions) or any Disclosure Reporting Page (DRP).

15E   FIRM/APPROPRIATE SIGNATORY AMENDMENT REPRESENTATIONS
This section must be completed on all amendment form filings.

15F   FIRM/APPROPRIATE SIGNATORY CONCURRENCE
This section must be completed to concur with a U4 filing made by another *firm* (IA/BD) on behalf of an individual that is also registered with that other *firm* (IA/BD).

### 15A. INDIVIDUAL/APPLICANT'S ACKNOWLEDGMENT AND CONSENT

1.  I swear or affirm that I have read and understand the items and instructions on this form and that my answers (including attachments) are true and complete to the best of my knowledge. I understand that I am subject to administrative, civil or criminal penalties if I give false or misleading answers.

2.  I apply for registration with the *jurisdictions* and *SROs* indicated in Section 4 (SRO REGISTRATION) and Section 5 (JURISDICTION REGISTRATION) as may be amended from time to time and, in consideration of the *jurisdictions* and *SROs* receiving and considering my application, I submit to the authority of the *jurisdictions* and *SROs* and agree to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of the *jurisdictions* and *SROs* as they are or may be adopted, or amended from time to time. I further agree to be subject to and comply with all requirements, rulings, orders, directives and decisions of, and penalties, prohibitions and limitations imposed by the *jurisdictions* and *SROs*, subject to right of appeal or review as provided by law.

3.  I agree that neither the *jurisdictions* or *SROs* nor any person acting on their behalf shall be liable to me for action taken or omitted to be taken in official capacity or in the scope of employment, except as otherwise provided in the statutes, constitutions, certificates of incorporation, by-laws or the rules and regulations of the *jurisdictions* and *SROs*.

4.  I authorize the *jurisdictions*, *SROs*, and the *designated entity* to give any information they may have concerning me to any employer or prospective employer, any federal, state or municipal agency, or any other *SRO* and I release the *jurisdictions*, *SROs*, and the *designated entity*, and any person acting on their behalf from any and all liability of whatever nature by reason of furnishing such information.

5. I agree to arbitrate any dispute, claim or controversy that may arise between me and my *firm*, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the *SROs* indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent *jurisdiction*.

6. For the purpose of complying with the laws relating to the offer or sale of securities or commodities or investment advisory activities, I irrevocably appoint the administrator of each *jurisdiction* indicated in Section 5 (JURISDICTION REGISTRATION) as may be amended from time to time, or such other person designated by law, and the successors in such office, my attorney upon whom may be served any notice, process, pleading, subpoena or other document in any action or *proceeding* against me arising out of or in connection with the offer or sale of securities or commodities, or investment advisory activities or out of the violation or alleged violation of the laws of such *jurisdictions*. I consent that any such action or *proceeding* against me may be commenced in any court of competent *jurisdiction* and proper venue by service of process upon the appointee as if I were a resident of, and had been lawfully served with process in the *jurisdiction*. I request that a copy of any notice, process, pleading, subpoena or other document served hereunder be mailed to my current residential address as reflected in this form or any amendment thereto.

7. I consent that the service of any process, pleading, subpoena, or other document in any *investigation* or administrative *proceeding* conducted by the SEC, CFTC or a *jurisdiction* or in any civil action in which the SEC, CFTC or a *jurisdiction* are plaintiffs, or the notice of any *investigation* or *proceeding* by any *SRO* against the *applicant*, may be made by personal service or by regular, registered or certified mail or confirmed telegram to me at my most recent business or home address as reflected in this Form U4, or any amendment thereto, by leaving such documents or notice at such address, or by any other legally permissible means.

   I further stipulate and agree that any civil action or administrative *proceeding* instituted by the SEC, CFTC or a *jurisdiction* may be commenced by the service of process as described herein, and that service of an administrative subpoena shall be effected by such service, and that service as aforesaid shall be taken and held in all courts and administrative tribunals to be valid and binding as if personal service thereof had been made.

8. I authorize all my employers and any other person to furnish to any *jurisdiction, SRO, designated entity*, employer, prospective employer, or any agent acting on its behalf, any information they have, including without limitation my creditworthiness, character, ability, business activities, educational background, general reputation, history of my employment and, in the case of former employers, complete reasons for my termination. Moreover, I release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any of the above information, including that information reported on the Uniform Termination Notice for Securities Industry Registration (Form U5). I recognize that I may be the subject of an investigative consumer report and waive any requirement of notification with respect to any investigative consumer report ordered by any *jurisdiction, SRO, designated entity*, employer, or prospective employer. I understand that I have the right to request complete and accurate disclosure by the *jurisdiction, SRO, designated entity*, employer or prospective employer of the nature and scope of the requested investigative consumer report.

9. I understand and certify that the representations in this form apply to all employers with whom I seek registration as indicated in Section 1 (GENERAL INFORMATION) or Section 6 (REGISTRATION REQUESTS WITH AFFILIATED FIRMS) of this form. I agree to update this form by causing an amendment to be filed on a timely basis whenever changes occur to answers previously reported. Further, I represent that, to the extent any information previously submitted is not amended, the information provided in this form is currently accurate and complete.

10. I authorize any employer or prospective employer to file electronically on my behalf any information required in this form or any amendment thereto; I certify that I have reviewed and approved the information to be submitted to any *jurisdiction* or *SRO* on this Form U4 Application; I agree that I will review and approve all disclosure information that will be filed electronically on my behalf; I further agree to waive any objection to the admissibility of the electronically filed records in any criminal, civil, or administrative *proceeding*.

*Applicant* or *applicant*'s agent has typed *applicant*'s name under this section to attest to the completeness and accuracy of this record. The *applicant* recognizes that this typed name constitutes, in every way, use or aspect, his or her legally binding signature.

L14023PB00914.001

| Date (MM/DD/YYYY) | Signature of **Applicant** |
|---|---|
| 01/06/2014 | DENISE A BADGEROW |

Signature _Denise A Badgerow_

## 15B. FIRM/APPROPRIATE SIGNATORY REPRESENTATIONS

To the best of my knowledge and belief, the *applicant* is currently bonded where required, and, at the time of approval, will be familiar with the statutes, constitution(s), rules and by-laws of the agency, *jurisdiction* or *SRO* with which this application is being filed, and the rules governing registered persons, and will be fully qualified for the position for which application is being made herein. I agree that, notwithstanding the approval of such agency, *jurisdiction* or *SRO* which hereby is requested, I will not employ the *applicant* in the capacity stated herein without first receiving the approval of any authority that may be required by law.

This *firm* has communicated with all of the *applicant's* previous employers for the past three years and has documentation on file with the names of the persons contacted and the date of contact. In addition, I have taken appropriate steps to verify the accuracy and completeness of the information contained in and with this application.

I have provided the *applicant* an opportunity to review the information contained herein and the *applicant* has approved this information and signed the Form U4.

| Date (MM/DD/YYYY) | Signature of **Appropriate Signatory** |
|---|---|
|  | Signature _____ |

---

## BANKRUPTCY/SIPC/COMPROMISE WITH CREDITORS DRP

No Information Filed

### BOND DRP

No Information Filed

### CIVIL JUDICIAL DRP

No Information Filed

### CRIMINAL DRP

No Information Filed

### CUSTOMER COMPLAINT/ARBITRATION/CIVIL LITIGATION DRP

No Information Filed

### INVESTIGATION DRP

No Information Filed

### JUDGMENT LIEN DRP

No Information Filed

### REGULATORY ACTION DRP

No Information Filed

### TERMINATION DRP

No Information Filed

Privacy | Legal | Use of Web CRD®, IARD™, or PFRD™ is governed by the Terms & Conditions.
©2014 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, inc.

DOC0106200048

Ameriprise Financial Services, Inc. 50301 Ameriprise Financial Center Minneapolis, MN 55474

# AFG Registered Staff Agreement
Ameriprise Financial Services, Inc.


Ameriprise Financial

Social Security Number
(registered staff)
Redacted        208

This REGISTERED STAFF AGREEMENT (this "Agreement") is an agreement by and between Ameriprise Financial Services, Inc. ("Ameriprise Financial") at its principal place of business at 200 Ameriprise Financial Center, Minneapolis, Minnesota 55474, and you

**Denise A. Badgerow**
Registered Staff Name

(hereinafter, "you" or "your"), executed and effective as of the date shown on the last line of this Agreement. It defines your relationship with Ameriprise Financial as Registered Staff employed/contracted by a duly licensed Ameriprise Financial Independent Advisor,

**Gregory A. Walters**
Franchise Advisor Name

Both you and Ameriprise Financial promise to comply with the terms of this Agreement and any executed Riders to this Agreement.

## Part 1   Definitions

1. For purposes of this Agreement, the terms listed below have the special meanings shown. Other terms used with initial capital letters herein shall have the meaning ascribed to them elsewhere in this Agreement.

(a) "Affiliate" means any entity recognized at law including but not limited to any partnership, business, trust, company or corporation affiliated with Ameriprise Financial at any time while this Agreement is in effect.

(b) "Ameriprise Financial" means Ameriprise Financial Services, Inc.

(c) "Client" means a person or entity who (i) purchases or holds a Product or Service acquired from or through Ameriprise Financial or an Affiliate or one of their financial Advisors with consent of Ameriprise Financial or the Affiliate, or (ii) authorized Ameriprise Financial, an Affiliate or one of their Advisors to make personal financial planning presentations to it or its employees or members, or (iii) is a member of a Client's household.

(d) "Independent Advisor" or "Advisor" means an Ameriprise Financial Independent Advisor or Franchisee.

(e) "Issuer" means the company or entity that issues a Product or Service distributed or offered by Ameriprise Financial itself or by Ameriprise Financial as the agent of the company.

(f) "Product(s)" means certificates, stock, other securities or investments, lending products, life insurance and annuity policies and contract, and other insurance products.

(g) "Proprietary Marks" means trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, the marks used in providing Products or Services.

(h) "Records and Materials" means all data or documents related to Products and Services, all records, files, manuals, blanks, forms, materials, supplies, stationery, literature, seminar materials, computer software, licenses, papers and books that Ameriprise Financial or an Issuer furnishes or leases to you for use, with or without charge, and any data or information that you use, create or prepare, including notes, memos, works of authorship, and any information regarding Clients or Clients' financial data in connection with the performance of this Agreement.

(i) "Service(s)" means financial planning, advisory, securities brokerage, tax or other financial services.

## Part 2   Appointment

A. You are acting as Registered Staff working for a duly licensed Independent Advisor and your duties may require you to undertake activities which are reserved by law to broker-dealer agents, investment adviser agents and/or insurance agents. You understand and acknowledge you are not an employee or independent contractor of Ameriprise Financial. You are required to hold registrations, securities licenses, insurance licenses and appointments with our companies in order to perform such activities, but only upon the express condition that you acknowledge and agree, by signing this Agreement, that you will receive no compensation or benefits of any kind from Ameriprise Financial.

B. Ameriprise Financial appoints you to act as an agent of Ameriprise Financial in connection with your activities as Registered Staff for Independent Advisor but only in accordance with this Agreement, and you accept that appointment. As a condition of your association with Ameriprise Financial and as an agent of Ameriprise Financial, you will be subject to certain obligations, both during and after your affiliation with Ameriprise Financial, as set forth in this Agreement.

C. You understand and agree that Ameriprise Financial will not appoint you until you pass a background investigation and any and all debt or other obligations you may have with Ameriprise Financial and its affiliates have been satisfied.

© 2008-2013 Ameriprise Financial, Inc.
All rights reserved.


EXHIBIT
tabbies®   B-3



DOC0206200048

## Part 3   Duties

Except as provided in Section 4, your duties will be assigned to you by the Independent Advisor for whom you are working, and will be carried out under their direction and supervision.

## Part 4   Limitation of Duties

A. Your duties under this Agreement must at all times comply with the policies and procedures of Ameriprise Financial and all Federal, state, self-regulatory organization and local laws.

B. Prior to obtaining your licenses and registrations and applicable state securities and insurance authorities and appointment as Registered Staff with Ameriprise Financial you will not engage in any activities requiring a license or registration or appointment by law or Ameriprise policies.

C. Your duties under this Agreement will be exercised only under the supervision of an Independent Advisor and the individuals responsible for providing compliance supervision of your activities.

D. As a registered person you must comply with Ameriprise Financial's company policy requiring you to report and obtain prior written approval for your outside business activities, if any. You are prohibited from engaging in employment or outside activities that: (i) compete with or do business with Ameriprise Financial or its parent company; (ii) create the potential for a conflict of interest with Ameriprise Financial or its parent company; or (iii) otherwise are not approved in advance and in writing by Ameriprise Financial. If the activity is deemed to be inappropriate, you will be required to immediately cease the activity.

## Part 5   Status of Registered Staff

A. You acknowledge and agree that nothing in this Agreement can be interpreted as creating an employee or independent contractor relationship between Ameriprise Financial or an Affiliate and you or between any Issuer and you.

B. You or your employing/contracting Independent Advisor will pay all expenses and fees you incur while carrying out the terms of this Agreement and you will comply with all applicable laws, ordinances and regulations.

C. You will, before conducting any activities under this Agreement, become appointed by Ameriprise Financial as Registered Staff and obtain any licenses or registrations required by law or Ameriprise Financial.

D. Ameriprise Financial will, during the term of this Agreement, provide you with reasonable levels of errors and omissions coverage protecting you against demand or claims arising or occurring in connection with the business conducted through the Independent Advisor. Such policy or policies shall be written by a carrier or carriers approved by Ameriprise Financial. Ameriprise Financial or any of its Affiliates may be such an approved carrier.

E. This Agreement will terminate upon cancellation or non-renewal of any license, registration or bond you are required to have by the terms of this Agreement and in the event that you, at any time, are no longer affiliated with an Independent Advisor.

F. This Agreement will terminate in the event you do not satisfy any debt or other obligations you may have with Ameriprise Financial or its Affiliates.

G. All Clients with whom you interact or otherwise provide Products or Services are Clients of Ameriprise Financial.

H. Registered Staff understands that your employing or contracting Independent Advisor may reallocate his/her rights to compensation paid to the Independent Advisor by Ameriprise Financial in an outside agreement as long as: (a) any transfer be in accordance with then current Ameriprise Financial policies and procedures; (b) compensation is paid consistent with the then current Ameriprise Financial policies and procedures; (c) the agreement will be enforced among the Independent Advisor and Registered Staff and Ameriprise Financial will not be responsible to enforce or follow contested terms in such an agreement; and (d) any disagreements be handled by the parties without Ameriprise Financial involvement.

## Part 6   Undertaking by Registered staff

A. You must have written approval from Ameriprise Financial or an Affiliate before you issue or use in any way any material about Products and Services distributed by Ameriprise Financial or an Affiliate or Issuer or about them.

B. You agree to abide by all Federal and state securities and insurance laws. You further agree to abide by all rules and policies of Ameriprise Financial and an Affiliate or any associated company, including but not limited to all client privacy rules.

C. You cannot alter or change the provisions of any Product or Service distributed by Ameriprise Financial or through the Ameriprise Financial field force. You also cannot incur any liability or expense on behalf of Ameriprise Financial or an Issuer.

D. When authorized to do so, you will promptly deliver premium receipts and policies originating from any application solicited by you or an Independent Advisor for life insurance.

E. When authorized to do so, you will collect and immediately report and remit to Ameriprise Financial or Issuer renewal premiums or any loan repayments you receive with respect to insurance and annuities sold by an Independent Advisor and any payments with respect to others Products or Services sold by an Independent Advisor.

F. You will send all payments, money or property you collect or receive to Ameriprise Financial or Issuer without commingling it with your own money and property or the money or property of another person.

G. You must review and abide by the provisions of the applicable Ameriprise Financial Compliance Manual.

H. You must transfer all applicable securities to Ameriprise® Brokerage, Schwab or Merrill Lynch within 45 days from your appointment date.

*Undertaking by Registered Staff continued on next page..*



DOC0306200048

## Undertaking by Registered Staff continued

I.  In consideration of the promises and covenants given by you in this Agreement, Ameriprise Financial hereby grants to you during the term of this Agreement a non-exclusive, limited, terminable, royalty-free and non-assignable or transferable license, without the right to sublicense to others, to use the Proprietary Marks of Ameriprise Financial's parent that are listed on Exhibit A to this Agreement in the performance of your obligations and undertakings expressly set forth in this Agreement and for no other purpose. This limited license is further limited as follows:

1.  You may not use such Proprietary Marks to: (i) sell any unauthorized Products or Services; (ii) register a domain name that includes, in whole or part, any Proprietary Mark; or (iii) in any manner not explicitly authorized in writing by Ameriprise Financial;

2.  You may not use any such Proprietary Mark as a noun, but only as an adjective followed by an appropriate noun and can never use any Proprietary Mark in the possessive or plural form or as part of a noun;

3.  You may not use any such Proprietary Mark without the proper trademark or service mark symbol $(^{TM}, ^{SM}$ or $^{\circledR})$ as shown in Exhibit A or in conjunction with any Product or Service not associated properly with such Proprietary Mark;

4.  You may not use or attempt to register any trademark, service mark, logo or company name that might be deemed to be confusingly similar to any such Proprietary Mark; and

5.  You may not use any trademark, service mark, logo, company name or trade name owned by Ameriprise Financial or its Affiliates other than the Proprietary Marks identified on Exhibit A.

J.  You agree to comply with Ameriprise Financial trademark usage guidelines as they are published and amended and updated from time to time.

K.  The license granted in this Section 6 terminates immediately upon the termination of this Agreement. In addition, the license granted by Ameriprise Financial in this Section 6 is terminable at any time by Ameriprise Financial, for any reason or no reason, upon notice from Ameriprise Financial. Your failure to comply with any of the provisions of this Section 6 results in an immediate termination of this license.

### Part 7   Compensation

A.  You will not receive any compensation or benefits of any kind from Ameriprise Financial for any of your activities under this Agreement. You also acknowledge that you have no claim to any compensation, benefit plan, program or policy of or sponsored by Ameriprise Financial unless such plan, policy or benefit plan specifically references Registered Staff in their role as Registered Staff as an eligible group under such plan, program or policy and Registered Staff meets all conditions for eligibility set forth in such program.

B.  You agree to maintain records of any and all compensation paid to you from the Independent Advisor and to produce such records within 24 hours of any request from Ameriprise Financial.

### Part 8   Termination

A.  This Agreement will terminate upon your death, your total and permanent disability, your retirement or immediately at any time that you are no longer officially associated with an Independent Advisor. You will promptly notify Ameriprise Financial, in writing, of the termination of your relationship with an Independent Advisor for any reason. Such written notice must be delivered personally to the Independent Advisor's Regional Vice President ("RVP") designate, or if no designate is timely provided, to the Independent Advisor's immediate Ameriprise Financial leader, and, in either event, a copy, by facsimile or overnight mail, to Ameriprise Financial Corporate Office, Licensing Unit.

B.  This Agreement may be terminated by either party upon written notice to the other party. A breach by you of any provision of this Agreement will be considered a material breach of, and will result in immediate termination of this Agreement.

C.  While this Agreement is in effect and after it ends, except pursuant to written policy or consent of Ameriprise Financial:

1.  All Records and Materials are the property of Ameriprise Financial, an Affiliate or an Issuer. All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to Ameriprise Financial. You agree that you will not reproduce or allow the reproduction of the Records and Materials in any manner whatsoever;

2.  You are responsible for the safekeeping of Records and Materials. Such Records and Materials are open to inspection by Ameriprise Financial, its auditors, compliance personnel and regulators at any time during your normal business hours. When this Agreement ends, all of these items remain Ameriprise Financial property except pursuant to written policy or consent to the contrary from Ameriprise Financial. You must return all Records and materials and all copies of them to Ameriprise Financial at any time on request. Regardless of any written policy or consent from Ameriprise Financial, you must return at least one copy (originals) of all Records and Materials, together with any licenses you have or control, without demand for compensation;

3.  You agree that you will not reveal the contents of any Ameriprise Financial property or other confidential information (including this Agreement) or allow them to be revealed, except in connection with carrying out your duties under the Agreement;

4.  You agree that the identity of Clients or potential Clients, including but not limited to Client name, address, telephone number(s), electronic address, and personal and financial information and data, is and will always remain confidential information and you will not take or use any such information following the termination of your affiliation with Ameriprise Financial;

5.  You agree that you will not use any information or Records and Materials you acquired while this Agreement was in force in a manner adverse to the interests of Ameriprise Financial, an Affiliate, a Client or an Issuer; and

6.  You agree that you will not disparage Ameriprise Financial, its Affiliates, employees, financial advisors, Products and Services.

*Termination continued on next page...*

DOC0406200048

## Termination continued

D. While this Agreement is in effect and after it ends, due to your position and contact with Ameriprise Financial, you may have access to Ameriprise Financial's trade secrets and confidential information that has great value to Ameriprise Financial. You agree that because of such access, you are in a position of trust and confidence with respect to this information. To protect Client confidentiality, Ameriprise Financial goodwill, trade secret, and other proprietary and confidential business information, you agree to not, during the term of this Agreement or thereafter, communicate, divulge, or use for yourself, except in performing your duties for the Ameriprise Financial system, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the Ameriprise Financial system and the business franchised to the Independent Advisor to whom you provide services. You also shall not reveal any information about potential clients to whom a presentation has been made by you or any Independent Advisor who might reasonably be expected to do business with Ameriprise Financial. You agree that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential Information includes compilations and lists of such Client information, including without limitation, compilations or lists that were the result of substantial effort, time and/or money expended by you pursuant to the Ameriprise Financial system. You further agree to use this confidential information only in furtherance of this Agreement or in accordance with Ameriprise Financial's policies and for no other purpose. Confidential Information does not include information which is generally known outside of Ameriprise Financial, other than as a result of a disclosure by an Independent Advisor, Independent Advisor's agents or representatives, or any other person or entity in breach of any contractual, legal or fiduciary obligation of confidentiality to Ameriprise Financial or to any other person or entity with respect to such information, including you.

E. You agree, in express consideration for (i) your securities registration by Ameriprise Financial, (ii) your right to act as an agent of Ameriprise Financial, and (iii) the terms of this contract, all of which provide you with significant and valuable consideration and which you would not be entitled to absent execution of this Agreement, that you will not, during the term of this Agreement and for a period of one (1) year following the termination of your affiliation with Ameriprise Financial, either directly or indirectly, for yourself or through, on behalf of, or in conjunction with any person or entity:

  1. Contact any Client or prospective business of any customer who you, or the Independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, for the purpose of: (i) identifying the termination of your affiliation with Ameriprise Financial; (ii) identifying your change of employment or affiliation; or (iii) identifying your new employment or affiliation.

  2. Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer who you, or the Independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, to terminate an agreement with Ameriprise Financial, Affiliates, or Issuers;

  3. Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer whom you, or the Independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, to terminate, surrender, redeem, or cancel any action related to Products and Services acquired or ordered from or through Ameriprise Financial, Affiliates, or Issuers;

  4. Solicit any Clients who you, or the Independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, to open an account other than an Ameriprise Financial account or to sell any investment, financial or insurance products or services other than through Ameriprise Financial;

  5. Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients whom you, or the Independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement; or

  6. Employ, or retain as an independent contractor, any person who is at that time, or within the previous six (6) months prior to the termination of this Agreement has been, employed by Ameriprise Financial or associated with Ameriprise Financial as an independent contractor or agent, or by any other Independent Advisor of Ameriprise Financial, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with Ameriprise Financial.

F. You must not disparage Ameriprise Financial, its Affiliates, employees, financial advisors, Products and Services or do anything to damage the goodwill of Ameriprise Financial, an Affiliate, or Issuer.

G. You agree that:

  1. The violation of the provisions in paragraphs C, D, E, or F of this Section 8 will result in damage to Ameriprise Financial that cannot be determined precisely and for which Ameriprise Financial has no adequate remedy under the law;

  2. Ameriprise Financial has the specific right to attempt to enforce these provisions; and

  3. Notwithstanding Section 9, Ameriprise Financial is entitled to seek an injunction to keep you from violating the provisions or to enforce them.

## Part 9   Arbitration

A. Unless otherwise agreed to in writing by both parties, you agree to arbitrate any dispute, claim or controversy that may arise between you and Ameriprise Financial or its Affiliates, or a Client, or any other person, ("Claims"); however, the parties agree that Claims brought by Ameriprise Financial pursuant to Section 8 of this Agreement will not be arbitrated, but shall be subject to the jurisdiction of the courts as provided in Section 11 of this Agreement to the extent consistent with the law and the rules, constitutions, or by-laws of FINRA as they may be amended from time to time.

B. To the extent that any Claims are required to be arbitrated under the rules, constitutions, or by-laws of FINRA as they may be amended from time to time, they will be arbitrated in accordance with the policies and procedures established by FINRA.

C. Except as provided in paragraph 1 of this Section 9, if either FINRA declines to administer an arbitration of any Claims or FINRA rules do not allow for arbitration of any Claims, the parties agree that the Claims shall be finally decided by arbitration conducted pursuant to the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA"), and its Supplementary Rules for Securities Arbitration, or the AAA National Rules for the Resolution of Employment Disputes, as applicable. In addition, you and Ameriprise Financial specifically agree that all Claims, statutory or otherwise, which allege discrimination, including but not limited to claims of sexual harassment, shall be finally decided by arbitration pursuant to the AAA unless otherwise agreed to in writing by the parties.

*Arbitration continued on next page.*



DOC0506200048

## Arbitration continued

D. By agreement of the Parties in writing, disputes may be resolved in arbitration by a mutually agreed-upon organization other than FINRA or the AAA.

E. In consideration of the promises and the compensation provided in this Agreement neither Ameriprise Financial (except as provided in paragraph A of this Section 9) nor you shall have a right to: (a) arbitrate any Claim on a class action basis or in a purported representative capacity on behalf of any Registered Staff, Independent Advisors, employees, applicants or other persons similarly situated; (b) join or to consolidate in an arbitration Claims brought by or against another Registered Staff, Independent Advisor, employee, applicant or Ameriprise Financial, unless otherwise agreed to in writing by all parties; (c) litigate any Claims in court or to have a jury trial on any Claims; or (d) participate in a representative capacity or as a member of any class of claimants in an action in a court of law pertaining to any Claims. Nothing in this Agreement relieves you or Ameriprise Financial from any obligation you or it may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Agreement.

F. Either you (except as provided in paragraph A of this Section 9) or Ameriprise Financial may compel arbitration of any Claims filed in a court of law. In addition, either you or Ameriprise Financial may apply to a court of law for an injunction to enforce the terms of this Agreement pending a final decision on the merits by an arbitration panel pursuant to this provision.

G. Ameriprise Financial shall pay all fees, costs or other charges charged to it by FINRA, AAA or any other organization administering an arbitration proceeding pursuant to these provisions that are above and beyond the filing fees of the federal or state court in the jurisdiction in which the dispute arises. You and Ameriprise Financial shall each be responsible for their own costs of legal representation, if any except where such costs of legal representation may be awarded as a statutory remedy by the arbitrator.

H. Any award by an arbitration panel shall be final and binding upon the parties. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant party or its assets.

I. This Agreement is covered and enforceable under the terms of the Federal Arbitration Act.

## Part 10   Termination Claims

In the event of the termination of this Agreement, you have no claims against Ameriprise Financial for compensation, profits or earnings under the terms of this Agreement.

## Part 11   Miscellaneous

A. This Agreement is a Minnesota contract. The validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of Minnesota. You expressly (i) consent to personal jurisdiction in the state and federal courts located in the State of Minnesota, (ii) waive any argument that venue in any such forum is not convenient, and (iii) agree that any action at law, suit in equity, judicial proceeding, or arbitration arising directly, indirectly, or otherwise in connection with, out of, related to or from this agreement or any provision hereof, shall be litigated only in the appropriate state or federal court in the State of Minnesota, County of Hennepin.

B. If Ameriprise Financial waives any provisions of this Agreement, the waiver applies only to that provision, not to any other parts of the Agreement. A waiver is effective only when it is in writing and signed by an authorized Ameriprise Financial officer.

C. If the laws of any state prohibit any provision of this Agreement, such laws apply only to such provision. They do not invalidate the remaining portions of the Agreement.

D. Any notice to Ameriprise Financial under this Agreement must be given to the corporate office of Ameriprise Financial in Minneapolis, Minnesota. Any notice given to you under this Agreement is considered to have been given if delivered to you in person or mailed to your last known address on file with the Ameriprise Financial corporate office in Minneapolis.

E. You and Ameriprise Financial both acknowledge that no oral or written representations were made about this Agreement or about the relationship between you and Ameriprise Financial that are not set forth in this Agreement. Your rights and Ameriprise Financial's rights are governed only by this Agreement and by any other subsequent written agreements or riders between you and Ameriprise Financial and signed by you and an authorized officer of Ameriprise Financial.

## Part 12   Assignment

You may not assign this Agreement without Ameriprise Financial's written consent.

## Part 13   Prior Agreements

This Agreement terminates and supersedes any existing agreements, written or oral, between the parties, whether executed the same date as this Agreement or otherwise, related to the topics contained herein. This Agreement further terminates your right to any commissions payable under such an agreement for business written under that agreement or your right to any compensation earned and unpaid under that agreement.



DOC0606200048

**Part 14**  **Effective Date**

In witness of the provisions of this Agreement as described above, you and Ameriprise Financial have entered into this Agreement with the understanding that it becomes effective on _January 6th_ 20 _14_.

Registered Staff Printed Name
Denise A. Badgerow

Registered Staff Signature
X _Denise A. Badgerow_

Registered Staff Social Security Number
Redacted

Independent Advisor Printed Name
Gregory A. Walters

Independent Advisor Signature
X

Independent Advisor Number
163169

Ameriprise Financial Services, Inc.
Assistant Secretary Signature:
X

DOC0606200048

| Part 14 | Effective Date |

In witness of the provisions of this Agreement as described above, you and Ameriprise Financial have entered into this Agreement with the understanding that it becomes effective on _____ , 20 ____.

Registered Staff Printed Name
Denise A. Badgerow

Registered Staff Signature
X _____

Registered Staff Social Security Number

Independent Advisor Printed Name
Gregory A. Walters

Independent Advisor Signature
X _____

Independent Advisor Number
76369

Ameriprise Financial Services, Inc.
Assistant Secretary Signature:
X _____

03/06/2014 THU 10:35  FAX 9854461989  AMERIPRISE FINANCIAL                    @005/032

DOC0108402563

9.44.
Redacted

# Associate Financial Advisor Agreement

Ameriprise ✦
Financial

Franchise Advisor ID
0103109

This ASSOCIATE FINANCIAL ADVISOR AGREEMENT (this "Agreement") is an agreement by and between Ameriprise Financial Services, Inc. ("Ameriprise Financial") at its principal place of business at 200 Ameriprise Financial Center, Minneapolis, Minnesota 55474, and you
Denise Badgerow (hereinafter, "you" or "your"), executed and effective as of the date shown on the last line of this Agreement.

It defines your relationship with Ameriprise Financial as an Associate Financial Advisor employed/contracted by a duly licensed Ameriprise Financial Associate Financial Advisor employed/contracted by a duly licensed Ameriprise Financial Independent Advisor. Gregory Walters L

Both you and Ameriprise Financial promise to comply with the terms of this Agreement and any executed Riders to this Agreement.

**1. Definitions.** For purpose of this Agreement, the terms listed below have the special meanings shown. Other terms used with initial capital letters herein shall have the meaning ascribed to them elsewhere in this Agreement.

A. "Affiliate" means any entity recognized at law including but not limited to any partnership, business, trust, company or corporation affiliated with Ameriprise Financial at any time while this Agreement is in effect.

B. "Ameriprise Financial" means Ameriprise Financial Services, Inc.

C. "Client" means a person or entity who (i) purchases or holds a Product or Service acquired from or through Ameriprise Financial or an Affiliate or one of their financial advisors with consent of Ameriprise Financial or the Affiliate, or (ii) authorized Ameriprise Financial, an Affiliate or one of their Advisors to make personal financial planning presentations to it or its employees or members, or (iii) is a member of a Client's household.

D. "Independent Advisor" or "Advisor" means an Ameriprise Financial Independent Advisor or Franchisee.

E. "Issuer" means the company or entity that issues a Product or Service distributed or offered by Ameriprise Financial itself or by Ameriprise Financial as the agent of another company.

F. "Product(s)" means certificates, stock, other securities or investments, lending products, life insurance and annuity policies and contracts, and other insurance products.

G. "Proprietary Marks" means trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, the marks used in providing Products or Services.

H. "Records and Materials" means all data or documents related to Products and Services, all records, files, manuals, blanks, forms, materials, supplies, stationery, literature, seminar materials, computer software, licenses, paper and books that Ameriprise Financial or an Issuer furnishes or licenses to you for use, with or without charge, and any data or information that you use, create or prepare, including notes, memos, works of authorship, and any information regarding Clients or Clients' financial data in connection with the performance of this Agreement.

I. "Service(s)" means financial planning, advisory, securities brokerage, tax or other financial services.

**2. Appointment.**

A. You are acting as an Associate Financial Advisor working for a duly licensed Independent Advisor and your duties may require you to undertake activities which are reserved by law to broker-dealer agents, investment adviser agents and/or insurance agents. You understand and acknowledge you are not an employee or independent contractor of Ameriprise Financial. You are required to hold registrations, securities licenses, insurance licenses and appointments with our companies in order to perform such activities, but only upon the express condition that you acknowledge and agree, by signing this Agreement, that you will receive no compensation or benefits of any kind from Ameriprise Financial.

B. Ameriprise Financial appoints you to act as an agent of Ameriprise Financial in connection with your activities as an Associate Financial Advisor for an Independent Advisor but only in accordance with this Agreement, and you accept that appointment. As a condition of your association with Ameriprise Financial and as an agent of Ameriprise Financial, you will be subject to certain obligations, both during and after your affiliation with Ameriprise Financial, as set forth in this Agreement.

Sign on Page 8

Fax # 1 858.263.0223

402563                          Page 1 of 8              A (06/13)    ●

© 2013 Ameriprise Financial, Inc.
All rights reserved.

L14079PC033314.001.001-

EXHIBIT
B - 4
tabbies®

03/03/14   05:43PM   Ameriprise Financial   7722334316   p.04

C. You understand and agree that Ameriprise Financial will not appoint you until you pass a background investigation and any and all debt or other obligations you may have with Ameriprise Financial and its affiliates have been satisfied.

3. Duties. Except as provided in Section 4, your duties will be assigned to you by the Independent Advisor for whom you are working, and will be carried out under his or her direction and supervision.

4. Limitation of Duties.

A. Your duties under this Agreement must at all times comply with the policies and procedures of Ameriprise Financial and all Federal, state, self regulatory organization and local laws.

B. Prior to obtaining your licenses and registrations and applicable state securities and insurance authorities and appointment as an Associate Financial Advisor with Ameriprise Financial, you must not do any of the following:
   * Solicit applications for Ameriprise Financial Products and Services
   * Interview Clients
   * Sell Products
   * Sell or provide Services
   * Conduct Client data gathering
   * Contact Clients or prospective Clients by phone, fax, mail, e-mail, or in person
   * Hold out to the public as an Associate Financial Advisor or registered representative of Ameriprise Financial
   * Describe Products or Services to Clients or prospective Clients
   * Conduct initial interviews with prospective Clients
   * Or any other activities that require licensing, registration and appointment

C. Your duties under this Agreement will be exercised only under the supervision of an Independent Advisor and the individuals responsible for providing compliance supervision of your activities.

D. As a registered person you must comply with Ameriprise Financial's company policy requiring you to report and obtain prior written approval for your outside business activities, if any. You are prohibited from engaging in employment or outside activities that: (a) compete with or do business with Ameriprise Financial or its parent company; (b) create the potential for a conflict of interest with Ameriprise Financial or its parent company; or (c) otherwise are not approved in advance and in writing by Ameriprise Financial. If the activity is deemed to be inappropriate, you will be required to immediately cease the activity.

5. Status of Associate Financial Advisor.

A. You acknowledge and agree that nothing in this Agreement can be interpreted as creating an employee or independent contractor relationship between Ameriprise Financial or an Affiliate and you or between any Issuer and you.

B. You or your employing/contracting Independent Advisor will pay all expenses and fees you incur while carrying out the terms of this Agreement and you will comply with all applicable laws, ordinances and regulations.

C. You will, before conducting any activities under this Agreement, become appointed by Ameriprise Financial as an Associate Financial Advisor and obtain any licenses or registrations required by law or Ameriprise Financial.

D. Ameriprise Financial will, during the term of this Agreement, provide you with reasonable levels of errors and omissions coverage protecting you against demand or claims arising or occurring in connection with the business conducted through the Independent Advisor. Such policy or policies shall be written by a carrier or carriers approved by Ameriprise Financial. Ameriprise Financial or any of its Affiliates may be such an approved carrier.

E. This Agreement will terminate upon cancellation or non-renewal of any license, registration or bond you are required to have by the terms of this Agreement and in the event that you, at any time, are no longer affiliated with an Independent Advisor.

F. This Agreement will terminate in the event you do not satisfy any debt or other obligations you may have with Ameriprise Financial or its Affiliates.

G. All Clients with whom you interact or otherwise provide Products or Services are Clients of Ameriprise Financial. Clients transferred to you by the Independent Advisor employing or contracting you, or that are otherwise obtained by you, will remain or become Clients of Ameriprise Financial following the termination of your association with Ameriprise Financial or your relationship with the Independent Advisor.

H. Associate Financial Advisor understands that your employing or contracting Independent Advisor may reallocate his/her rights to compensation paid to the Independent Advisor by Ameriprise Financial in an outside agreement as long as: (a) any transfer be in accordance with then current Ameriprise Financial policies and procedures; (b) compensation is paid consistent with the then current Ameriprise Financial policies and procedures; (c) the agreement will be enforced among the Independent Advisor and Associate Financial Advisor and Ameriprise Financial will not be responsible to enforce or follow contested terms in such an agreement; and (d) any disagreements be handled by the parties without Ameriprise Financial involvement.

6. Undertaking by Associate Financial Advisor.

A. You must have written approval from Ameriprise Financial or an Affiliate before you issue or use in any way any material about Products and Services distributed by Ameriprise Financial or an Affiliate or Issuer or about them.

B. You agree to abide by all Federal and state securities and insurance laws. You further agree to abide by all rules and policies of Ameriprise Financial and an Affiliate or any associated company, including but not limited to all client privacy rules.

C. You cannot alter or change the provisions of any Product or Service distributed by Ameriprise Financial or through the Ameriprise Financial field force. You also cannot incur any liability or expense on behalf of Ameriprise Financial or an Issuer.

402563                                    Page 2 of 6                    A (06/13)

L14079PC03314.001.002

03/06/2014 THU 10: 29 FAX 9854461989  AMERIPRISE FINANCIAL                                     ☒008/032

DOC0308402663

D.  When authorized to do so, you will promptly deliver premium receipts and policies or contracts originating from any application solicited by you or an independent Advisor for life insurance and annuities.

E.  When authorized to do so, you will collect and immediately report and remit to Ameriprise Financial or issuer renewal premiums or any loan repayments you receive with respect to insurance and annuities sold by an independent Advisor and any payments with respect to others Products or Services sold by an independent Advisor.

F.  You will send all payments, money or property you collect or receive to Ameriprise Financial or issuer without commingling it with your own money and property of the money or property of another person.

G.  You must review and abide by the provisions of the applicable Ameriprise Financial Compliance Manual.

H.  You must transfer all applicable securities to Ameriprise® Brokerage, Schwab or Merrill Lynch within 45 days from your appointment date.

I.  In consideration of the promises and covenants given by you in this Agreement, Ameriprise Financial hereby grants to you during the term of this Agreement a non-exclusive, limited, terminable, royalty-free and non-assignable or transferable license, without the right to sublicense to others, to use the Proprietary Marks of Ameriprise Financial's parent that are listed on Exhibit A to this Agreement in the performance of your obligations and undertakings expressly set forth in this Agreement and for no other purpose. This limited license is further limited as follows:

   1.  You may not use such Proprietary Marks to: (i) sell any unauthorized Products or Services; (ii) register a domain name that includes, in whole or part, any Proprietary Mark; or (iii) in any manner not explicitly authorized in writing by Ameriprise Financial;

   2.  You may not use any such Proprietary Mark as a noun, but only as an adjective followed by an appropriate noun and can never use any Proprietary Mark in the possessive or plural form or as part of a pun;

   3.  You may not use any such Proprietary Mark without the proper trademark or service mark symbol (™, SM or ®) as shown in Exhibit A or in conjunction with any Product or Service not associated properly with such Proprietary Mark;

   4.  You may not use or attempt to register any trademark, service mark, logo or company name that might be deemed to be confusingly similar to any such Proprietary Mark; and

   5.  You may not use any trademark, service mark, logo, company name or trade name owned by Ameriprise Financial or its Affiliates other than the Proprietary Marks identified on Exhibit A.

J.  You agree to comply with Ameriprise Financial trademark usage guidelines as they are published and amended and updated from time to time.

K.  The license granted in this Section 6 terminates immediately upon the termination of this Agreement. In addition, the license granted by Ameriprise Financial in this Section 6 is terminable at any time by Ameriprise Financial, for any reason or no reason, upon notice from Ameriprise Financial. Your failure to comply with any of the provisions of this Section 6 results in an immediate termination of this license.

**7.  Compensation.**

A.  You will not receive any compensation or benefits of any kind from Ameriprise Financial for any of your activities under this Agreement. You also acknowledge that you have no claim to any compensation, benefit plan, program or policy of or sponsored by Ameriprise Financial unless such plan, policy or benefit plan specifically references Associate Financial Advisors in their role as Associate Financial Advisor as an eligible group under such plan, program or policy and Associate Financial Advisor meets all conditions for eligibility set forth in such program.

B.  You agree to maintain records of any and all compensation paid to you from the Independent Advisor and to produce such records within 24 hours of any request from Ameriprise Financial.

**8.  Termination.**

A.  This Agreement will terminate upon your death, your total and permanent disability, your retirement or immediately at any time that you are no longer officially associate with an Independent Advisor. You will promptly notify Ameriprise Financial, in writing, of the termination of your relationship with an Independent Advisor for any reason. Such written notice must be delivered personally to the Independent Advisor's Regional Vice President ("RVP") designate, or if no designate is timely provided, to the Independent Advisor's immediate Ameriprise Financial leader, and, in either event, a copy, by facsimile or overnight mail, to Ameriprise Financial Corporate Office, Licensing Unit.

B.  This Agreement may be terminated by either party upon written notice to the other party. A breach by you of any provision of this Agreement will be considered a material breach of, and will result in immediate termination of this Agreement.

C.  While this Agreement is in effect and after it ends, except pursuant to written policy or consent of Ameriprise Financial:

   1.  All Records and Materials are the property of Ameriprise Financial, an Affiliate or an issuer. All rights to Records and Materials that you prepare or create in connection with the performance of this Agreement are hereby assigned to Ameriprise Financial. You agree that you will not reproduce or allow the reproduction of the Records and Materials in any manner whatsoever;

   2.  You are responsible for the safekeeping of Records and Materials. Such Records and Materials are open to inspection by Ameriprise Financial, its auditors, compliance personnel and regulators at any time during your normal business hours. When this Agreement ends,

L14079PC03314.001.003

03/06/2014 THU 10: 30 FAX 98544 61989  AMERIPRISE FINANCIAL                    @009/032

DOC0408402583

all of these items remain Ameriprise Financial property except pursuant to written policy or consent to the contrary from Ameriprise Financial. You must return all Records and materials and all copies of them to Ameriprise Financial at any time on request. Regardless of any written policy or consent from Ameriprise Financial, you must return at least one copy (originals) of all Records and Materials, together with any licenses you have or control, without demand for compensation;

3. You agree that you will not reveal the contents of any Ameriprise Financial property or other confidential information (including this Agreement) or allow them to be revealed, except in connection with carrying out your duties under the Agreement;

4. You agree that the identity of Clients or potential Client , including but not limited to Client name, address, telephone number(s), electronic address, and personal and financial information and data, is and will always remain confidential information and you will not take or use any such information following the termination of your affiliation with Ameriprise Financial;

5. You agree that you will not use any information or Records and Materials you acquired while this Agreement was in force in a manner adverse to the interests of Ameriprise Financial, an Affiliate, a Client or an Issuer; and

6. You agree that you will not disparage Ameriprise Financial, its Affiliates, employees, financial advisors, Products and Services.

D. While this Agreement is in effect and after it ends, due to your position and contact with Ameriprise Financial, you may have access to Ameriprise Financial's trade secrets and confidential information that has great value to Ameriprise Financial. You agree that because of such access, you are in a position of trust and confidence with respect to this information. To protect Client confidentiality, Ameriprise Financial goodwill, trade secret, and other proprietary and confidential business information, you agree to not, during the term of this Agreement or thereafter, communicate, divulge, or use for yourself, except in performing your duties for the Ameriprise Financial system, or for the benefit of any other person, partnership, association, or corporation any confidential information, or trade secrets, including, without limitation, Client names, addresses and data and know-how concerning the methods of operation of the Ameriprise Financial system and the business franchised to the independent Advisor to whom you provide services. You also shall not reveal any information about potential clients to whom a presentation has been made by you or any independent Advisor who might reasonably be expected to do business with Ameriprise Financial. You agree that, without limitation, Client names, addresses, data and other personal and financial information recorded in Client records are confidential. Confidential information includes compilations and lists of such Client information, including without limitation, compilations or lists that were the result of substantial effort, time and/or money expended by you pursuant to the Ameriprise Financial system. You further agree to use this confidential information only in furtherance of the Agreement or in accordance with Ameriprise Financial's policies and for no other purpose. Confidential information does not include information which is generally known outside of Ameriprise Financial, other than as a result of a disclosure by an independent Advisor, independent Advisor's agents or representatives, or any other person or entity in breach of any contractual, legal or fiduciary obligation of confidentiality to Ameriprise Financial or to any other person or entity with respect to such information, including you.

E. You agree, in express consideration for (i) your securities registration by Ameriprise Financial, (ii) your right to act as an agent of Ameriprise Financial, and (iii) the terms of this contract, all of which provide you with significant and valuable consideration and which you would not be entitled to absent execution of this Agreement, that you will not, during the term of this Agreement and for a period of one (1) year following the termination of your affiliation with Ameriprise Financial, either directly or indirectly, for yourself or through, on behalf of, or in conjunction with any person or entity

1. Contact any Client or prospective business of any customer whom you, or the independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, for the purpose of: (i) identifying the termination of your affiliation with Ameriprise Financial; (ii) identifying your change of employment or affiliation; or (iii) identifying your new employment or affiliation.

2. Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer whom you, or the independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, to terminate an agreement with Ameriprise Financial, Affiliates, or Issuers;

3. Encourage, assist, participate, induce, or attempt to induce any Client or prospective business or customer whom you, or the independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, to terminate, surrender, redeem, or cancel any action related to Products and Services acquired or ordered from or through Ameriprise Financial, Affiliates, or Issuers;

4. Solicit any Clients whom you, or the independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement, to open an account other than an Ameriprise Financial account or to sell any investment, financial or insurance products or services other than through Ameriprise Financial;

5. Open an account for, or provide or offer to provide any investment, financial, or insurance products or services to any Clients whom you, or the independent Advisor with whom you are or were affiliated, contacted, serviced, or learned about while operating under this Agreement; or

6. Employ, or retain as an independent contractor, any person who is at that time, or within the previous six (6) months prior to the termination of this Agreement has been, employed by Ameriprise Financial or associated with Ameriprise Financial as an independent contractor or agent, or by any other independent Advisor of Ameriprise Financial, or otherwise directly or indirectly induce such person to leave his or her employment, association or independent contractor relationship with Ameriprise Financial.

L14079PC03314.001.004

03/06/2014 THU 10:30 FAX 9854461989 AMERIPRISE FINANCIAL                                    ☒019/032



DOC0506402563

F. Ameriprise Financial agrees that the restrictive covenant set forth in this Section 8 (E) 1-5 will not apply to any client brought to Ameriprise Financial from your prior firm listed on the client list attached hereto as Exhibit B.

G. You must not disparage Ameriprise Financial, its Affiliates, employees, financial advisors, Products and Services or do anything to damage the goodwill of Ameriprise Financial, an Affiliate, or, Issuer.

H. You agree that:

   1. The violation of the provisions in paragraphs C, D, E, or G of this Section 8 will result in damage to Ameriprise Financial that cannot be determined precisely and for which Ameriprise Financial has no adequate remedy under the law;

   2. Ameriprise Financial has the specific right to attempt to enforce these provisions; and

   3. Notwithstanding Section 9, Ameriprise Financial is entitled to seek an injunction to keep you from violating the provisions or to enforce them.

**9. Arbitration.**

A. Unless otherwise agreed to in writing by both parties, you agree to arbitrate any dispute, claim or controversy that may arise between you and Ameriprise Financial or its Affiliates, or a Client, or any other person, ("Claims") however, the parties agree that Claims brought by Ameriprise Financial pursuant to Section 8 of this Agreement will not be arbitrated, but shall be subject to the jurisdiction of the courts as provided in Section 11 of this Agreement to the extent consistent with the law and the rules, constitutions, or by-laws of FINRA as they may be amended from time to time.

B. To the extent that any Claims are required to be arbitrated under the rules, constitutions, or by-laws of FINRA as they may be amended from time to time, they will be arbitrated in accordance with the policies and procedures established by FINRA.

C. Except as provided in paragraph 1 of this Section 9, if either FINRA declines to administer an arbitration of any Claims or FINRA rules do not allow for arbitration of any Claims, the parties agree that the Claims shall be finally decided by arbitration conducted pursuant to the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA"), and its Supplementary Rules for Securities Arbitration, or the AAA National Rules for the Resolution of Employment Disputes, as applicable. In addition, you and Ameriprise Financial specifically agree that all Claims, statutory or otherwise, which allege discrimination, including but not limited to claims of sexual harassment, shall be finally decided by arbitration pursuant to the AAA unless otherwise agreed to in writing by the parties.

D. By agreement of the Parties in writing, disputes may be resolved in arbitration by a mutually agreed-upon organization other than FINRA or the AAA.

E. In consideration of the promises and the compensation provided in this Agreement neither Ameriprise Financial (except as provided in paragraph A of this Section 9) nor you shall have a right to: (a) arbitrate any Claim on a class action basis or in a purported representative capacity on behalf of any Associate Financial Advisors, Independent Advisors, employees, applicants or other persons similarly situated; (b) join or to consolidate in an arbitration Claims brought by or against another Associate Financial Advisor, Independent Advisor, employee, applicant or Ameriprise Financial, unless otherwise agreed to in writing by all parties; (c) litigate any Claims in court or to have a jury trial on any Claims; or (d) participate in a representative capacity or as a member of any class of claimants in an action in a court of law pertaining to any Claims. Nothing in this Agreement relieves you or Ameriprise Financial from any obligation you or it may have to exhaust certain administrative remedies before arbitrating any claims or disputes under this Agreement.

F. Either you (except as provided in paragraph A of this Section 9) or Ameriprise Financial may compel arbitration of any Claims filed in a court of law. In addition, either you or Ameriprise Financial may apply to a court of law for an injunction to enforce the terms of this Agreement pending a final decision on the merits by an arbitration panel pursuant to this provision.

G. Ameriprise Financial shall pay all fees, costs or other charges charged to it by FINRA, AAA or any other organization administering an arbitration proceeding pursuant to these provisions that are above and beyond the filing fees of the federal or state court in the jurisdiction in which the dispute arises. You and Ameriprise Financial each be responsible for their own costs of legal representation, if any except where such costs of legal representation may be awarded as a statutory remedy by the arbitrator.

H. Any award by an arbitration panel shall be final and binding upon the parties. Judgment upon the award may be entered by any court having jurisdiction thereof or having jurisdiction over the relevant party or its assets.

I. This Agreement is covered and enforceable under the terms of the Federal Arbitration Act.

**10. Termination Claims.** In the event of the termination of this Agreement, you have no claims against Ameriprise Financial for compensation, profits or earnings under the terms of this Agreement.

L14079PC03314.001.005

03/06/2014 THU 10:31  FAX 9554461989  AMERIPRISE FINANCIAL



@011/032

DOC0808402563

**11. Miscellaneous.**

A. This Agreement is a Minnesota contract. The validity, interpretation, performance and enforcement of this Agreement shall be governed by the laws of the State of Minnesota. You expressly (i) consent to personal jurisdiction in the state and federal courts located in the State of Minnesota, (ii) waive any argument that venue in any such forum is not convenient, and (iii) agree that any action at law, suit in equity, judicial proceeding, or arbitration arising directly, indirectly, or otherwise in connection with, out of, related to or from this agreement or any provision hereof, shall be litigated only in the appropriate state or federal court in the State of Minnesota, County of Hennepin.

B. If Ameriprise Financial waives any provisions of this Agreement, the waiver applies only to that provision, not to any other parts of the Agreement. A waiver is effective only when it is in writing and signed by an authorized Ameriprise Financial officer.

C. If the laws of any state prohibit any provision of this Agreement, such laws apply only to such provision. They do not invalidate the remaining portions of the Agreement.

D. Any notice to Ameriprise Financial under this Agreement must be given to the corporate office of Ameriprise Financial in Minneapolis, Minnesota. Any notice given to you under this Agreement is considered to have been given if delivered to you in person or mailed to your last known address on file with the Ameriprise Financial corporate office in Minneapolis.

E. You and Ameriprise Financial both acknowledge that no oral or written representations were made about this Agreement or about the relationship between you and Ameriprise Financial that are not set forth in this Agreement. Your rights and Ameriprise Financial's rights are governed only by this Agreement and by any other subsequent written agreements or riders between you and Ameriprise Financial and signed by you and an authorized officer of Ameriprise Financial.

**12. Assignment.** You may not assign this Agreement without Ameriprise Financial's written consent.

**13. Prior Agreements.** This Agreement terminates and supersedes any existing agreements, written or oral, between the parties, whether executed the same date as this Agreement or otherwise, related to the topics contained herein. This Agreement further terminates your right to any commissions payable under such an agreement for business written under that agreement or your right to any compensation earned and unpaid under that agreement.

**14. Effective Date.** In witness of the provisions of this Agreement as described above, you and Ameriprise Financial have entered into this Agreement with the understanding that it becomes effective on: | 3 / 19 / 2014 |  (date to be entered by Ameriprise)

Associate Financial Advisor (AFA) Name  
Denise A. Badgerow

Area Office Number  
186

AFA Social Security Number  
Redacted

Associate Financial Advisor Signature  
X  Denise A. Badgerow

Date (MMDDYYYY)  
02252014

Employee/Contracting Independent Advisor Name  
Gregory Walters

Advisor ID  
763169

Ameriprise [signature]  Assistant Secretary Signature  
X

Date (MMDDYYYY)  
03/19/2014

402283                                Page 8 of 8                    A (05/13)

L14079PC03314.001.006

03/06/2014 THU 10:34 FAX 9854461989 AMERIPRISE FINANCIAL                    ☑019/032



                                                                    DOC0101402569

# Amendment to the Associate Financial Advisor (AFA) Agreement



Ameriprise
Financial

```
Franchise Advisor ID
    76369
```

Ameriprise Financial Services, Inc. and Associate Financial Advisor are parties to the Ameriprise Financial Services, Inc. Associate Financial Advisor Agreement (the "Agreement") and agree as follows:

1.   Section 5, Status of Associate Financial Advisor, shall be supplemented with the following paragraph at its conclusion:

"You understand and agree that you will be temporarily appointed with Ameriprise Financial as an under-licensed or under-registered Associate Financial Advisor. As such, the scope of your activities will be limited until you reach full licensure/registration as more fully described in the Ameriprise Financial Compliance Manual, Minimum Licensing and Registration Requirements which is subject to change from time-to-time. You must obtain all required licenses and registrations within one-hundred and fifty (150) days from the date of your initial appointment with Ameriprise Financial. You further understand and agree that failure to obtain all required licenses and registrations within the allotted time-frame will result in the termination of all your active registrations with Ameriprise Financial and the immediate termination of this Agreement."

The terms and conditions of the Agreement, as modified by this Amendment, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on
_____, 20____.

AFA Name                                                    Area Office Number
Denise A. Badgerow                                          186
AFA Signature                                               Date (MM/DD/YYYY)
X Denise A. Badgerow                                        02252014

Employing/Contracting Advisor Name                          Employing/Contracting Advisor ID
Gregory Walters                                             76369

Ameriprise Financial Services, Inc., Assistant Secretary Signature    Date (MM/DD/YYYY)
X                                                           02252014



Sign On Page 1

Fax # 1.855.283.0223

© 2013 Ameriprise Financial, Inc.
All rights reserved.

402569                          Page 1 of 1          A (05/13)      ⑩

FINANCIAL INDUSTRY REGULATORY AUTHORITY

(FINRA)

In the Matter of the Arbitration Between

DENISE A. BADGEROW,
        Claimant

AMERIPRISE FINANCIAL SERVICES,
INC., THOMAS MEYER, GREGORY
WALTERS, AND RAY TROSCLAIR
        Respondents

## SECOND AMENDED AND RESTATED STATEMENT OF CLAIM

      This Second Amended and Restated Statement of Claim shall amend and restate Claimant, Denise Badgerow's, original Statement of Claim filed with FINRA on September 19, 2016 (the "Original Claim"), to address: (i) that certain Order and Reasons in Civil Action 17-9492 dated January 10, 2018 (the "District Court Order Compelling Arbitration") whereby the District Court of the Eastern District of Louisiana compelled arbitration of certain claims relating to Ameriprise, and (ii) to remove an allegation contained within the Amended and Restated Statement of Claim consistent with that certain Order of the Panel dated June, 2018.

### *PARTIES*

      **Claimant Denise Badgerow (CRD#:6285199):**    At the time of this filing, Claimant, Denise Badgerow is a resident of Thibodaux, Louisiana.  Ms. Badgerow was involuntarily terminated from her employment as an Associate Financial Advisor ("AFA") with REJ Properties, Inc., a Louisiana corporation, doing business as Walters, Meyer, Trosclair & Associates (the "WMT"), a franchisee of Ameriprise Financial Services, Inc. (the "Member Firm").[1]  Claimant's employment with WMT was governed, in part, by that certain Employment Agreement dated on

---

[1] This statement is not accurate.  Contrary to what is asserted in Respondents Answer, Respondents individually, not WMT, hold the franchise agreements with Ameriprise.  This is because WMT is not a registered financial advisor and cannot legally be paid dealer commissions by Ameriprise because of this fact.  In a similar fashion, WMT was not allowed to pay Badgerow commissions through WMT, but did so in violation of the law.

1



or about January 1, 2014 (the "Employment Agreement") among Claimant, WMT and Member Firm.[2]

**Respondent Gregory Alan Walters (CRD#1948720):** Respondent Gregory Walters is a member of the Company, a Financial Advisor, an Associated Person with the Member Firm, was the direct supervisor of Claimant.

**Respondent Thomas James Meyer (CRD#3007926):** Respondent Thomas James Meyer is a member of the Company, a Financial Advisor, and an Associated Person with the Member Firm.

**Respondent Ray Anthony Trosclair (CRD#3167612):** Respondent Ray Anthony Trosclair is a partner of the Company, a Financial Advisor and an Associated Person with the Member Firm.

**Member Firm Ameriprise Financial Services, Inc. (CRD#6320):** Respondent Ameriprise Financial Services, Inc. is the Member Firm, a party to the Employment Agreement with Claimant and Respondents' Company, and the franchisor of Respondents' Company.[3]

## *FACTUAL ALLEGATIONS*

Claimant, Ms. Badgerow was hired to work for REJ Properties, Inc., d/b/a Walters, Meyer, Trosclair & Associates (the "Company") directly upon graduating from Nicholls State University with a Bachelor of Arts in finance. She worked for the Company as a Para-Planner from approximately January 1, 2014, to approximately March 19, 2014, and as an Associate Financial Advisor (AFA), from March 19, 2014, until she was involuntarily terminated on July 26, 2016. This termination came on the same day Marc Cohen, an Ameriprise Compliance officer, spoke to Respondents, Gregory Walters and Thomas James Meyer, individually, about concerns expressed

---

[2] This statement is also not accurate, the Employment Agreement is between Ameriprise, Badgerow and Respondent Walters.
[3] See footnote 1.

by Ms. Badgerow on July 13, 2016, whereby Ms. Badgerow told Cohen she believed she was not being paid lawfully and was being treated differently from other employees of the Company.

When Ms. Badgerow was hired to work for the Company it was verbally agreed that she would receive compensation of $30,000/year in base salary plus additional commission of 20%-40% of Gross Dealer Compensation, depending on her total sales balance for the year, which balance would reset every January 1.

In October of 2014, Ms. Badgerow made her first sizable commissioned sale that resulted in receipt of Gross Dealer Compensation, a term used to describe commissions received as a result of sales of an Ameriprise Financial Product. After this commissioned sale, she was informed by Kylie Kern (the Company's Office Manager) that the Company had retroactively changed its compensation structure, and that she would no longer be paid a base salary plus commission. Rather, the new unwritten compensation policy now required first year AFAs to repay their base salary before earning any commissions. As a result of this new unwritten policy and unwritten compensation agreement, Ms. Badgerow retroactively began to earn a salary draw of $30,000, plus commission, instead of a base salary plus commission as was originally agreed. In essence this new policy (that appears to have been applied only to Ms. Badgerow) and this new unwritten compensation agreement retroactively cancelled out any benefit Ms. Badgerow received from her first large commission. While the new and sudden policy change seemed unfair and oddly timed, Ms. Badgerow wanted to seem like a team player and not rock the boat in what was proving to be a very difficult office environment. This was Ms. Badgerow's first job as a AFA and she was committed to succeeding, so she did not object or resign over the new policy.

Months into her new career, Walters offered Ms. Badgerow the opportunity to change roles from a client-facing AFA to an assistant to Walters. Assistants are equally credentialed AFAs who work solely on another's book of business, and do not develop a portfolio of their own. Ms. Badgerow adamantly rebuffed Walters' suggestion. Ms. Badgerow was determined to grow her own portfolio and book of business, not work as an assistant to Walters even though all the other female employees of the Company and the Respondents are assistants – not client facing AFAs.

Other than Ms. Badgerow, WMT has never employed a female client-facing AFA or FA. All of these positions have been filled by men. In fact, all of the competent female AFAs act as non-client facing assistants to male FAs at WMT.

3

About the time Ms. Badgerow refused to become an Assistant to Walters, the office harassment began. Ms. Badgerow was told that Meyer did not like her. When Ms. Badgerow asked Walters why Meyer did not like her, Walters stated, "*I don't know – did you rebuff his sexual advances or turn him down for a date?*" After assuring Walters that nothing like that had ever happened, Walters responded to Ms. Badgerow, that it could be that, "*he is just a misogynist.*"

In 2015, Ms. Badgerow was subjected to constant harassment and ridicule by Meyer and his team, including Kylie Kern, Lynna Marcel, and other team members who worked under Meyer.

Also, in 2015, Ms. Badgerow became aware that even though she was a top producing AFA, she was earning quarterly bonuses which were half the amount of her male counterparts. When questioned about the bonus differential by Ms. Badgerow, Walters blamed the difference in bonus pay on Meyer with no further explanation, and hand wrote a payroll check to Ms. Badgerow to cover the $400 difference to "*make it right*".

In December 2015, after complaining constantly to Walters, Ms. Badgerow was moved to a separate office to avoid any further distress to Meyer, segregating her from the rest of WMT team and putting her in an office all by herself.

On or about January 20, 2016, after the end of her two-year period and a rock-star record of performance as an AFA, Walters informed Ms. Badgerow that she was promoted to the role of FA. However, on February 20, 2016, Meyer sent Ms. Badgerow and Kylie Kern an email stating: "*I have made a decision that all associate financial advisors will maintain the title of Associate, as opposed to financial advisor, until they have completed five years of service with WMTA*" a new unwritten company policy was being adopted against long standing company policy, and Ms. Badgerow would be demoted and remain an AFA at WMT.

During her time at the Company and as an Ameriprise Associate Financial Advisor, Ms. Ms. Badgerow was required to answer several compliance questionnaires distributed by Member Firm, in which Member Firm asked questions regarding the Company's compliance with the Member Firm's Financial Compliance Manual, which manual ensures adherence of all of Ameriprise's Financial Advisors with certain books and record keeping requirements for registered securities personnel, as well as appropriate payment of commissions.

Ms. Badgerow was instructed on at least two occasions by Respondent Walters and the Company Office Manager Kylie Kern that she must answer any questions relating to her compensation by affirming that she was being paid commissions through a third-party vendor,

even though Ms. Badgerow was not being paid using a third-party vendor, she was being paid directly by the Company. On these occasions, Ms. Kern stood over Ms. Badgerow's shoulder as she electronically checked the box affirming that she was paid in this manner, while Ms. Kerns watched her complete the form. Ms. Badgerow objected to this payment arrangement to Walters on several occasions urging that she be paid the same way that the other client-facing AFAs were paid which was using Employshare. However, Ms. Badgerow was repeatedly told by Kern and Walters that Meyer would not agree to it. Kern even prepared a spreadsheet which highlights the reason why Meyer would not agree to it: because to use such a payment system resulted in substantially less profit to the Company than with the illegal secondary payment scheme the Company had conjured up.

Ms. Badgerow contacted both Employshare and Paychex to provide a cost analysis to Walters of the necessary changes required to get herself paid on the proper system and even completed the necessary paperwork with Paychex to get enrolled. But the papers were left to sit on the desk of Kylie Kern for months, with Meyer refusing to sign them based on his "disdain" for Ms. Badgerow and his continued unfounded statements that Ms. Badgerow didn't deserve to be compensated on par and in the same manner as the other AFAs (all of whom are male).

The evidence now shows that the Respondents policy of AFAs receiving a salary-draw compensation structure was selectively adopted and enforced only against Ms. Badgerow and not the other similarly situated male AFAs in the office at the time or enforced with respect to any of the other male AFAs who have been hired subsequently.

Around this time Ms. Badgerow spoke with Michael Barker of Ameriprise to get advice on the difficult office environment and strange dynamics at the Company. Barker told Ms. Badgerow that if she did not like the situation she should quit, but, *Do not tell me anything I would have to act upon.*" He hung up quickly.

She also reported her concerns to a mentor she met an Ameriprise Women's Empowerment Conference she attended, this mentor reported the incident directly to Mark Cohen with Ameriprise.

On July 13, 2016, Ms. Badgerow spoke with Marc Cohen, a compliance officer of the Member Firm via teleconference after a telephonic compliance meeting. She was asked by Mr. Cohen directly whether she was paying her commissions using a third-party vendor. Ms. Badgerow answered honestly that her base salary draws and commissions were always paid

directly by the Company, not through a third-party vendor. During that call she also expressed significant concerns about how she was being treated by the Company and the Respondents. These concerns are logged in Marc Cohen's CIR notes for the July 13, 2016, relating to the telephone conference where he stated that Ms. Badgerow was concerned about not being properly paid through a third-party vendor and that, "she was not sure if she was not treated fairly because she was not family or because she is a woman."

Marc Cohen called Mr. Walters and Mr. Meyer individually on the morning of July 26, 2016, to discuss the concerns Ms. Badgerow expressed to him regarding the working conditions and payment methods of the Company, which calls were documented in his notes. Ms. Badgerow was then called into the main office of the Company later that day, by Respondent Walters, and was asked to resign from her position four or five times because "her statement to Marc Cohen dinged [Mr. Walters'] perfect compliance record." Ms. Kern was in the room during this termination. After refusing to resign, Ms. Badgerow was terminated by Respondent Walters after he made Ms. Badgerow select one of two letters to sign: a resignation letter or a termination letter. Ms. Badgerow signed the termination letter. She was told by Mr. Walters that she'd better remember that she was subject to a noncompete and non-solicitation agreement – and that she was no longer allowed to contact her clients.

After the termination, Ms. Badgerow received a copy of the FINRA U5 Form filed by Mr. Walters in connection with her termination in which he fraudulently asserts in Section 3 that Ms. Badgerow's termination was "voluntary," contrary to the Company's own termination letter Ms. Badgerow was forced to sign.

Ms. Badgerow called the Ameriprise Retaliation hotline and filed a formal complaint on August 12, 2016, but was informed by the representative that Ameriprise had no ability to provide any assistance to employees that were retaliated against in connection with compliance, even though all franchises were subject to the Ameriprise Code of Conduct. The Ameriprise Code of Conduct states that it applies to all Ameriprise Financial Advisors. Member Firm knew of Ms. Badgerow's wrongful termination and has tacitly participated in the retaliatory conduct of Company by offering none of the safe harbors it affords to its own employees who report violations of such laws. In addition, in response to the conduct of WMT, Ameriprise instead of detailing the incident and noncompliance and illegal conduct of WMT and Respondents simply issued the most vague and undescriptive "letter of deficiency" regarding the unlawful behavior, which letter fails

to state any of the compliance violations it had uncovered during Cohen's investigation. It's this coverup that ultimately is the loudest indicator of WMT's true joint employer status.

### *The Company's Unwritten Compensation Agreement and Payment Method of Commissions Violated SEC and FINRA regulations*

The Ameriprise Financial Compliance Manual requires AFAs and Independent Advisors to comply with certain rules relating to compensation arrangements and payment of AFAs compensation based on a number of SEC and FINRA rules requiring: (i) that broker-dealers create and maintain a record of all compensation agreements between the firm or members of the firm and persons associated with the firm, including the amount and the method which the compensation is determined,[4] and (ii) prohibits the redistribution of non-advisory compensation.[5] These record keeping rules are replicated in Louisiana law pursuant to the Broker Dealer and Investment Adviser Recordkeeping Requirements promulgated under the Louisiana Administrative Code 10:XIII.Chapter 17. Specifically, Louisiana law provides adoption of SEC Rules 17a-3 (17CFR 240.17a-3), 17a-4 (17 CFR 240.17a-4), and 15c2-11 (17 CFR 240.15c2-11).

Paragraph (a) (19) (i) of SEC Rule 17a-3 requires firms to make a record as to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record must include the amount of compensation (if monetary) and a description of the compensation (if non-monetary). Under this requirement, firms must make records of all commissions, concessions, overrides, and other compensation to the extent they are earned or accrued for transactions. Contrary to these legal requirements, the Company never maintain a written compensation record for Ms. Badgerow.

In addition, Section 15 of the Securities and Exchange Act of 1934, FINRA Rule 2040, provides, as follows:

> *"No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to:*

---

[4] SEC Rule 17a-3(a) (19) (ii)
[5] Section 15 of the Securities and Exchange Act of 1934, FINRA Rule 2040 and SEC Rule 17a-3

*(1) any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act but, by reason of receipt of any such payments and the activities related thereto, is required to be so registered under applicable federal securities laws and SEA rules and regulations; or*

*(2) any appropriately registered associated person unless such payment complies with all applicable federal securities laws, FINRA rules and SEA rules and regulations."*

The Respondents policy of receiving commissions from Ameriprise, then combing the revenues in the account of the Company and then paying Ms. Badgerow commissions from the Company account is a direct violation of SEC Rule 2040, and is the subject of countless SEC No Action Letters.

In contravention to federal law, state law, contracts between the parties, and the Member Firm's policies designed to enforce these rules, none of the Respondents, have provided a valid explanation for their conduct other than that "it was a minor infraction", nor has the Company produced a compensation agreement between the Company or members of the firm and Ms. Badgerow which includes the amount and the method which her compensation is determined.

## Company's Unwritten Compensation Agreement and Payment Method of Commissions Violated SEC and FINRA regulations

The Ameriprise Financial Compliance Manual requires AFAs and Independent Advisors to comply with certain rules relating to compensation arrangements and payment of AFAs compensation based on a number of SEC and FINRA rules which require: (i) that broker-dealers create and maintain a record of all compensation agreements between the firm or members of the firm and persons associated with the firm, including the amount and the method which the compensation is determined , and (ii) prohibits the redistribution of non-advisory compensation.

Specifically, paragraph (a) (19) (i) of SEC Rule 17a-3 requires firms to make a record as to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that associated person. The record must include the amount of compensation (if

monetary) and a description of the compensation (if non-monetary). Under this requirement, firms must make records of all commissions, concessions, overrides, and other compensation to the extent they are earned or accrued for transactions. Contrary to this legal requirement, the Company never maintain written compensation records for Ms. Badgerow, and in fact, changed such compensation arrangements unilaterally without notice – a practice that is much easier to undertake when compensation arrangements are unwritten.

In addition, Section 15 of the Securities and Exchange Act of 1934, FINRA Rule 2040, provides, as follows:

> "No member or associated person shall, directly or indirectly, pay any compensation, fees, concessions, discounts, commissions or other allowances to:
>
> (1) any person that is not registered as a broker-dealer under Section 15(a) of the Exchange Act but, by reason of receipt of any such payments and the activities related thereto, is required to be so registered under applicable federal securities laws and SEA rules and regulations; or
>
> (2) any appropriately registered associated person unless such payment complies with all applicable federal securities laws, FINRA rules and SEA rules and regulations."

SEA Rule 17a-3(a)(19)(ii) further requires every member of a national securities exchange who transacts a business in securities directly with others than members of a national securities exchange, and every broker or dealer who transacts a business in securities through the medium of any such member, and every broker or dealer registered pursuant to section 15 of the Securities Exchange Act of 1934, as amended, shall make and keep current the following books and records relating to its business:

> "(i) As to each associated person listing each purchase and sale of a security attributable, for compensation purposes, to that

9

*associated person. The record shall include the amount of compensation if monetary and a description of the compensation if non-monetary. In lieu of making this record, a member, broker or dealer may elect to produce the required information promptly upon request of a representative of a securities regulatory authority.*

*(ii)   Of all agreements pertaining to the relationship between each associated person and the member, broker or dealer including a summary of each associated person's compensation arrangement or plan with the member, broker or dealer, including commission and concession schedules and, to the extent that compensation is based on factors other than remuneration per trade, the method by which the compensation is determined. [Emphasis Added]"*

By not being paid through a third party vendor that would require a written compensation arrangement, the Company - at its whim and discretion – had the ability to change such compensation arrangement and payment of commissions unilaterally and without a record.  Such practice is in clear violation of SEC law, FINRA rules, and Member Firm's Financial Compliance Manual.

### *Ms. Badgerow was Fired in Retaliation for Reporting this Conduct of Respondents to Member Firm in violation of Louisiana Law*

*Ms. Badgerow was wrongfully terminated by Company after reporting its unlawful conduct to Member Firm, who in turn notified the Company, which then fired Claimant for "dinging" the Company/Mr. Walter's perfect compliance record.  La. Rev. Stat. Ann. § 23:967, entitled "Employee protection from reprisal; prohibited practices; remedies" states:*

*"A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:*

*(1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.*

*(2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.*

*(3) Objects to or refuses to participate in an employment act or practice that is in violation of law.*

*B. An employee may commence a civil action in a district court where the violation occurred against any employer who engages in a practice prohibited by Subsection A of this Section. If the court finds the provisions of Subsection A of this Section have been violated, the plaintiff may recover from the employer damages, reasonable attorney fees, and court costs.*

*C. For the purposes of this Section, the following terms shall have the definitions ascribed below:*

*(1) "Reprisal" includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such.*

*(2) "Damages" include compensatory damages, back pay, benefits, reinstatement, reasonable attorney fees, and court costs resulting from the reprisal."*

Ms. Badgerow was fired in connection with her truthful statement to Member Firm that she was not being paid commissions by a third party vendor as required by Member Firm's policies. Such practice highlighted Company's violation of SEC, FINRA and SEA rules relating to compensation agreements with AFAs which require payment of commissions to through a third

party vendor to ensure that written records of kept of compensation agreements.  Company did not have a written record of Claimant's compensation agreement.  Such written agreement would have prevented the company from changing the compensation agreement at it whim after Claimant's first sale.

Member Firm reported Ms. Badgerow's statement to Respondent(s), and Claimant was subsequently terminated for "*dinging the perfect compliance record*" of the Company. Pursuant to the whistleblower statute, Ms. Badgerow is entitled to compensatory damages, back pay, benefits, reinstatement, reasonable attorneys fee and court costs as a result of Respondents conduct and Member Firms tacit participation therein.

### *Company Tortiously Interfered with Employment Agreement*

The Company's retaliation and termination of Ms. Badgerow was also an intentional and willful interference with Ms. Badgerow's Employment Agreement, which requires Ms. Badgerow to comply with certain financial policies of the Member Firm, including Section 4(A), Section 5(H), 6(B), and 6(G), in pertinent part, as follows:

Section 4 (A) of the Employment Agreement provides that Ms. Badgerow "must comply with the policies and procedures of Ameriprise Financial and all Federal, state, self-regulatory organization and local laws."

Section 5(H) provides that "Associate Financial Advisor understands that your employing or contracting Independent Advisor may reallocate his/her rights to compensation paid to the Independent Advisor by Ameriprise Financial in an outside agreement as long as: (a) any transfer be in accordance with then current Ameriprise Financial policies and procedures; (b) compensation is paid consistent with the then current Ameriprise Financial policies and procedures; (c) the Employment Agreement will be enforced among the Independent Advisor and Associate Financial Advisors and Ameriprise Financial will not be responsible to enforce or follow contested terms in such an agreement; and (d) any disagreements be handled by the parties without Ameriprise Financial involvement.

12

Section 6 (B) provides that "You agree to abide by all Federal and state securities and insurance laws. You further agree to abide by all rules and policies of Ameriprise Financial and an Affiliate or any associated company, including but not limited to all client privacy rules."

Section 6(G) provides, "You must review and abide by the provisions of the applicable Ameriprise Financial Compliance Manual."

By firing Ms. Badgerow for fulfilling her obligations to inform Member Firm of Company's practices under the Employment Agreement, the Company tortiously interfered with the Employment Agreement. Such termination was motivated by malice and in retaliation for Ms. Badgerow's reporting of the conduct to Member Firm.

***Associate Financial Advisor Agreement's Noncompete and Nonsolicitation Provisions Are Invalid and Company Tortiously Interfered With Claimant's Book of Business After Wrongful Termination in violation of Louisiana's Unfair Trade Practices & Consumer Protection Law ("LUPTA")***

The Employment Agreement includes an unlawful noncompete and nonsolicitation provision which Ms. Badgerow seeks a declarative ruling is not enforceable. and damages as a result of Company's improper statement to Claimant that she was prohibited from contacting her clients because of the invalid provisions. Such intentionally tortious conduct, in violation of the Louisiana Unfair Trade Practices Act ("LUPTA") has caused Claimant to sustain quantifiable damages as a result of the loss of her book of business that she spent 2.5 years building over the course of her employment with Company.

In Louisiana, the validity of non-competes and non-solicitation agreements is strictly controlled by a single statute and its interpretation and application by Louisiana courts. La. R.S. 23:921 provides, in part:

13

"C.      Any person, including a corporation and the individual shareholders of such corporation, who is employed as an agent, servant, or employee may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer within a specified parish or parishes, municipality or municipalities, or parts thereof, so long as the employer carries on a like business therein, not to exceed a period of two years from termination of employment. An independent contractor, whose work is performed pursuant to a written contract, may enter into an agreement to refrain from carrying on or engaging in a business similar to the business of the person with whom the independent contractor has contracted, on the same basis as if the independent contractor were an employee, for a period not to exceed two years from the date of the last work performed under the written contract."

Louisiana courts almost universally begin opinions on the subject with a statement that public policy disfavors these types of agreements. The stated justification for this public policy is the need to protect a working person from a contractual inability to support him or herself and to avoid the result of an otherwise capable employee becoming a public burden. Therefore, these agreements are strictly construed. Based on the language in subsection C on the geographic scope of a non-compete, most Louisiana circuits require the agreement to specify the restricted parish or parishes by name. The Employment Agreement Ms. Badgerow executed provides no such geographical list, and is therefore invalid under Louisiana law and would not be enforceable against Ms. Badgerow. However, Respondent Walters, after wrongfully terminating Ms. Badgerow told her the Employment Agreement prohibited her from keeping or contacting her clients, which intentional conduct tortuously interfered with Claimant's employment agreement with her current employer. Such conduct violates LUPTA which allows for treble damages, injunctive relief and attorneys' fees.

14

In *Gearheard v. Depuy Orthopedics, Inc.*, the United States District Court for the Eastern District of Louisiana specifically addressed the issue of what remedies are available to an employee or independent contractor when his employer has attempted to bind him to an unenforceable covenant not to compete.   In that case, the Court had voided the covenant not to compete between defendant DePuy Orthopaedic, Inc. ("DePuy") and Plaintiff Nall Gearheard pursuant to Louisiana Revised Statute 23:921.1  Then the court addressed the issue of whether Mr. Gearheard and his company could also recover damages for DePuy's violation of the public policy concluding that in fact the employee had a claim under L.A.-R.S. 51:1409(A) known as the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUPTA") and such cause of action could be maintained if plaintiff could prove the Company intentionally attempted to enforce an invalid noncompete and nonsolicitation agreement and such intentional conduct caused the employee to suffer damages.

## LUPTA

LUPTA provides, "[unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." LUPTA creates a cause of action available to "[any person who suffers any ascertainable loss of money or movable property ... as a result of the use or employment by another person of an unfair or deceptive method, act, or practice...." Id. "To be unfair the conduct must offend established public policy. Fraud, deceit and misrepresentation constitute deceptive practices. A defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition.

In the present case, Respondent Walters repeatedly told Claimant throughout her employment that she was subject to a noncompete and nonsolicitation agreement in violation of Louisiana public policy, for the specific purpose of deterring Claimant from leaving her employment.   Respondent Walters further threatened Claimant to refrain from contacting her clients upon her involuntary termination by the Company for the specific purpose of harming competition in violation of public policy and for the specific purpose of deterring Claimant from maintaining her book of business.

**Ameriprise Was a Joint Employer and is Jointly and Severally Liable for the Actions of Respondents and WMT**

Ms. Badgerow asserts that Ameriprise has the same degree of culpability for WMT's discriminatory actions and retaliatory conduct as Respondents and WMT and should be found to be a joint employer as a result of its direct and indirect conduct with Badgerow during her employment and its tacit participation in their actions.

Ms. Badgerow alleges that Ameriprise had interrelated operations with Respondents and WMT, regularly communicating with WMT for purposes of compliance with its policies and procedures. Ms. Badgerow alleges that Ameriprise was integrally involved in compliance with SEC and FINRA rules and regulations, including conducting annual compliance audits to ensure that employees who had worked for Respondents complied with certain requirements of Ameriprise's internal policies for all franchises. Further, Ms. Badgerow's termination came after a telephone conversation between Marc Cohen of Ameriprise and Greg Walters, a principal at WMT, where Cohen reported that Ms. Badgerow had stated WMT was not in compliance with Ameriprise's policies and procedures.[6] Ameriprise was informed on at least two occasions of the potentially discriminatory treatment faced by Ms. Badgerow, and was subsequently informed of Ms. Badgerow's termination directly after she reported this treatment to Marc Cohen and Ameriprise did absolutely nothing, alleging at all times to Ms. Badgerow that Ameriprise was not her employer and could do absolutely nothing to help her. But not only did Ameriprise do nothing, Ameriprise actually participated with Respondents in covering up the unlawful behavior by issuing to WMT and Respondents a vague and nonspecific "Letter of Deficiency" which is completely devoid of stating the unlawful behavior and compliance issues that were committed. Why did Ameriprise's letter give no details of what it knew? To further aid Respondents and WMT in perpetuating its illegal scheme.

---

[6] See attached Exhibit C and Exhibit D.

16

Sitting idly by and watching the illegal conduct of its franchise advisors and then helping to cover up such conduct, Ameriprise tacitly participated in all the conduct Ms. Badgerow alleges herein and in the Federal Complaint with regard to discrimination and other employment issues described herein. In addition to the other specific allegations asserted herein, Ms. Badgerow asks for this panel to find Ameriprise liable as a joint employer with Respondents.

### Relief Requested and Damages

Ms. Badgerow seeks a declaratory ruling that the noncompete and nonsolicitation provisions of the Employment Agreement are null and void in addition to compensatory and punitive damages, as follows:

1. Back pay from the Company in an amount to be determined based upon prior compensation and commissions, including $75,000 for the change in Ms. Badgerow's pay without a proper record of such compensation arrangement, as required by FINRA and SEC law.

2. Front pay damages for the period of time Claimant was unemployed together with damages in lieu of Claimant's right of reinstatement of her employment and loss of 401K matching benefits, in an amount to be determined based upon prior compensation and commissions and benefits, estimated to be $350,000 for a period of three (3) years from the date of termination.

3. Treble Damages under LUPTA in the amount of $1,125,000 for the Company and Respondent Walters tortiously interfering with Ms. Badgerow's book of business by instructing her she could not contact her clients or keep her book of business if she was ever terminated by Company even though such noncompete and nonsolicitation provisions of the Employment Agreement were invalid under Louisiana law.

4.     All attorneys' fees and costs relating to sustaining this action, which amounts shall be determined at conclusion, but total $55,000 to date.

5.   Any other amounts as may be determined after review of Ms. Badgerow's compensation and benefits, including any amounts for nonpayment of overtime wages earned under the Fair Labor Standards Act.

6. Badgerow seeks a declaratory judgment that Ameriprise's conduct in this matter created a Joint Employer relationship with WMT.

FINANCIAL INDUSTRY REGULATORY AUTHORITY

(FINRA)

**In the Matter of the Arbitration Between**

DENISE A. BADGEROW,
          Claimant


AMERIPRISE FINANCIAL SERVICES,
INC., THOMAS MEYER, GREGORY
WALTERS, AND RAY TROSCLAIR
          Respondents


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have served a copy of the foregoing *Second Amended and Restated Claim on behalf of Claimant, Denise A. Badgerow's,* upon the following via email and through the DR Portal on this 22nd day of June, 2018.

| | |
|---|---|
| Claude F. Reynaud, Jr.<br>BREAZEALE, SACHSE &<br>WILSON, LLP<br>P.O. Box 3197<br>Baton Rouge, LA 70821<br>Claude.Reynaud@bswllp.com<br>*Counsel for Gregory Walters, Ray*<br>*Trosclair and Walters, Meyer,*<br>*Trosclair & Associates* | Edward A. Walton<br>Melissa Raphan<br>Jack Sullivan<br>AMERIPRISE FINANCIAL SERVICES, INC.<br>Edward.a.walton@ampf.com<br>Raphan.Melissa@dorsev.com<br>sullivan.jack@dorsev.com<br>*On behalf of Ameriprise Financial Services, Inc.* |

Thomas A. Roberts
BRESSLER, AMERY & ROSS, P.C.
17 State Street,
New York, New York 10004
Troberts@bressler.com
*Counsel for Thomas J. Meyer*


s/ Amanda Butler

Amanda Butler

4837-4865-6747, v. 1

19

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

NO. 19-4752                                            DIVISION "M"

DENISE A. BADGEROW

VERSUS

GREG WALTERS, THOMAS MEYER, AND RAY TROSCLAIR

---

FILED                              DEPUTY CLERK

### NOTICE TO STATE COURT OF FILING OF NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that Greg Walters, Thomas Meyer, and Ray Trosclair, sought to be made Defendants in the above-captioned action, hereby advise this Court as required by 28 U.S.C. § 1446(d) that this matter has been removed to federal court; that in accordance with 28 U.S.C. § 1446(a) and (b), a true and correct copy of the Notice of Removal filed in the United States District Court for the Eastern District of Louisiana is attached as Exhibit "A"; and that copies of this Notice as well as the Notice of Removal are being served upon counsel for the Plaintiff.

Also in accordance with 28 U.S.C. §1446(d), the filing of the Notice of Removal immediately effects the removal of this action to federal district court and all further state-court proceedings in this action are stayed until and unless this case is remanded by order of the United States District Court.

BREAZEALE, SACHSE & WILSON, L.L.P.

By: _____
E. FREDRICK PREIS, JR. (LA BAR #10704)
EVE B. MASINTER (LA BAR #1218), T.A.
CLAUDE F. REYNAUD, JR. (LA BAR #11197)
MATTHEW M. MCCLUER (LA BAR #33970)
First Bank & Trust Tower, Suite 1500
909 Poydras Street
New Orleans, LA 70112-4004
Telephone: (504) 619-1800
Fax: (504) 584-5452
Email: Fred.Preis@bswllp.com
Email: Eve.Masinter@bswllp.com
Email: Claude.Reynaud@bswllp.com
Email: Matthew.McCluer@bswllp.com
*Attorneys for Greg Walters, Thomas Meyer, and Ray Trosclair*

EXHIBIT
D

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 13, 2019, I forwarded a copy of the above and foregoing pleading to all known counsel of record by email and by depositing a copy thereof, postage prepaid, in the United States mail, as follows:

Amanda Butler (abutler@lawgroup.biz)
Stephanie Dovalina (sdovalina@lawgroup.biz)
Business Law Group
700 Camp Street, Suite 405
New Orleans, LA 70130.

Eve B. Masinter

263088.1